UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO.04-10994NMG

PARENTS OF DANIELLE
Plaintiffs,

v.

MASSACHUSETTS DEPARTMENT OF
EDUCATION, DAVID P. DRISCOLL, COMMISSIONER;

And

SCHOOL COMMITTEE FOR
THE TOWN OF SHARON:
SAM LIAO, ANDREW NEGENAZHL,
DONALD GILLIGAN, JANE FURR, MITCH
BLAUSTEIN AND SUAZANNE PEYTON

Defendants.

_____

PARENTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT AS TO COUNT I

_____

*I. Overview of Issues Presented for De Novo Review and Relief*

Plaintiffs, *Parents of Danielle,* (referred to below as "*Parents*") have moved for summary judgment in regard to Count I of their Complaint. In so doing, they ask this court for a *de novo* review. They do so relying upon the findings of the state's agency, the *Bureau of Special Education Appeals* (referred to below as "*BSEA*" or "Agency"), as set forth in that Agency's two decisions. In short, they say that based upon the Agency's subsidiary findings, the ultimate findings and rulings constitute errors of law. *Ross v. Framingham Sch. Comm., 44 F. Supp.2d 104, 111 (D. Mass. 1999).* The record of the agency proceedings, and its findings, were previously filed. The two decisions appear here, attached and incorporated by reference.

Page 1 of 21

The *BSEA* considered three issues:

1.    Whether IEPs (Independent Education Plans) for March, 2003-March, 2004, provided Danielle with a free appropriate public education (FAPE) in the least restrictive environment (LRE).

2.    If not, whether accommodations or modifications to the program would provide a FAPE "in the LRE."

3.    If not, whether Danielle required an out of district day program at Landmark to achieve a FAPE "in the LRE."

*II. Summary of Parent's Position*

*Parents* respectfully urge that issue formulation, itself, manifests errors of law.  They also argue that the *BSEA* erred when it failed to order the implementation of the special education prescription found to be necessary: the *IEP* elements it determined to be required in order to provide a *FAPE;* and instead, permitted a lesser program in order to achieve a less restrictive environment, *(LRE).*

*Parents* further complain that based upon the fact findings and rulings, the Agency also committed error by ordering the creation of a new, untried program for Danielle, rather than requiring placement in an established, proven, and experienced program.  Instead of ordering her placement at the Landmark School (upon availability of an opening), the Agency ordered an as-yet non-existing program.  In that fashion, the Agency exposed her to an experimental program, which included delivery by at least one uncertified professional -- and exposed her to all of the risks attendant to that, including the loss of educational time, progress, and access to curriculum content.  In short, Danielle lost another year of learning.  *See Findings, below.*

Below, Plaintiff *Parents* argue that under current legal standards, Danielle was entitled to a *Free Appropriate Public Education.*  By that, they mean that under then-new, current legal standards, she was entitled to a certain quality of program.  She was entitled to that particular program which would provide all of the elements she needed, using the best instructional practices necessary to a full educational opportunity.  In other words, under those new standards, *Parents* say that Danielle was and remains entitled to the best instructional practices applicable to those educational elements, and all implemented in the fashion necessary to achieve the best education possible.  They argue that Sharon was obliged to provide that, irrespective of the learning environment in which it was available; and that the Hearing Officer was obliged to order that.  However, Sharon offered no such program, and the Hearing Officer ordered no such program. *Parents* therefore urge that neither Sharon, nor the Hearing Officer, were entitled to place Danielle in any program where those elements and methodologies did not exist; or where they were not likely to be provided to the same standards, or where they could not be provided to the same standards; or where they did not already exist in a proven, programmatic fashion for

similarly afflicted students. They argue that both Sharon, and the Hearing Officer, were obliged to protect Danielle from use of an unknown, unproven program delivered by one or more unqualified person; and to protect her from further loss of time through an educational experiment, where an identified program existed (and would be available to her either as a day student, or as a residential student.) *See cited authorities, below*

*Parents* also argue that the Hearing Officer's placement order was based upon speculation about whether their daughter would be as happy in a particular environment. However, there were no emotional or psychiatric issues, nor any evidence from any qualified mental health professional. The evidence was limited to the child's fears and anxiety about a change. Indeed, that evidence should have been excluded. as it was gained surreptitiously through clinical interview, without parental knowledge or consent.

The Hearing Officer determined that as yet, and for years, Danielle had not been provided a *FAPE*. She also determined that Landmark would provided a *FAPE*. The Hearing Officer found that the public school's own existing special program, LANGUAGE!, expressly included children with emotional issues, that would not provide a *FAPE*, and that would not provide the features required to constitute a *FAPE* for Danielle.

The Hearing Officer found that Sharon's *IEPs* did not provide Danielle with a free appropriate public education. She then considered whether the School's program might provide a *FAPE*, if accommodations or modifications were added. To that end, she permitted the school to try to create such a program, anew; but still required the school to forward applications to separate, specialized schools providing an out of district day program, with Landmark to be under continued consideration and discussion (including both its day and residential programs).

In addition to those issues identified above, *Parents* respectfully suggest that given the findings made, the Hearing Officer erred by entering a ruling consisting of disparate alternatives, giving Sharon the option of locating or creating an appropriate program. In so doing, the Hearing Officer allowed the *FAPE* to be reduced and mediated by the *LRE*, rather than give precedence to the *FAPE*. In that regard, Parents say the Hearing Officer erred. While the Hearing Officer relied upon *603 CMR 28.02, Parents* say that the regulation either does not conform to the required federal standard, as argued below; or must be construed and interpreted strictly according to the federal standard of "best" and according to its own, internal standard, requiring a program that will allow timely growth to "chronological age and developmental expectations, *[and]* the individual educational potential of the student, as argued below. *Id., (18)*.

*III. Relevant Facts Found by Agency - Initial Decision*

*A. Restatement Hearing Officer's Findings Regarding Objective Data (Testing):*

1.  Danielle is a thirteen year old 7th grader in Sharon, MA who is artistic, athletic, popular, and initially shy with peers. Danielle swims for the Y Team and also is a Pop-Warner

cheerleader. *Finding No. 1.*

2.   Danielle is diagnosed with dyslexia and a central auditory processing disorder (CAP-D).While she can apply phonics and structural analysis in her reading, she struggles to do so with automaticity, and displays many reversals in her spelling. Danielle also displays moderate delays in receptive and expressive language, sequencing and word retrieval, deficits in understanding inferential concepts, and weaknesses in her writing skills. Danielle also requires more time to process auditory information due to weaknesses in (both) auditory memory and reception of complex auditory information.  Parents felt that Danielle required a substantially separate language-based program.  The TEAM IEP proposed daily small group academic support in a resource room, speech therapy once a week, and academic support and accommodations in (mainstream) inclusion classes from a paraprofessional or speech and language pathologist, with small group participation in a sequential, rule-based reading/decoding program. *Finding No. 2.*

3.   Danielle began displaying reading difficulty in 1ˢᵗ grade (School Year 1997-1998). She also continued to have a difficult time staying focused and on track. In the middle of that year, Danielle began seeing a reading specialist three times a week  At the beginning of second grade (September 1, 1998) Father asked for a reading evaluation, and a core evaluation.  During second grade (SY 98-99) and early third grade (SY99-00) Danielle received informal support within the classroom from special needs and academic assistants. She also received support from the reading specialist three times a week, and accommodations.  However, Sharon did not formally evaluate Danielle, conduct a TEAM meeting, or provide Danielle with services pursuant to an IEP. *Finding No. 3.*

4.    After about two years of evaluations and special needs services, *Findings 4-27,* on May 13, 2002 Sharon administered the Woodcock Reading Mastery Test. Danielle had previously taken this test in November of the 4ᵗʰ grade. Now, Danielle was in the 5ᵗʰ grade. Testing showed that in a year and a half, her percentile ranks had dropped in every subtest. Specifically, Danielle dropped from the 32ⁿᵈ to the 5ᵗʰ percentile in word identification, from the 53ʳᵈ to 50ᵗʰ in word attack, from the 38ᵗʰ percentile to the 14ᵗʰ percentile in word comprehension, and from the 27ᵗʰ percentile to the 9ᵗʰ percentile in passage comprehension. Her basic skills cluster dropped from the 41ˢᵗ to the 14ᵗʰ percentile, reading comprehension cluster scores dropped from the 28ᵗʰ to the 11ᵗʰ percentile, and the total reading cluster dropped from the 34ᵗʰ to the 12ᵗʰ percentile. *Finding No. 28.*

5.    The TEAM reconvened on May 15, 2002 to review Danielle's progress and outside testing. As of May, 2002, Danielle was receiving a 84.5 average in math, was able to answer questions when called on, and was beginning to ask for clarification of concepts that she did not understand  Her 5ᵗʰ grade teacher also noted tremendous growth in Danielle's spelling and punctuation, and in her ability to express her ideas. She also noted Danielle's willingness to participate in class discussions and she noted that Danielle was well behaved, courteous, respectful and attentive.  Teachers noted that Danielle was highly motivated in class, well prepared, and well behaved, and that her confidence had blossomed that year demonstrating huge

growth over fourth and fifth grade. Teachers also found that Danielle's word attack skills were on grade level, and that she was able to succeed in understanding the curriculum texts, and could answer both concrete and literal questions. *Finding No. 29.*

6.    The special education teacher and SLP also noted that Danielle was more confident, was using the strategies more in small group, and was asking for help when she needed it. Sharon noted that Danielle was still guessing at some words but was now reading more for meaning and could, when redirected, go back and use the class supports. It also noted that making predictions still remained hard for Danielle, but that she was increasing her ability to do this. *Id., par. 2.*

7.    The TEAM did not discuss the Woodcock Mastery testing done two days previously, nor did it compare those scores to testing done the year before. As a compromise, Sharon proposed the language-based program at the Sharon Middle School. Its description reads

> The Alternative Learning Program…, previously titled the Language Based Program, provides services for students with special needs who are having difficulty succeeding in the regular education setting with typical accommodations and modifications. These students receive more academic support, and receive more modified services than other students receiving special education at Sharon Middle School. The program is designed as an inclusion program. Students in the program are able to succeed while spending the majority of their time in the regular education setting. The placement is inappropriate for any child who needs a self contained academic model in order to achieve academic success. The program is designed for students who have …learning issues, emotional issues, or a combination of the two. Many of the students have language based learning disabilities and receive supports that cater to this specific need… . The goals for the program are to provide academic success for students and *[to then]* reintegrate them into the regular education classroom environment with as little support as necessary to succeed. *Findings Nos. 29, 30, and J54.*

8.    Ms. Pearlstein noted that Danielle had made a smooth transition to middle school with respect to changing classes, manipulating the rotating schedule, and getting to all her classes in a timely fashion. She also noted that Danielle participated well when called on, and appeared to be happy and socially accepted by her peers, and seemed to enjoy her new school. *Finding No. 41.*

9.    Danielle's estimated academic ability as measured by the Woodcock-Johnson III spanned mostly within the average to low average range with average math skills and low average scores in reading comprehension, vocabulary, and word identification subtests, with variation of scores in the related subtests of Letter-Word Identification and Word Attack suggesting inconsistency in Danielle's ability to decode words. Two evaluators found that Danielle could apply phonics and structural word analysis, but struggled with their automatic application, requiring additional time to read text succinctly with correct phrasing and pronunciation. One noted that Danielle's low scores in the Reading Comprehension subtest

suggested some difficulty with inferential comprehension. Danielle's spelling, punctuation and writing fluency skills were in the average range with above average scores in the writing fluency subtest. Oral Language skills (Story Recall, Understanding Directions, Picture Vocabulary, Oral Comprehension and Sound Awareness) were all in the low average range. When this November 2003 testing was compared with previous testing done in May, 2002, Danielle showed growth in her word attack skills going from the 5th to the 18th percentile. She also showed growth in her basic skills increasing from the 14th percentile to the 30th percentile and increasing from the 11th percentile to the 19th percentile. These scores were all still lower than her Woodcock Reading Mastery scores of November 2000. *Id.*

10.    On July 12, 2003 Danielle underwent a private psychological evaluation by Gina-Marie Bonanno in support of her admission to Landmark. Ms. Bonanno conducted a clinical interview and a mental status exam, and made behavioral observations of Danielle. She also administered the Cole Animal test, the Three Wishes test, and looked at an informal writing sample. Ms. Bonanno also administered the WISC-III, considered to be valid indicators of Danielle's intellectual ability. Ms. Bonanno also reviewed independent evaluations, interviewed the educational advocate and Parents, and reviewed school records. She did not, however, talk to anyone from the school or observe programs. Danielle was reserved and shy and did not participate in spontaneous conversation but did answer all the questions that Ms. Bonanno asked. She required extra time to process information and did not always ask to have the examiner repeat questions. Some of the questions, however, were multi-step instructions. Danielle achieved a WISC verbal IQ score of 97 with a performance IQ score of 116 (Full Scale 106). Previous testing on the WISC done by Sharon in 1999 show a Full Scale score of 100 with a verbal IQ of 104 and a Performance IQ of 96, indicating growth. The results of subtests (*i.e.,* comprehension, vocabulary) indicate that all of Danielle's verbal scores were in the average range, except for those subtests that required auditory attention and reception. Danielle's long term memory skills were in the average range. However, she displayed weaknesses in receiving short-term memory information which directly impacted her ability to comprehend messages that were complex. The private evaluator concluded that Danielle would have difficulty in a general learning situation because the majority of educational instruction involves some form of verbal learning. As such, Ms. Bonanno recommended that Danielle participate in a highly structured multi-sensory language based program that incorporates specialized instruction and a specialized reading program. She also recommended that the program incorporate extra time, brainstorming strategies, and graphic organizers for written tasks; to allow for repetition, clarification and review; to pair written and verbal instruction; teach sequencing strategies, and to use techniques such as chunking, visual imagery, and mnemonic devices to improve word retrieval skills. *Finding No. 47.*

11.    On August 22, 2003 Landmark conducted an admission screening battery Landmark administered the Lindamood Auditory Conceptualization Test, the Woodcock Reading Mastery Test-Revised (WRMT-R) word identification and word attack subtests, the Gray Oral Reading Test-III (GORT), the Kaufman Test of Educational Achievement (KTEA), the Berea Visual-Motor Gestalt (BEREA) and the Detroit Test of Learning Aptitude-2 (DTLA-2) Word Sequences and Oral Directions subtests, and a Landmark informal writing sample. Danielle

achieved 4th percentile on the DTLA-2 Word Sequences subtest, dropping from 37th percentile when Sharon administered the test in November 1999. She achieved a 37th percentile on the Oral Directions subtest of the DTLA . On the WRMT-R Danielle achieved 7th percentile on the word identification subtest. On previous testing by Sharon in May 2002 Danielle achieved 5th percentile. She scored in the 25th percentile on the word attack subtest, where, when tested by Sharon in May 2000, she had performed in the 50[th]percentile on this test. *Finding No. 48, par. 1.*

12.    On the GORT passage reading subtest, Danielle's rate scored at the 9th percentile (SS 6), with an accuracy rate at the 2nd percentile (SS 4) and a passage score in the 1st percentile (SS 3). Testing by Dr. Kemper done in February 2002 showed SS of 4 in rate and accuracy with a passage score of 3, scores higher than Landmark's more recent entrance testing. She scored in the mid 2nd grade range in auditory perception of speech sounds and scored in the 10th percentile in spelling on the KTEA, a grade equivalent of 3.8. *Id., par. 2.*

13.    Landmark did not admit Danielle for the 2003-2004 school year because it did not have an opening due to lack of staff to teach the individual tutorial. However, Danielle was eligible for admission and fit the profile of many of the students there, although none would be at a lower reading level. *Finding No. 49.*

14.    Danielle began 7th grade at the Sharon Middle School in September 2003. She received an updated psycholinguist reevaluation from Dr. Kemper on September 5, 2003. Dr. Kemper readministered the tests that he gave Danielle in February 2002 in order to compare scores and draw conclusions regarding whether Danielle had made gains since February 2002. Dr. Kemper found that Danielle made few, if any, gains in decoding, reading fluency, reading comprehension, writing, and spelling. However, Dr. Kemper also acknowledged that some or all of Danielle's scores may be indicative of regression over the summer. However, he continued to believe that Danielle had a greatly impaired ability to become a competent reader and achieve success in meeting a 7th grade curriculum due to deficits in phonological awareness, memory and rapid naming skills, only showing a comfortable reading level in the mid-2[nd] to mid- 3rd grade level, oral reading fluency at the 2nd grade level, and reading comprehension at a third grade level. Dr. Kemper continued to recommend a substantially separate language based program that incorporates the Fast Forward computer program (to address language processing), LiPs, and Project Read. Although Dr. Kemper feels that these are the best methodologies, there are other methodologies that can accomplish the same goals. *Finding No. 52.*

15.    On September 13, 2003 Danielle received an updated Central Auditory Processing evaluation from an audiologist, Ms. Shubow  Danielle did show improvement in her hearing acuity. She also showed improvement in her auditory processing when compared to her previous audiological testing done in February 2000. Much of her improvement in auditory processing is attributable to neurological maturation of the auditory system.   However even with testing done under ideal listening conditions in a sound proof room, Danielle continued to display mild difficulty processing complex auditory information, displaying more difficulty with longer tasks. She also continued to have difficulty accurately comprehending speech which was presented with competing background noise. This difficulty would be exacerbated in a classroom setting where ambient noises fluctuate through the day resulting in varied attention over the course of the day or from day to day.   In addition, Danielle's language-based learning difficulties combined with her auditory processing deficits, all put Danielle at continued risk for inaccurately perceiving

Page 7 of  21

auditory information in a classroom setting. This was especially true in situations where information is presented in a noisy background or is presented quickly or contains multiple parts or unfamiliar language concepts. Ms. Shubow recommended a setting that has a structured, stable, and supportive environment where goals, expectations, and time frames are clear, and where extra time is given to process the information given. She also reiterated the educational modifications made in February, 2000. (However, she no longer recommended an auditory trainer due to Danielle's neurological auditory maturation.) Ms. Shubow noted that her recommendations could be implemented in a public school setting. However, such implementation would be more difficult due to larger class size. *Finding No. 54.*

### B. Hearing Officer's Ultimate Findings

15.    The IEP on its face is inappropriate. It does not address Danielle's difficulty comprehending mathematical word problems that Sharon agrees would be beneficial for Danielle. Danielle is now beginning to use the computer and Inspiration software (recommended by Sharon in June, 2000) to assist in writing, but she is not encouraged to consistently use the technology that Sharon and Ms. Shubow (the audiologist) recommend for her to use at school and at home. The IEP also does not include the Fast Forward and LindaMood Bell programs which Ms. Shubow recommends to address auditory processing deficits, and consultation is not included on the IEP. *Ruling (II) par. 3.*

16.    Sharon's own testing shows that Danielle decodes inefficiently on materials at or above a 5th grade level and continues to have deficits in reading comprehension. Woodcock Reading Mastery testing done in May 2002 (5th grade) show significant percentile drops in all subtests done a year and a half earlier (November 2001), dropping from the 41st to the 14th percentile in basic skills, from the 28th to the 11th percentile in reading comprehension, and from the 34th to the 12th percentile in total reading skills.

17.    Although Sharon's testing done in March, 2003 show that her basic skills increased from the 14th to the 30th percentile, this percentage is still significantly below her 41st percentile rank in November 2001. In addition, Sharon's testing of Danielle's written expression, using identical tests (WIAT written expression subtest), show a drop from the 61st percentile in November, 1999 to the 47th percentile in March 2003. *Id., par. 4.*

18.    Danielle requires an extended year program. Her school work shows that she is able, with teacher assistance, to focus in class, and has been able to make use of Ms. Lanzel's assistance in previewing and reviewing class material. However, Landmark's admission testing shows percentile drops when compared to Sharon's testing, indicating a failure to generalize the information she learned, or substantial regression, requiring an extended year program. *Id.*

19.    The current program is also inappropriate because Ms. Reeves (the Speech/Language Pathologist) only attends one social studies and two of Danielle's English classes despite testimony that Danielle needs frequent checking to ensure that she remains on task. Ms. Reeves works on recall and retrieval but does not address breaking down language to make it accessible for Danielle because Ms. Lanzel covers those issues. Ms. Lanzel works with

Page 8 of 21

the teachers to modify class material. However, Ms. Lanzel is not in her classes, instead sending a paraprofessional to cover English. No evidence was offered regarding Ms. Lanzel's work with the paraprofessional to break down the language to ensure Danielle's comprehension or monitoring of the paraprofessional to ensure compliance with the IEP. *Id., par. 5.*

20.    The science website, although excellent, has content that has not been made language-based and as such, is not fully accessible for Danielle. *Id.*

21.    Although the LANGUAGE! program provides the small group phonics based on instruction recommended by the private audiologist and private psycholinguist (licensed as a speech and language pathologist), it is only provided twice a week instead of being provided daily, contrary to the program's own instructions. *Id.*

22.    A day placement at Landmark is inappropriate based only upon commuting issues, and a residential placement at Landmark is inappropriate based on questions about Danielle's motivation to attend, and because Sharon did not explore local day programs.. *Id., pars. 6 and 7;*

*C. Initial Rulings after Hearing*

23.    The Hearing Officer entered an alternative ruling. She ordered Sharon to locate *or* create an appropriate language-based program. At the time, no existing program was offered or provided to Danielle.

24.    The Hearing Officer also ordered Sharon to send applications for admission to the South Shore Collaborative's Intermediate LD program in Randolph, MA, and to any other language-based day programs in the Southeastern Massachusetts, Rhode Island or the Metro-West area which service cognitively average- to- above average middle school students with dyslexia and Central Auditory Processing-D.

25.    In addition, the Hearing Officer ordered Sharon (under Special Education Hearing Rule 9 B12) to hire an independent evaluator (to be approved by the Hearing Officer) to observe both Sharon's own program and the South Shore Collaborative program, to speak to Danielle about all options, including Landmark, *[emphasis added],* and to report to the Hearing Officer and to the Parties.

26.    The Hearing Officewr deferred a decision about placement at Landmark, the school requested by parents. In her rationale, she explained that while Landmark is a language-based program with a good reputation and a charming and personable staff, she considered both its distance (reportedly beyond an hour), Danielle's lack of motivation to wake up early enough to attend as a day student, Danielle's preference not to leave her activities and friends and her alleged shyness, and, as well, Sharon's failure to explore closer, less restrictive day programs. In regard to Danielle's feelings, the Hearing Officer relied upon an evaluation/clinical interview of Danielle which had been done without parental knowledge or permission, and which had not been disclosed to parents until *BSEA* discovery, long after the

Page 9 of  21

fact.

27.    Still, the Hearing Office identified a residential placement at Landmark as an appropriate academic placement to provide a *Free Appropriate Public Education*. She also ordered Sharon to locate or create a language-based summer program which included use of particular software programs such as Fast Forward and/or LiPs instruction.  The Hearing Officer also ordered Sharon to locate or create a language based program that provided the agreed-upon special education support with math word problems during the school year, to provide consultation from Danielle's special education providers, and to provide daily phonics-based instruction in reading and writing.

28.    The independent evaluator was ordered to discuss Landmark with Danielle. As well, the independent evaluator was ordered to view Sharon's current program as well as the South Shore Collaborative program, and to report to the Hearing Officer and to the Parties, with the hearing to be reconvened after receipt of the report to consider the independent evaluator's recommendations.

29.    In reaching these findings and rulings, the Hearing Officer identified the issues to be whether the program and services that Sharon's IEP offered Danielle at the Sharon Middle School provided a free appropriate public education (FAPE) in the least restrictive environment (LRE), and whether Sharon failed to implement accepted speech/language therapy services and if so, whether Parents' should be reimbursed for privately retaining those services:

D. *Final Decision April, 2004: Relevant Findings*

After taking further evidence from the independent evaluator,  the Hearing Officer found that

30.    Danielle was comfortable and happy in the school environment in Sharon.  She participated in some, not all, of her classes by raising her hand; spoke about liking some of her classes, talked to students in the hall and appeared incredibly well organized and motivated.

31.    There may be benefits to placing Danielle in a more specialized, language immersion program.  However, there was concern about the costs to Danielle socially and academically if she were to be moved from the current setting based upon her current comfort and happiness in school.

32.    A three-hour round trip commute to and from Landmark, or boarding at the Landmark residential middle school program, would not be emotionally advantageous for Danielle.

33.    Danielle did not require an out of district program in order to have an effective educational program because her current program could be modified to meet her needs . Further, Danielle's progress could be monitored through consultation and through the ongoing

Page 10 of  21

assessment.

34.    Danielle could be provided appropriate reading services by an existing teacher, although that teacher was not certified in the program to be administered.

35.    [Contrary to the content of the initial decision, or based upon commuting,] now, a Landmark placement was not found to be an appropriate placement for the school year, [but as expressed in the initial decision, it was not yet able to accept Danielle based upon its own staffing.] In her initial decision, the Hearing Officer had found Landmark to be appropriate, and now, still found it appropriate as the summer component of an extended year program, to extend Danielle's program during the summer.

*IV.  Argument under Applicable Law*

 *A. Relationship between FAPE and LRE:  Pursuet to IDEA and NCLB the FAPE determines the LRE - not Vice Versa*

Danielle is protected both under the *IDEA, 20 USC 1400 et seq.* and under the *NCLB, PL 107 110 (2002) amending 20 USC 2701 et seq. and IDEA, etc.*  At issue is the relationship between a *FAPE* and an *LRE*.  Their relationship has been expressly determined under these statutes, as set forth in applicable updated regulations.  In particular, where the a *FAPE* appears to be in conflict with "the *LRE*," the regulations set out how competing interests are prioritized, and how they are to be resolved.

*34 CFR 300.121* at 300.123 expressly sets out the goal incumbent upon each state and school system for each disabled child between birth and age 21.  That goal is "full educational opportunity."  "Full educational opportunity" is given neither limitation nor exception.  As a goal, it is expressly the responsibility of *both* the state and the individual school system.

*34CFR300.550 (b)* then provides the standard under which a child may be removed from regular classes.  It provides that where

> the nature or severity of the disability is such that education in regular classes, even with the use of supplementary aids and service, cannot be achieved satisfactorily

a student will be educated in special classes, or separate schooling which is removed from the regular educational environment.

Taken together, these provisions demonstrate the functional relationship between a *FAPE* and an *LRE*.  They are not equal, competing legal standards.  They are not equal, competing requirements or considerations.  The *FAPE* is the first priority.  It must be served first.  It must be fully satisfied first.  Only once the educational prescription has been determined, and its elements

Page 11 of 21

defined, can that be satisfied. Only once the educational prescription has been fully identified and structured, *i.e.* by way of an *IEP,* does the next issue arise.

### B. Where a Preferred LRE would Compromise the FAPE, the LRE is not Permitted

Only once the *IEP* elements are determined does *LRE* arises as a question: what is the least restrictive environment in which the education prescription can be successfully delivered? It is the educational prescription, the *IEP,* which drives the *LRE,* not vice versa. It is the *IEP* which drives the *LRE.* The *LRE* must be subservient to the *FAPE.* Choices between *LREs* do not exist, as a matter of law, unless the particular *FAPE* can be provided without compromise of quality in more than one learning environment. Only then may the learning environments be compared, with the requirement that the *FAPE* be provided in the least restrictive placement -- but only as between those environments which provide the same programmatic elements, to the same quality. The *FAPE* may not be sacrificed for the *LRE,* but the *LRE* must be sacrificed for the *FAPE (*assuming parental consent) *34 CFR 300.552 (d).*

*34 CFR 300.552 (d)* expressly provides the standard by which an *LRE* is to be determined. In regard to the content of the *FAPE,* determination of the *LRE* must be determined both with attention to the "... potential harmful effect on the child" or to the "... potential harmful effect... on the quality of services that he or she needs...," all as those services are identified to constitute the required elements of the the the *FAPE.* This is expressly pursuant to *20 U.S.C. 1412(a)(5),* which authorizes greater restriction of the environment

> when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. *Id.*

The test is a two pronged test, to be applied in the alternative. First, attention must be given to whether there is evidence of a potential harmful effect on the child. If there is no evidence of such a risk, then the second tier of the test is applied: potential harmful effect on the quality of services needed

Ergo, under *34 CFR 300.552 (d),* where there is no evidence of potential harm to a child by an *LRE ,* the issue turns to which *LRE* will deliver the *IEP* elements with the least compromise of quality and effectiveness. Given more than one learning environment, if a placement in a particular, less restrictive, learning environment would directly harm the quality of services needed by the child, or their effectiveness, that particular learning environment is not a permitted option. The regulation requires and provides that where the required educational program cannot be achieved as effectively in a lesser-restricted environment, including regular classes, the child must be educated in special classes or separate schooling removed from the regular educational environment - and as between those, in that environment which will optimize the quality of the special educational elements. The only exception is where there is a potential for harm otherwise. *Id.* In the instant matter, the *Agency* did otherwise. While specifically

finding that a program in the public school's learning environment lacked the required *IEP* elements, lacked efficacy, and lacked teacher certification, nonetheless, it allowed the proposed placement. (Landmark staffing did not allow for acceptance mid-year, but was anticipated to be sufficient for the school cycle next following the *BSEA's* final decision in April, beginning with the summer session, and indeed, following that, the Hearing Officer required Danielle to be enrolled in Landmark's summer session.)

   *C. By Federal Regulation, Learning Environment May Not Be Reduced based on Child's Popularity, Recreation, or Shyness, and Must Provide Direct Curriculum Content Instruction in the Child's Communication Mode to assure Educational Progress*

   The Hearing Officer finally ordered a public school learning environment, doing so based on "concern" about Danielle's social life, athletic activities, shyness, and recreational activities, and without attention to the regulatory requirements discussed above. Those do permit the Hearing Officer to consider potential harm beyond educational efficacy and elements. However, the regulations directly address the relationship between such "potential harm," and any non-academic and social considerations, and prescribe how those must be considered. By regulation, only once a student's academic and educational needs are met may programming efforts then go on to consider and provide for a child's non-academic and extracurricular services and activities with non-disabled children. Only then may placement be in a less restrictive learning environment. Only then may the environmental restrictions be reduced (if restrictions they be). However, by regulation, the environment may be reduced only "to the maximum extent appropriate to the needs of that child." *34 CFR 300.553*. Again, proven, demonstrable, determined needs come first, and control such considerations. Anything less than a (proven) "need" may not be considered.

   In this instance, the Hearing Officer found that in such a placement as the public school, in some instances, Danielle had already fallen further and further behind. The Hearing Officer found that even in areas of some recent improvement, Danielle still had not recovered earlier performance levels (based upon percentiles disclosed by regular testing). With these findings, such an *LRE* was proven to be inadequate, and therefore, inappropriate to the requisite *FAPE* and its elements. Therefore, the regulations preclude such a placement. Given demonstrated impairment of the *FAPE* and its elements, the demonstrated failure of the educational program to restore Danielle to recovery of earlier performance levels, and its demonstrated failure to advance her beyond those, such an *LRE* was simply not a legally available option.

   Under *34 CFR 300.123*, the "harm" test is limited in its application. It applies only to the educational elements prescribed to address the nature and severity of the disability. The regulation expressly provides that the *FAPE* must be determined based upon the child's identified disabilities, and their nature and severity. No other elements may be considered by the *FAPE*, nor included in it. Therefore, where other considerations may be tempting, they are simply not permitted unless they reflect the specifically identified disabilities, and the consequent education and service needs, *infra*; or unless their consideration will not compromise the

program elements necessary to maximize education in the context of those disabilities. The only exception would require findings that there are other needs which must be met in order to avert other, overriding, potential harm. Clearly, to compromise the requisite educational prescription, there must be more potential for non-academic harm than mere speculation, mere concern, mere preference, or mere shyness.

The regulations also require that the *FAPE* address more than a student's disability, *per se*. To comply, the educational program and services provided to children such as Danielle must "address all of the child's identified special education and related services needs *34 CFR 300.300 (3)(i)*. Again, the *FAPE* must come first. It must address *all* of the student's identified special education needs. None of those needs may be sacrificed to an *LRE*. The *FAPE* must be driven by the student's unique needs - his or her individual *special* education needs. Such issues as popularity are not among "identified special education and related services needs." Therefore, such a consideration is impermissible. Under *34 CFR 300.300(3)(ii)*, the *FAPE*, and therefore, the *IEP*, must first serve the student's unique special education needs (which result from the disability) so that there is "full educational opportunity." It may not serve the disability alone. In order to achieve such "full educational opportunity," placement in a residential program is expressly permitted, if necessary to achieve that full educational opportunity. *S. 300.302, s. 300.304.* In short, "full educational opportunity" may not be compromised by social, recreational, or avocational interests, unless those are a function themselves of recognized disabilities which bespeak special education needs warranting response.

The regulations expressly recognize the issue of communication. They provide that an *IEP*, and therefore, a *FAPE*, must take into account a child's communication needs. *S. 300.346 (2) (iv)* requires that communication be fully addressed, without exception, to achieve the required full educational opportunity. In turn that must include "... opportunity for direct instruction in the child''s communication mode" to avert "the effect of that communication mode and the effect of the disability on progress." The *FAPE*, through the *IEP*, must not only identify how the student's disability effects her involvement and progress in the general curriculum *s. 300.347 (a) (1) (i)*. It must also provide direct instruction in academic content areas that will provide a full educational opportunity to the content area, and provide a full opportunity to learn the material being taught, as it is being taught. Recognition of the communication needs, alone, is not sufficient. Therapy for the communication disabilities, alone, is not sufficient The *FAPE* and *IEP* must provide for them, and must "address all of the child's identified special education and related services needs *34 CFR 300.300 (3)(i)*. Therefore, where a student's communication modes are compromised by placement in a learning environment, and where the student's disability effects her progress acquiring the knowledge and skills taught in the general curriculum, placement in a more restrictive environment is not only permissible, but is warranted *S. 300.347 (a) (1) (i)* (unless parents do not consent.) in order to allow the child full opportunity to gain the education that is delivered by the curriculum. Only that, in turn, may be to "satisfactory" levels.

In the instant matter, both the Hearing Officer and the school, expressly compromised the

*FAPE.* They compromised both its elements, and the environment necessary to enable and enhance Danielle's expressive and receptive communication - her most essential tools. Indeed, those were the areas of her greatest need, given her Central Auditory Processing disorder. Yet, School and Hearing Officer sacrificed such issues to social concerns. They did so specifically based upon Danielle's happiness and popularity in her then-current school placement. However, nowhere do the Agency Findings disclose any professional evidence concerning any specific risk of psychological, psychiatric, emotional, or behavioral harm to Danielle in the event of an educational relocation, nor was there any evidence adduced that there were any related special education diagnoses or needs. Similarly, there are no Findings that there was any significant likelihood of any such harm. References to such issues were limited to "concern" and the like - to mere speculation, and no more. Significantly, no such concern arose from any identified or diagnosed disability, impairment, or condition; nor did any such concern arise from any professionally identified need. In short, the *FAPE* was compromised on nothing more than a teenagers' understandable enjoyment of her popularity. Indeed, the Hearing Officer's order specifically provided that there would be on-going discussion with Danielle about attending the Landmark School, presumably for the purposes of engaging her greater interest or increased willingness. However, that too, was unnecessary: the Hearing Officer found that Danielle *was* willing to try Landmark.

Further, as between the identified, available *LREs* with *existing* programs, Landmark was identified as the only *LRE* which would provide an established, proven, non-experimental placement and program. It was the only one where curriculum material would be directly communicated in the fashion necessary to assure that Danielle could and would access the content of the curriculum information being taught, and that she would and could manipulate it through the learning process. Among the identified programs, it, alone, offered the special elements and program in an effective fashion, and it was the only *LRE* that would not expose Danielle to direct involvement with a population of children who were receiving services due to primary emotional or behavioral diagnoses. Certainly, it would better serve Danielle's education and special needs to place her in a program where she would not be exposed to emotionally disturbed or behaviorally disordered children, and where her educational efforts would not be distracted or diluted by the psychiatric, psychological, or behavioral needs of other students.

While the hearing officer gave consideration to "concerns" about social life, shyness, and avocational interests, she gave no consideration to the risks of exposing Danielle to an emotionally disturbed or behaviorally disordered population. Those risks - learning bad behavior or sick thinking, are the very risks associated with the more classical forms of institutionalization, such as mental health facilities and prisons. The legal history of *LRE* arises from the issues of institutionalization in a mental health institution (*Olmstead, below).* However, the issue and risks becomes slightly different in the context of placement in a learning disability environment. Isn't the environment more restrictive when it is populated by students who suffer mental health diagnosis, where the environment is a program designed to directly treat those diagnoses (as described in LANGUAGE! (J54)). Isn't that more restrictive than a program designed exclusively for mentally healthy learning disabled students who are grouped together

Page 15 of 21

for more effective teaching and learning, free of exposure to mental illness and its therapeutic interventions? Doesn't the presence of such mental illness and programmatic interventions compromise the education of a child who has no such needs?

In the matter at bar, there is a conflict. Should social life be the deciding factor, or should efficacy of education be the deciding factor? Should freedom from a mentally ill or mentally disturbed population control placement, or should (minor) distance, travel, or dormitory-style campus living be averted? The above-cited regulations do not provide clear answers to all of those competing issues. However, where there is a conflict between which should be accorded priority as between social life and efficacy of the learning environment, the above-cited regulations do provide a clear answer: efficacy of the learning environment must and should come first, absent some other potential for harm. Social life is the most easily replicated and exchanged circumstance, compared to efficacy of learning environment, and freedom from bad behavior and sick thinking.

Similarly, where, as here, there is a communication issue, the regulations clearly answer whether *LRE* is an equal consideration, or whether communication of curriculum content comes first. A "full educational opportunity" requires that curriculum content be taught by direct instruction in the child's communication mode, S. *300.346 (2) (iv)*. That instruction, and the program, must be sufficiently pervasive to by-pass the effect of the communication mode and the effect of the disability on a child's progress. Therefore, where an available program provides such features, it must be chosen over the *LRE* which does not. In short, the design of Sharon's program would not and could not provide the necessary communication mode in a consistent fashion throughout content area classes. The Landmark program would do so. Therefore, *LRE* could not be reached as an issue.

*D. State Regulation, Interpreted Consistently with Federal Regulations, Require the Same Outcome*

Under *603 CMR 28.02,* Danielle's *IEP* was required to provide for any and all sensory impairment, and its sequelae, including but not limited to:

> ...(d) 1. Hearing. The capacity to hear, with amplification, is limited, impaired, or absent and results in one or more of the following: reduced performance in hearing acuity tasks; difficulty with oral communication; and/or difficulty in understanding auditorally-presented information in the education environment. The term includes students who are deaf and students who are hard of -hearing.
>
> (e) Neurological Impairment. The capacity of the nervous system is limited or impaired with difficulties exhibited in one or more of the following areas: the use of memory, the control and use of cognitive functioning, sensory and motor skills, speech, language, organizational skills, information processing, affect, social skills, or basic life functions. The term includes students who have received a

traumatic brain injury.

and resulting or independent communication limitations and issues:

> (g) Communication Impairment. The capacity to use expressive and/or receptive language is significantly limited, impaired, or delayed and is exhibited by difficulties in one or more of the following areas: speech, such as articulation and/or voice; conveying, understanding, or using spoken, written, or symbolic language. The term may include a student with impaired articulation, stuttering, language impairment, or voice impairment if such impairment adversely affects the student's educational performance. *Id at (g)*.

including where identified as a specific learning disability:

> (j) Specific Learning Disability. The term means a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in an imperfect ability to listen, think speak, read, write, spell, or to do mathematical calculations. Use of the term shall meet all federal requirements given in federal law at *34 C.F.R. §§ 300.7(c)(10)* and *300.541*.

In those instances, a child's program and placement requires a structure that will provide for "documented growth in the acquisition of knowledge and skills...according to the chronological age and expectations, the individual educational potential of the child and the learning standards set forth in the ...curriculum... *603 CMR 28.02 (18)*. The Hearing Officer's findings documented the effects and results of Sharon's program and placement to be just to the contrary. Therefore, whether viewed from the perspective of state regulations or from the perspective of federal regulations, the result is the same.

> ### E. Controlling Federal Case Law and Statute Warrant the Same Outcome

The current issue of *LRE* arises from *Olmstead et als v. L.C., 527 U.S. 581 (1999)*. That concerned involuntary mental health institutionalization, where the patient's diagnosed clinical needs did not require institutionalization. *Olmstead* construed language of the *Americans with Disabilities Act,* the *ADA, Title 1, s. 12132,* which provided:

> Subject to the provisions of this subchapter, no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

Therefore, the issue is limited to involuntary institutionalization, *i.e.* for mental health treatment. Where the clinical placement is unnecessary to achieve treatment, it is not permitted on an

involuntary basis. *Olmstead* considered that to be discriminatory. It concerned imposition of such discrimination (such involuntary institutionalization) by an arm of government. However, in the case at bar, the residential placement is a voluntary choice proposed by parents, and agreed-upon by the student *who was found to be willing to try it.* In the case at bar, the issue is not *LRE, per se.* It is more akin to parental choice between treatment alternatives than to involuntary institutionalization. That is especially so since the Landmark experience cannot be said to mimic involuntary hospitalization, but rather to mimic a college campus. In that context, there is no issue of an involuntary placement, and there is no dispute that the placement would provide the more efficacious educational "treatment." In the instant matter, there is no issue of mental health diagnosis or treatment, except in the program and placement advanced by Sharon. There is no issue concerning an arm of government imposing institutionalization, or any restrictive environment beyond that sought by Parents, and agreed upon by the child, herself.

    *F. Same Continued: The Hearing Officer's Decision and Rulings Violate "No Child Left Behind Act"*

    Long after *Olmstead,* Congress enacted the *No Child Left Behind Act, PL 107-110 of 2002 (115 Stat. 1425).* That generally effected multiple titles of the *ESEA.* By its terms, it sets out to ensure that every school provides the best possible education to each student, expressly including both academic content and academic achievement. Contrary to that new standard, in the instant matter, both the Sharon and the Hearing Officer expressly compromised Danielle's access to academic content, achievement, and progress. Those were sacrificed to issues which had no relationship to any diagnosed impairment or disability, or to any identified special education need. *Fed Reg 68698 (FR December 9, 2003 (Volume 68, Number 236).) Id., 68704.*

    The State, School, and Hearing Officer, were all obliged to ensure objective achievement testing standards. The purpose of those standards is, in turn, to reflect the instructional standard: best instructional practices known for students with the most significant cognitive disabilities. *Id. 68707* such as Danielle (see *603 CMR 28.02 (e)).* The terms of *S. 200.13 (c) (2) (iii) and S. 20013 (c) (4) (i)-(iii)* require accountability for these through the executive branches of government, requiring that School demonstrate annual yearly progress of students using the same standards as applied to non-disabled students. If the testing standard is "the best," then *ipso facto,* the instructional standard must be considered to be the same: the best. The court should require no less of any *FAPE* and *IEP.*

    Apparently taking into account the regulations cited above, in *Shawsheen,* this Court properly ruled that

> Under the federal *FAPE* standard, an educational program must be provided under an *IEP* that is tailored to the unique needs of the disabled child and meets all the child's identified special education and related service requirements. This includes academic, physical, emotional and social needs; *34 C.F.R. 300.300(3)(ii); Lenn v Portland School Committee, 910 F. 2d 983 (1ˢᵗ Cir. 1990), cert. Denied, 499 U.S. 912 (1991) and Burlington v Mass. Dept. of Education, 736*

Page 18 of 21

*F. 2d 773, 788 (1ˢᵗ Cir. 1984).*

In the instant case, Danielle has no diagnosed physical or social needs: she suffers no physical, emotional, mental health, or social impairment or disability. Therefore, the *FAPE* must be provided according to an *IEP* which is determined by her neurological, hearing, communication, cognitive, and learning disability needs, as they affect her learning - as they effect her receipt of information and skills, from her academic courses. Only her diagnosed needs may structure her program and placement, and those prove to be limited to academic needs.

Danielle's academic needs are, in turn, driven by her disabilities. Those specifically include communication needs determined by a Central Auditory Processing disorder which, by its nature, disables full and accurate receipt of communication. Without enhancing service to her communication needs to the fullest extent, she cannot engage to the fullest extent in receptive communication. Her expressive communication then must become a function of that receptive communication, and suffer resulting impairment. *Ergo,* she cannot engage in the cross-communication activities which allow her either the learning experience to either the "best " standard or to a "full opportunity" standard, as now expressly required by Federal regulations pursuant to the *NLRB.* Without that, she cannot access curriculum subject matter information to those required standards.

In *Roland v Concord School Committee, 910 F. 2d 983 (1ˢᵗCir. 1990),* the holding was that an

> ... *IEP* must be reasonably calculated to provide a student the opportunity to achieve meaningful educational progress. This means that the program must be reasonably calculated to provide effective results and demonstrable improvement in the various educational skills identified as special needs, *Id.*

However, *Roland* was decided years prior to the *NCLB.* The issue should now be considered in light of the new standards set out in NCLB. Similarly, the court's attention is called to the regulatory requirements cited above. Those regulations do not permit the *IEP* to be limited to the child's disabilities, *i.e.* educational skills in need of special help, nor the improvement of those skills, alone. Now, the *IEP* must also address simultaneous acquisition of educational content. The *IEP* must address all of the education needs which flow from those disabled and deficient skills.

In regard to whether the *FAPE* drives the *LRE,* or *vice versa,* this court has properly ruled in the past that

> In addition to meeting the above standard, special education and related services must be provided in the least restrictive environment. This means that to the extent appropriate, students with disabilities must be educated with children who do not have disabilities. *Shawsheen, supra.*

However and again, the *LRE* is not the first consideration, nor even an equal consideration. The extent to which a learning environment is appropriate is now controlled, and must now be determined, under the new standards set out in the *NLRB* and the Federal Regulations set out

Page 19 of  21

above. The *LRE* follows the *IEP* and *FAPE*, and does not drive them  Further, and perhaps above all else, it must be driven by particular attention to the communication issues, as referred to above: without effective exchange of communication between teacher and student, there can be no effective teaching, let alone effective learning.  Without effective exchange between students, there can be little secondary learning.

> Programs and services can only be implemented in separate settings when the nature and severity of the child's special needs is such that the student can not make meaningful progress in a regular education setting even with the use of accommodations and specialized services; see *20 U.S.C. 1412 (5)(A). Shawsheen., supra.*

Such programs and services must be so implemented where the nature and severity of the student's special needs are such that they cannot be implemented under the "best" standard.  In the instant matter, they cannot be implemented to the best standard, or to the former "satisfactory" standard or "meangingful progress" standard, where the student's ability to receive and express communication is compromised.  The Findings were clear.  Danielle's communication would be best enhanced and most efficacious at Landmark.  All other identified programs were found to have characteristics and participants that would limit and compromise communication.  To place her in such a program would be no different than submerging a child who speaks only Russian in an English literature class taught only in English.  Danielle, and other such students, require much more.

### G. *Massachusetts Lex Loci is the "Best Standard"*

Massachusetts requires that under an *IEP*, the student must be enabled to progress effectively in the content areas of the general curriculum. *603 CMR 28.02 (18).   603 CMR 28.02 expressly incorporates by reference both M.G.L. c. 71B* and *20 U.S.C. 1400 et seq.*, thereby recognizing federal primacy in such regards.  Under the definition of *LRE*, the state regulation also incorporates, by express reference, all "federal special education law."  That is included without limitation.  Therefore, it incorporates all standards set out by federal regulation and the Federal Register.

### V. *Conclusion*

*Lex Loci* brings Parents full circle: their daughter was, and remains, entitled to the "best" standard once the *NCLB* was enacted.  Both under federal statute and regulation, and under state statute and regulation, the Hearing Officer erred.  Both federal and state law mandated that Danielle be relieved of participating with a population of students afflicted with bad behavior, sick thinking, and mental health and behavioral treatment in her immediate presence.  Where there is no diagnosis involving social considerations or extra-curricular activities, and where there are no more than mere speculative concerns about social life and extra-curricular athletic activities, Danielle was, and remains, entitled to the most efficacious *LRE* to achieve the "best" results from her education prescription, the *IEP* required by the Hearing Officer.  Otherwise, a

Page 20 of  21

child may be considered to be deprived of the very educational benefits necessitated by her disabilities and resulting special education needs. If those are not included in her *IEP,* or in her program as a whole, she loses the best instructional methods to which she is legally entitled, and their benefits. *See and compare Roland M. v Concord Public Schools, 910 F. 2d at 994 (1ˢᵗCir. 1990); see also Murphy v Timberlane Regional Sch. Dist., 22 F. 3d 1196 (1ˢᵗCir. 1994)*

For these reasons, Plaintiff Parents ask for summary judgment in their favor as to Count I.

Respectfully submitted,

Alanna G. Cline
Parents' Counsel
300 Market St.
Brighton, MA 02135
617 783 5997
BBO 086860

December 7, 2005

Page 21 of 21