COMMONWEALTH OF MASSACHUSETTS
SPECIAL EDUCATION APPEALS

BSEA #03-4311

RE:    DANIELLE[1]  v
SHARON PUBLIC SCHOOLS

DECISION

This decision is issued pursuant to M.G.L. c.71B and 30A, 20 U.S.C.§1401 et
seq., 29 U.S.C. §794, and the corresponding regulations.  A hearing occurred on October
2, 3 and 22, 2003 at the Bureau of Special Education Appeals (BSEA) in Malden, MA.

Those present for all or part of the hearing were:

|  |  |
|---|---|
|  | Mother |
|  | Father |
| Robert Kemper | Pyscholinguist |
| Elaine Lord | Parents' Advocate |
| Karl Pulkkinen | Public School Liaison; Landmark School (Landmark) |
| Gina-Marie Bonanno | School Pychologist |
| Gerri Ann Shubow | Audiologist |
| Patricia Terrell | Science Teacher; Sharon Public Schools (Sharon) |
| Nancy Pearlstein | Special Education Teacher; Sharon |
| Naami Turk | Consulting Clinical Pychologist for Sharon |
| Mare Ambrose | Teacher; Sharon |
| Elisa Reeves | Speech/Language Pathologist (SLP); Sharon |
| Judy Levin-Charns | Director Student Services; Sharon |
| Ruth Bortzfield | Attorney for Parents |
| Barry Mintzer | Attorney for Sharon |
| Tammy Richardson | Attorney for Sharon (2nd Chair) |
| Joan Beron | Hearing Officer, BSEA |
| Maryellen Coughlin | Court Stenographer, Catougno Court Reporting (Catougno) |
| Sonya Medieros | Court Stenographer, Catougno |

The official record of the hearing consists of Joint Exhibits marked J1-124[2] and
approximately three days of stenographic recorded oral testimony.  The record closed on
January 9, 2004.[3]

---

1 Danielle is a pseudonym used for confidentiality and classification purposes.
2 Exhibit 103A and portions of Exhibit 114A were admitted over Parents' objection; see Record.
3 The Hearing Officer received written closing arguments from both Parties on December 7, 2003.  On

## ISSUES

I.    Do the IEPs designating a program at the Sharon Middle School resulting from a TEAM meeting on April 1, 2003, covering the period from March 24, 2003-March 24, 2004 provide Danielle with a free appropriate public education (FAPE) in the least restrictive environment (LRE)?

II.   If not, will accommodations or modifications to the current program provide a FAPE in the LRE?

III.  If not, does Student require an out of district day program at Landmark to achieve a FAPE in the LRE?

IV.   Did Parents prior to December 2000 accept an IEP designating two pull-out speech/language therapy sessions per week? If so, does Sharon owe Danielle compensatory speech/language services?

## PARENTS' POSITION

Danielle has dyslexia and a central auditory processing disorder (CAP-D). Sharon's inclusion program has not provided and cannot provide the language-based program that Danielle requires to receive a FAPE. Therefore Sharon should develop an IEP for a day program at Landmark. Danielle is also owed compensatory services from September 2000-December 2000 because Parents accepted an IEP for speech/language therapy services twice a week and Danielle did not receive them.

## SCHOOL'S POSITION

Sharon has provided and can provide the in-class and pull out support and related services Danielle requires to address her reading comprehension, writing and auditory processing deficits. Sharon is also not liable for compensatory speech/language services because Parents did not accept the IEP amendment calling for those services until December 2000.

## FINDINGS OF FACT

1.    Danielle (d.o.b. September 1, 1990) is an artistic, pretty, athletic and popular thirteen-year-old 7th grade student with a great sense of humor, who lives in Sharon, MA (Sharon) with her parents and fifteen year old brother (Father, see also Lanzel, Pearlstein, Ambrose, Terrell, Reeves). Although shy with adults and initially shy with peers,

---

December 11, 2003 the Hearing Officer scheduled a conference call with Counsel. It occurred on December 15, 2003. On that day the Hearing Officer reopened the record to receive additional 7th grade information as well as information regarding substantially separate Larning diabilities (LD) programs in Southeastern Massachusetts and Rhode Island as well as additional information from Lnadmark and program options for modifications to Sharon's program. Additional conference calls occurred on December 29, 2003 and January 9, 2004. The record closed on that day.

Danielle now has many girlfriends and is beginning to be social with boys (see Father). At home, Danielle often engages in physical and verbal fighting with her brother and has been confrontational with Parents (J41, J107). The family goes to therapy to address these issues (Father). Danielle is on the Sharon Middle School basketball and swim teams, swims for the Y team and also is a Pop-Warner cheerleader (Father).

2.       Danielle is diagnosed with dyslexia and a central auditory processing disorder (CAP-D).[4]  While Danielle can apply phonics and structural analysis in her reading she struggles to do so with automaticity and displays many reversals in her spelling.  Danielle also displays moderate delays in receptive and expressive language, sequencing and word retrieval, deficits in understanding inferential concepts and weaknesses in her writing skills.  Danielle also requires more time to process auditory information due to weaknesses in auditory memory and reception of complex auditory information (see J1). Parents feel that Danielle requires a substantially separate language-based program and have rejected her current placement at the Sharon Middle School.  Parents have however accepted the services that Sharon has proposed in its current IEP pending resolution to the disputed IEP.  That IEP proposes a program with daily small group academic support in the resource room, speech therapy once per week and academic support and accommodations[5] in her inclusion classes from a supervised paraprofessional and/or the speech and language pathologist.  It also designates participation in a small group sequential, rule-based reading/decoding program (J1).

3.       Danielle began displaying reading difficulty in 1st grade (SY 1997-1998) (J41). She also continued to have a difficult time staying focused and on track (P41).  In the middle of that year Danielle began seeing a reading specialist three times per week see (J41, J90). At the beginning of second grade (September 1, 1998) Father requested a reading evaluation and a core evaluation for Danielle and her fourth grade brother (J93, see J41).  During second grade (SY 98-99) and early third grade (SY99-00) Danielle received informal support within the classroom from special needs and academic assistants.  She also received support from the reading specialist three times per week and accommodations.  Sharon did not formally evaluate Danielle, conduct a TEAM meeting or provide Danielle with services pursuant to an IEP; see (J90, J41).

4.       Danielle was tested at Children's Hospital (Children's) in October of her 3rd grade year (October 13, 1999). During language testing Danielle displayed no difficulty with phonology, easily identifying words based on their sounds (J41).  She did however display poor word retrieval when cued only visually and was unable to follow verbal

---

4 Brother also has reading and writing difficulties; see e.g. (J41, Lord).

5 These accommodations include: frequent teacher check in to ensure comprehension; clear and consistent expectations; breaking down of assignments into small, manageable parts; a reduction of work/homework when needed; utilization of organizational tools such as assignment notebooks; multisensory presentation of material; pairing of written and verbal directions (including homework); preview and review of concepts and preplanning strategies; use of computer for writing assignments; provision of study guides, modifications in tests if needed, integration of spelling and word attack skills into the reading curriculum; instruction in independent reading strategies (using context, checking for meaning, vocabulary preview, making connections, questioning) and oral presentation of books on tape when possible (J1).

instructions, draw inferences, answer questions about paragraphs read to her or deconstruct grammatically complex sentences. Danielle was also unable to create gramatically correct meaningful sentences from word lists or reformulate stories. She displayed weaknesses in auditory memory and increased distractibility as she fatigued and required extra time to complete many items. The evaluator however found that Danielle had no difficulty with memory skills and displayed distractibility only when language demands were high. (J41)

The testing also showed that Danielle was able to decode at a second to third grade level. She had no difficulty with phonology, easily making words into Pig Latin and identifying words by their sounds (J41). However, Danielle's reading fluency was decreased. She also displayed pronunciation difficulties with words that she did not recognize. Testing showed that Danielle's ability to spell, read connected text and comprehend reading were on a second grade level and her sentence structure in writing was simplistic, scoring at a first to second grade level (J41). Punctuation was inconsistent and her reading pace was decreased. Word retrieval was good when cued auditorily but when cued only visually was slow and inaccurate (J41). Danielle was able to do math calculations on grade level (3rd grade); however her ability to do word problems were on a 1st to 2nd grade level (J41). In addition Children's also noted that Danielle displayed an awkward pencil grasp and slightly illegible penmanship but felt that her fine motor/writing skills were in the normal range; see (J43). Parents described Danielle as easily jealous, clingy and demanding. Her teacher however described Danielle as a happy, quiet, helpful and polite child who has many friends (J41). Psychological screening showed that Danielle's noncompliance in the home (frequent fighting with brother and parents and running away from home) was not attributable to educational difficulties; Id.

5.    Children's diagnosed Danielle with a language based learning disability and delays in academic achievement. Children's recommended that Danielle receive specialized instruction and classroom accommodations such as seating near the teacher, repetition of directions, chunking, multimodal presentation of material, repetition of directions, untimed testing, reinforcement of study skills. It also recommended tutoring in math and writing and the use of a computer and software for written assignments and for assistance in writing, spelling and math (J41). Children's also noted that due to Danielle's auditory processing weaknesses she would benefit from a structured, predictable and very routinized class with a low student-teacher ratio and an environment free from extraneous noise (J41).

6.    Children's also recommended that Sharon conduct a CORE evaluation to determine which services would best suit Danielle's needs (J91, J41). Mother consented to the evaluation on November 5, 1999 (J88, J89). Sharon conducted testing in November and December 1999 (J37-41). Danielle's 3rd grade classroom teacher noted that she was easily distracted, had difficulty sounding out words and difficulty in reading comprehension and fluency and spelling. The teacher also noted that Danielle had not mastered topic sentences in writing or proper organization of paragraphs (J37, see also J39). She also noted that Danielle did not seek help when needed (J37). Danielle did

4

however have generally positive feelings about school (J39, see also J38). Danielle willingly accompanied the examiner and attempted all the subtests; however Danielle did appear very tired, yawning constantly during most of the testing (J38). Testing showed that Danielle had average cognitive ability with a verbal IQ of 104 and a Performance IQ of 96, with weaknesses in short-term auditory recall and visual sequencing (P39). The educational evaluator observed that Danielle did not display a good phonics base during reading subtests often inserting letters that were not there or sliding over words she could not decode (J38). Danielle also showed difficulty with recall and had difficulty attending auditorily. She was however able to ask for repetition; Id. The evaluator recommended multimodal teaching of phonetic rules and study skills, repetition, rephrasing and chunking of information, small group instruction focusing on comprehension, the use of untimed tests and a computer to assist with written assignments and spelling, frequent checking to ensure comprehension and clear identification for transitions (J38, J39). Although Sharon recommended a speech/language evaluation, one was not done until May 2000; see (J7, J39, J35).

7.     The TEAM reconvened on December 7, 1999 (J7). The TEAM recommended an IEP with pull out instructional support for three sessions per week in language arts and organizational skills (J7). The IEP did not offer assistance with math or use of the computer or software programs; compare (J7, J38, J39, J41). The IEP did however include many of the modifications suggested by Children's and Sharon; compare (J7, J37-39, J41). Sharon sent Parents the IEP on January 7, 2000 (J7, J87).

8.     On February 12, 2000 Danielle was seen for audiological and central auditory processing (CAP) testing from Gerri Shubow (J36)[6]. Results of the CAP testing showed that even under optimal acoustic testing conditions Danielle needed extra time to process information and integrate what she heard. She also had difficulty with auditory memory, and processing rapid speech and complex auditory information. In addition, Danielle also had significant problems with pitch pattern sequencing affecting her decoding of reading (J36, Shubow). Ms. Shubow found that in a classroom setting Danielle was at risk of inaccurately perceiving (or mishearing) auditory information especially when information was presented in a noisy background, involved multiple parts, was presented quickly or contained unfamiliar language concepts; Id. This was especially true in a large classroom setting due to ambient noise (air conditioners, outdoor or hallway noise) or auditory distractions (rustling papers, moving chairs) because Danielle is less able than other children to filter out the background noise and integrate the information she hears (Shubow). However, although it is harder to do, children, with CAP-D (including Danielle) can be educated in a regular classroom setting with accommodations and intervention (Shubow). Ms. Shubow recommended several educational modifications. These included:
•     reduction of auditory and visual classroom distractions;
•     seating near the primary classroom speaker away from doorways, windows or distracting students;
•     focusing of visual attention;

---

6 Ms. Shubow is an ASHA certified audiologist specializing in CAP disorders. Her qualifications and testing results are not in dispute; see J115B.

- repetition of structured concise instructions;
- teacher checking to ensure comprehension;
- short intensive periods of instruction with breaks for more complex listening demands;
- pairing of handouts, written outlines and summaries and/or visual information with oral presentations;
- preview and review of new vocabulary;
- encouragement of self advocacy;
- explicit teaching of strategies for listening and organizational skills;
- speech therapy and consultation of a speech therapist to monitor implementation of classroom modifications;
- computer assisted learning (software programs) to address writing, spelling and auditory processing (i.e., Earobics, Fast Forward, Lindamood Bell) and
- consideration of an FM trainer to increase sound and lessen reverberation (J36, Shubow).

Ms. Shubow has not evaluated Sharon's proposed program or Landmark and can not determine whether either is acoustically appropriate for Danielle. However an audiologist with training in CAP-D disorders would be able to do such an evaluation and make recommendations if appropriate (Shubow).

9.      Sharon contacted Parents on March 8, 2000 because it had not received a response to the December 7, 1999 IEP (J87, J86). In response Sharon received a request for educational records on March 15, 2000 from Parents' advocate Elaine Lord, requesting to schedule TEAM meetings for Danielle (and Brother). It did not however receive a response to the IEP; see J85, J7).

10.     Sharon attempted to schedule a TEAM meeting for Danielle (and Brother) on April 11, 2000 (J83). The Advocate requested that the meetings occur during the first or second week in May (J83).

11.     On May 10, 2000, Sharon sent a written request to conduct a speech/language evaluation (P80). It requested a three year reevaluation on May 19, 2000 and an additional request for a speech/language evaluation on May 25, 2000 (J81). Parents consented to all the evaluations on May 25, 2000; Id.

12.     Sharon conducted the evaluation on May 12, 19, and 26, 2000 (J35). Sharon had made a previous recommendation for a speech/language evaluation at the December 1999 TEAM meeting (J7, Father, J35, compare J35, J7). The speech/language pathologist (SLP) observed Danielle in her classroom and found that Danielle displayed good effort during reading, writing and small group discussion and benefited from teacher cues, verbal repetition of directions, visual/verbal pairing of information and verbal prompts to supplement writing (J35). During testing, Danielle's attention to tasks was good; however she periodically yawned and when asked, responded that she was tired (J35). Testing revealed low average receptive and expressive language skills that were lower than one might expect given Danielle's verbal IQ score as indicated on the WISC (104) (J35).

6

Danielle also displayed a word retrieval deficit that further impacted her expressive language skills; Id.. Danielle also demonstrated difficulties with ambiguity and figurative language. She did however display strengths in inferencing. Danielle's written language was disorganized and contained immature syntactic construction, run-on sentences and multiple spelling errors. Her writing also contained non-specific vocabulary most likely impacted by her retrieval problems; Id. The SLP recommended speech/language therapy three times weekly to focus on developing strategies for word finding and listening, improving expressive and receptive language skills and comprehension (J35). She also recommended and expanded on several of the accommodations suggested by Ms. Shubow; compare (J35, J36).

13.      On June 12, 2000 Sharon reconvened the TEAM to review the evaluations (J6). The IEP proposed that Danielle received instructional support in the classroom four times a week. The IEP also proposed that the SLP would service Danielle in the classroom once a week and provide pull out support twice weekly. Among the recommendations was for the technology specialist to explore organizational writing materials that may be appropriate for Danielle (i.e., Inspiration) (P6). The IEP was sent to Parents on June 26, 2000 (P6, P79). On July 7, 2000 Parents, after talking to their advocate, postponed a decision on the IEP until the completion of an independent evaluation (Father, J6). Due to this rejection, the SLP did not provide Danielle with direct services in the fall of 2000 (J117). The SLP did however provide her informally with services in the classroom because she was in that classroom servicing another child who was often grouped with Danielle (J117).  Parents believed that Danielle would receive these services as well as other services (computer programmed instruction) and when they were not implemented hired a private SLP who provided services from September 2000-February 2001 (Father, see J110, see also J111A).

14.      On September 18, 2000 Sharon requested permission to conduct the Lindamood Bell Auditory Conceptualization Test (LAC) and the Test of Reading Comprehension to assist in planning phonological intervention services (J78).  Parents consented to the testing but indicated that they did not wish to relinquish any rights for reimbursement for further testing (J78).

15.      On October 3, 2000, Danielle, per her Advocate's suggestion, received a BEAM[7] test at Children's Hospital (J32, see also J34). The neurologist found borderline features of a possible neurological basis for Danielle's auditory processing difficulties but also indicated that the report also indicates a possibly normal study (J29, J32). He suggested an FM trainer.  The neurologist also noted Danielle's pattern of going to sleep late during the school week and gave Father suggestions to address this issue (J32, see also J34).

16.      The SLP assessed Danielle's phonological awareness and reading comprehension skills in mid October 2000.  She drafted a report a month later (J33).  Danielle's scores on the (LAC) showed strong phonological skills making only one error on the test (J33). However, her reading comprehension skills during testing and in class showed that Danielle could not comprehend what she had read even though she could decode the text

---

7 A BEAM test is a nuerophysiological test designed to address reading difficulty (J35).

(J33, J31). The SLP recommended direct teaching of reading comprehension strategies (J33).

17.    Sharon administered the Woodcock Reading Mastery Test to Danielle on November 28, 2000 (J30). At the time of testing she was in the 3rd month of 4th grade (J30). Her composite reading cluster scores (word attack, word identification, word comprehension and passage comprehension) were in the 34th percentile with word comprehension scores at the 38th percentile and passage comprehension scores averging at the 27th percentile, approximately nine months below grade level (J30). Reading comprehension scores were at the 27th percentile approximately eleven months below grade level; Id.

18.    The TEAM reconvened on November 29, 2000 to review the evaluations. Sharon proposed an amendment for continued in class support by the special education teacher four times per week, pull-out speech/language services twice a week and continued in class support twice a week from the reading specialist (J5), see also (J75).[8] Parents requested Fast Forward and told Sharon that Danielle would be able to receive instruction for free from Carroll School but would need transportation (Father, Lord).[9] Sharon however did not agree with Parents that Danielle required Fast Forward because it felt that phonemic awareness was a core concept of the program and that although Danielle's word comprehension was weak, her phonemic awareness was good (J74, Terrell, Father). The IEP was sent to Parents on December 6, 2000. The TEAM agreed to reconvene in December 2000 to discuss Danielle's progress and the possibility of implementing the FAST Forward program (J5).

       The TEAM did not reconvene in December (Father). On December 12, 2000 the Advocate Elaine Lord contacted Sharon to ask when the services would be starting. She was told that the amendment had not been returned (J74). On December 26, 2000 Parents accepted the services but rejected the placement (Father, J5). The SLP began services upon Danielle's return from school vacation (J117).

19.    On January 2, 2001 Danielle was seen for an independent speech/language and neurological evaluation at Children's Hospital (J29). Children's spoke to Parents who reported that Danielle continued to have significant problems spelling, decoding reading and organizing her thoughts for writing (J29). Parents also noted continuing behavioral problems related to a very stressed relationship with her older brother and continuing sleep problems associated with settling down to sleep (J29). Children's reviewed previous testing, including school testing but did not speak to anyone from Sharon; see (J29). Like in previous outside testing, Danielle was tentative and shy (J29, compare J41). The evaluator found that Danielle's performance on the WISC-III were consistent with the Sharon's November 1999 testing indicating normal overall intellectual development and no significant impairment of reasoning or conceptual understanding (J29). She also performed at, or better than expected for age on nonverbal tests; Id. Her scores on the Boston Naming tests were one standard score higher than Sharon's May

---

8 Proper notice was sent (J77).
9 At that time Carroll was testing the product.

2000 results however, remained three standard deviations below the mean indicating
significant word retrieval difficulty.  She also displayed difficulty with immediate
auditory memory. The evaluators noted that during testing, Danielle appeared frustrated
about her learning disabilities and associated problems with academic work (J29).  They
reconfirmed the diagnosis of a language-based learning disability and reconfirmed their
previous 1999 recommendations emphasizing direct instruction on the use of a word
processor and computer production of writing and organizational issues (J29).  The
evaluator wrote: "Given the long-standing nature and extent of [Danielle's] learning
difficulties, she may require more intensive intervention than her current public school
can provide.  That is, children with neurologically based learning disorders, which
include the auditory processing disorder ...are at risk for increasing learning disabilities
as academic demands increase in the higher grades.  For this reason, it will be extremely
important for all teaching professionals working with [Danielle] and the team planning
her academic program to monitor her progress very carefully.  If she experiences
increasing difficulties or if progress is limited even with the special education supports in
place, an alternative program designed for children with average intellectual development
and specific language-based learning disabilities should be considered" (J29).

20.      On March 30, 2001 Sharon scheduled a TEAM meeting for April 11, 2001 to
review Danielle's progress and the outside testing (J73).[10] Her 4th grade teacher noted
that Danielle had great potential. She was able to use summarizing, predicting and
inferring details when doing class assignments with support but could not carry over
these skills independently or consistently (J27).

        Teachers also noted that Danielle had been able to complete work in school but
did not consistently complete homework (J27, also see J28, J26). Her 4th grade teacher
also noted however that Danielle's academic performance was greatly affected when she
was unsure or uninterested in a topic (J27).  She also found that Danielle's vocabulary
and spelling skills were not where they should be and that it would be beneficial for her
to know the basic math facts (J28, J71).  She also felt however that she had seen some
improvement in Danielle's comprehension and that she had become a more independent
learner; compare (J4, J71). However, Danielle had been recently gaining a reputation for
inappropriate behavior with peers at lunch and on the playground, picking on students
and taking food from the lunch line that was not paid for (J28).

        Spring 2001 MCAS scores indicated that Danielle needed improvement in math
and language arts (J109).  Sharon however did feel that Danielle had shown improvement
in her punctuation, capitalization and grammar and was using graphic organizers, but
continued to be persuaded to redo her writing to meet class and teacher expectations
(J27).

        Her speech/language pathologist (SLP), after working with her for a year twice a
week in one-to-one pull-out sessions, informed the TEAM that that Danielle had
progressed from simply decoding words to reading for meaning (J26). The SLP also
noted that Danielle had moved from reading and answering questions on a paragraph of a

_____

10 Sharon did not receive the nueropsychological evaluation until April 10, 2001 (J72).

9

lower level reading book to reading chapters, and had begun and done well with supplying inferential information from paragraphs (J26).

Sharon proposed increasing her resource room support and supplying an FM system to increase her skills (J4, J27). Her special needs teacher also proposed building in a time at the end of the day to organize and work on homework and encouragement of the use of a computer/Alpha Smart at home and at school (J27). These suggestions were not included in the IEP; compare (J27, J4).

Sharon did propose an IEP for daily pull-out special education instruction and continued the current level of instructional support in the classroom and the pull out speech therapy twice a week; (J4, compare J4, J5). It did not however agree that Danielle needed an outside placement (Father, Lord, J28).

21.     The IEP was sent on June 11, 2001. On September 1, 2001 Parents accepted the services but rejected the placement (J4).

22.     Sharon sent the rejected IEP to the BSEA.[11] Sharon contacted Parents on September 17, 2001 to clarify their response to the IEP (J69). Father informed Sharon that he remained concerned about Danielle's educational progress even with the pull-out services and wanted to be sure that she was not going to be penalized for being pulled out of class (J69). Sharon told Father that it would touch base with the teacher so that this would not occur; see (J69). Sharon also offered, and did follow through, with suggesting a parenting course to address Danielle's oppositional behavior at home and her running away from home (J67).

23.     On that day, Father also informed Sharon that Danielle would be receiving an educational evaluation. Sharon suggested setting up a meeting to discuss Danielle's progress. It also consented to Parent's request to have their advocate Elaine Lord, observe the program. She did so on October 29, 2001. Sharon also granted the Advocate's November 1, 2001 request to reconvene the TEAM and postpone the date of the TEAM meeting to accommodate her schedule (J69). It did not however send notice to reconvene the TEAM until December 3, 2001 (J65).[12] The day before the TEAM meeting Sharon agreed to extend the current IEP until outside testing was completed (J63).

24.     Parents' advocate, Elaine Lord, as part of her job, observed Danielle's 6th grade program on October 28, 2001 to determine if the program was delivering what the independent evaluators were recommending for Danielle (Lord).[13] She observed the reading, science, guidance and learning center period and a writing class (Lord). Most if

---

11 On September 14, 2001 the BSEA sent Parents information about options for mediation or a hearing (J68). Parents did not request a mediation or hearing.
12 The December 17, 2001 TEAM was rescheduled until January 23, 2002 to accommodate the Advocate's schedule (J69).
13 Ms. Lord has a Bachelors in Social Work with some masters level classes in social work. She has been an advocate since 1985 and routinely observes programs. She does not have any training in dyslexia, language based learning disabilities or CAP-D disorders (Lord, see J115J).

not all the rooms were carpeted although the science room had a noisy heater. The classes were well taught and Danielle appeared comfortable with her teachers (Lord). The classes Ms. Lord observed had flip charts, study guides and handouts. Ms. Lord did not see the teacher giving Danielle written instructions in reading and noted that Student wrote immediately, contrary to the other students who appeared to be reading first (Lord). All the teachers went over techniques and strategies for homework and/or test taking. Both the English and science class had a paraprofessional who checked with Danielle at the beginning to determine if she understood the assignment and rechecked with her frequently (about every three minutes) when Danielle appeared unfocused. In science Danielle volunteered with a well-constructed sentence. Ms. Lord however felt that Danielle did not understand what was going on and sat in "silent confusion" (Lord).

25.    Dr. Kemper administered a pyscholinguistic evaluation on February 19, 2002 (J24).[14]  Dr. Kemper interviewed Danielle and her parents and reviewed both school and independent evaluations (Kemper, J24).  However his report does not note that Danielle received in class services, incorrectly noted that Danielle was receiving speech and language therapy once per month instead of twice per week and slightly exaggerated some of the school test scores.[15]  He did not however speak to any of Danielle's teachers (Kemper).

During testing Danielle was quiet and reserved and did not initiate conversation but did respond appropriately when spoken to and was very motivated during testing (Kemper, J24, J41).  Danielle's standard score and percentile rank on the PPVT-III (a test to measure single word vocabulary) rose from a standard score (SS) of 90 (low-average) in May 2000 to a SS of 94 (average) in February 2002; compare (J35, J24).  Danielle's scores on the Expressive Vocabulary Test (EVT) dropped from a SS of 94 (low average) to a SS of 84 (below average); Id.  Dr. Kemper, like Sharon's SLP, attributed the discrepancy between Danielle's expressive word vocabulary scores (PPVT, and EVT) to be indicative of a word retrieval deficit which the Sharon SLP confirmed by administration of the Boston Naming Test; Id.

As in previous testing, Danielle exhibited the most difficulty processing sentences with complex sentence structure, personal possessive pronouns, inference, logic and obtaining meaning from context (J24, compare J41, J24, J35). Dr. Kemper, like Children's and Sharon, found that Danielle was able to recognize sight words and decode

---

14 Dr. Kemper is a psycholinguist. There is no degree in psycholinguistics or certification in this area. Nor are the evaluations conducted different than those performed by a speech/language pathologist (Kemper, compare J24, J35).  Dr. Kemper received his doctorate in speech and language pathology in 1985 and is a licensed SLP in Maine, Massachusetts and Ohio and through the American Speech Hearing and Language Association (ASHA).  He has extensive experience in language-based learning disabilities. (J115C).

15 For example Dr. Kemper cites to a school WIAT test that was given in November 1999, stating that Danielle's achievement test scores were "below grade level in Basic Reading, Spelling, Reading Comprehension, and Listening Comprehension." (J24). The actual test report states that Danielle is *somewhat* below grade level in those areas (J38). He also states that Danielle's math scores were "slightly below grade level", when the actual report states they are "just about at grade level.; compare (J24, J38), see School Brief at 4.

words fairly accurately through the third grade level (J41, J35, J24). However, her rate of decoding was extremely slow when reading fourth and fifth grade material. Dr. Kemper assessed decoding using the Test of Word Reading Efficiency (TOWRE), (a visual test requiring Danielle to decode a number of isolated words in 45 seconds) and the Slosson (a timed sight word vocabulary test).

On the Test of Reading Comprehension (TORC-3), Danielle achieved a SS of 6, scoring below average for her age (Grade Equivalents ranging from mid 2nd to mid 3rd grade level). The TORC-3 however is most accurate if correlated with teacher reports and Dr. Kemper did not speak to any school staff (Kemper). However, her performance in reading fluency on other tests administered by Dr. Kemper in February 2002 remained essentially the same as Children's Hospital's language testing in October 1999, showing performance on the second to third grade level; compare J24, J41).

26.    Dr. Kemper assessed Danielle's writing skills with the Test of Written Language –3 (TOWL-III) and Test of Written Spelling (TWS-4). Danielle's spelling skills were below average. She was however able to logically represent most phonemes with their corresponding graphemes (J24). On the TOWL-III Danielle showed weaknesses in punctuation, capitalization, spelling, sentence structure and to a lesser degree paragraph organization and text structure. The examiner manual of the TOWL-3 indicates that the test should not be used to make specific recommendations for day to day programming (Kemper). Danielle's performance with Dr. Kemper in this area however was similar to her performance with Sharon's SLP; compare (J35, J24)[16].

27.    After evaluating Danielle, Dr. Kemper found that she presented with most of the signs and symptomatology typically associated with dyslexia, due to her difficulties processing expressive and receptive language, including deficits in phonological processing and memory, and her associated difficulties in reading, writing and spelling (Kemper, J24). He concluded that Danielle's oral or written language skills would not support the demands of a typical fifth grade curriculum even with substantial program modifications and accommodations.

As such, he recommended that Danielle receive all academic instruction in a small multisensory, substantially separate language-based intensive educational program that incorporates direct systematic teaching with continuous review of previously learned information and the teaching of skills across various contexts in order to facilitate generalization effects. He also found that Danielle would require a daily, individual tutorial in which a multisensory, code emphasis program is provided for reading, spelling and written language instruction (J24). Although Dr. Kemper felt that the Orton-Gillingham was the best methodology, other methodologies could be used (Kemper).

In addition, Dr. Kemper recommended that Danielle's program would need to reinforce decoding strategies and oral reading fluency through oral reading of high

---

16 Sharon used the Written portion of the Oral and Written Language Scale (OWLS) to assess written language skills. Dr. Kemper used the oral portion of the OWLS but did not use the written portion; therefore standard scores can not be compared see (J29, J35).

interest low level books where she could apply word analysis skills and strategies learned in isolation to the text. Danielle should also be required to answer questions to ensure reading comprehension and use organizational templates and charts to identify and anticipate story form. Dr. Kemper also recommended individual instruction using the Lindamood Bell Phoneme Sequencing Program (LiPS program) to develop an awareness of sound-symbol relationships. In addition, Dr. Kemper recommended that Danielle be provided with specific writing strategies such as brainstorming, outlining, proofreading from a checklist, use of grammar outlines and coordination of her written work with her content area subjects (J24).

Specific accommodations included:
- preteaching, review, repetition and paraphrasing and summary of information using a multisensory approach;
- use of pausing to allow Danielle time to process the incoming message with extra time to respond;
- shortening the length and complexity of messages to match Danielle's level of comprehension with periodic checks to ensure understanding and
- modeling of appropriate use of language with questioning of students to elicit elaboration (J24).

Finally, Dr. Kemper recommended that Danielle participate in the Fast ForWord program during the summer to help her establish more efficient auditory pathways for processing auditory information (Kemper, J24).

28.     On May 13, 2002 Sharon administered the Woodcock Reading Mastery Test (J22). Danielle had previously taken this test in November of 4th grade. In that year and a half Danielle's SS's and percentile ranks had dropped in every subtest. Specifically, Danielle dropped from the 32nd to the 5th percentile in word identification, from the 53rd to 50th in word attack, from the 38th percentile to the 14th percentile in word comprehension and from the 27th percentile to the 9th percentile in passage comprehension; compare (J22, J30). Her Basic skills cluster dropped from the 41st to the 14th percentile, reading comprehension cluster scores dropped from the 28th to the 11th percentile and the total reading cluster dropped from the 34the to the 12th percentile; Id.

29.     The TEAM reconvened on May 15, 2002 to review Danielle's progress and outside testing (J59, 60, 61).[17]  As of May 2002 Danielle was receiving a 84.5 average in math, was able to answer questions when called on and was beginning to ask for clarification of concepts that she did not understand (J23, see also J60). Her 5th grade teacher also noted tremendous growth in Danielle's spelling and punctuation and her ability to express her ideas; see (J23, writing sample; J60, compare (J35, J24). She also noted Danielle's willingness to participate in class discussions and noted that Danielle was well behaved, courteous, respectful and attentive; Id. Teachers noted that Danielle was highly motivated in class, well prepared and well behaved and that her confidence had blossomed that year demonstrating "huge growth over fourth and fifth grade (see J3). Teachers also found that Danielle's word attack skills were on grade level and that she

---

17 Notice was timely.

was able to succeed in understanding the curriculum texts and could answer concrete and literal questions (J3).

The special education teacher and SLP also noted that Danielle was more confident, was using the strategies more in small group and was asking for help when she needed it. Sharon noted that Danielle was still guessing at some words but was now reading more for meaning and could, when redirected, go back and use the class supports (J60). It also noted that making predictions still remained hard for Danielle but that she was increasing her ability to do this (J3, J60).

The Advocate and Parents shared their concern that Danielle was not carrying through what she learned at school; see (J60, Lord). The Parties discussed Dr. Kemper's report and out of district options but remained in disagreement because Sharon felt that Danielle was making good progress and that the public school was the least restrictive environment for her (Father, Lord, P60). The TEAM did not discuss the Woodcock Mastery testing done two days previously or compare those scores to testing done the year before; see (J60).

30.    Sharon did propose, as a compromise, the language-based program at the Sharon Middle School (Father, J3). Parents did not want to consider this program and neither they nor their Advocate explored it because they did not feel that Sharon could implement an appropriate program. In addition, their Advocate did not feel that Sharon's program was appropriate for Danielle (Father, Lord). [18]

31.    Sharon's proposed IEP amendment continued the daily pull out instructional support and the pull-out speech therapy twice a week and increased the instructional support in the classroom from four to six sessions weekly; compare (J3, J4). The IEP proposed that this program be continued at her present 5th grade location (Heights Elementary) and then at the Sharon Middle School for 6th grade (J3). The IEP incorporated many of Dr. Kemper's recommendations for accommodations; compare (J24, J3). It did not include the recommendations for LiPs, Fast ForWord or an Orton-Gillingham type tutorial; compare (J24, J3, Father). Parents began exploring private schools including the Carroll School and St. Andrew's and retained Counsel; see (J56, J57, J58).

---

18 On June 18, 2002 Sharon's TEAM chair sent Parents a description of the program. The description read: "The Alternative Learning Program..., previously titled the Language Based Program, provides services for students with special needs who are having difficulty succeeding in the regular education setting with typical accommodations and modifications. These students receive more academic support, and receive more modified services than other students receiving special education at Sharon Middle School. The program is designed as an inclusion program. Students in the program are able to succeed while spending the majority of their time in the regular education setting. The placement is inappropriate for any child who needs a self contained academic model in order to achieve academic success.

The program is designed for students who have ...learning issues, emotional issues, or a combination of the two. Many of the students have language based learning disabilities and receive supports that cater to this specific need...The goals for the program are to provide academic success for students and reintegrate them into the regular education classroom environment with as little support as necessary to succeed" (J54).

32.    The IEP was sent to Parents on May 31, 2002. On June 6, 2002 Parents rejected the IEP but accepted the increased services pending resolution of the disputed IEP. (J3)

33.    Progress reports at the end of 5th grade show that Danielle had made significant gains in using more mature vocabulary and was comprehending more of what she read (J21). She was, with reminders, able to write complete sentences and five sentence paragraphs and was, with help, able to organize her thoughts and stay with a specific topic. She was beginning to correct her spelling and grammatical errors independently but remained resistant to correcting content. Danielle also continued to need reminders to consistently use graphic organizers and study strategies and continued to need teacher assistance to effectively answer questions that involve prediction and inference (J21).

34.    In July 2002 St. Andrew's School in Rhode Island rejected Parents' spring application for Danielle's attendance for the 6th grade (Father, J111A). Danielle attended the Sharon Middle School for 6th grade (02-03 SY). Sharon did implement most of the modifications in the IEP (Ambrose, see J96-105). However, despite Ms. Ambose's constant urging, Danielle hardly ever used the computer for language arts or social studies; Id. At Parent's request, Sharon reconvened the TEAM; see (J51, J52). The TEAM meeting occurred on November 26, 2002 (J2).[19] By that time Parents had received Danielle's 1st term report card (see J94, J16). Danielle received an A in Physical Education, B's in Science, Math, Computer, and Writing, a C+ in Math Extension (a required 6th grade math course), a C in social studies and a C- in reading (J94). All of Danielle's teachers noted that her conduct in class was good or excellent; Id. Her effort was acceptable (ranging from satisfactory to excellent) in all but social studies where effort was inconsistent; Id. That teacher noted that Danielle was having difficulty applying concepts to daily work and needed to focus completely on topics under discussion (J94). Her writing/math teacher also noted that Danielle needed to read math word problems more carefully, needed to proofread her writing more thoroughly and needed to work on adding detail to her writing (J94).

35.    At the TEAM meeting, the TEAM discussed the Advocate's request for tutoring at the Commonwealth Learning Center after school or as a half day program there (Lord, Father, J111A). The TEAM also discussed Sharon's recommendation for implementation of an FM system (Lord, Father, J2). Sharon did not feel that Danielle required after school tutoring but offered after school support. Parents and Advocate did not feel that this service would be beneficial to Danielle. They also did not want to implement an FM system because Danielle did not want to wear it (Father). He did not tell the TEAM this (Father). Sharon also told Parents that Danielle was due for her three-year reevaluation in December 2002 but that it did not receive Parents' response to the consent form sent on October 24, 2002; see (J2, J53). Sharon proposed an amendment that added speech/language support from the SLP in the classroom twice a week; see (J2, compare J2, J3).

---

19 Notice was timely and scheduled to accommodate the Advocate; see (J51, J52, Lord). Parent's Rights forms continued to be sent.

36.    Danielle did begin attending a regular education after school grammar and spelling group with her English and social studies teacher and continued it through 6th grade (Ambrose). She actively participated and benefited from the group. (Ambrose).

37.    On December 1, 2002 Parents consented to the educational assessment. They did not consent to a speech evaluation (J50).[20] Parents did not address Sharon's request for an observation; see (J50, J53). Sharon requested clarification and on February 10, 2003 obtained consent to conduct a speech/language evaluation and observe Danielle in the classroom (J48). The additional services were, after a January 2003 reminder was sent, accepted on March 24, 2003 with a request for a meeting (J2, J47). The placement continued to be rejected (J2). On that day Sharon sent notice to reconvene the TEAM and sent the rejected IEP to the BSEA (J44, J45).

38.    Danielle's 2nd term report card came out in February 2003 (J94). February progress reports show more accurate usage of capitalization, word usage and topic and paragraph organization with improvement in proofreading and summarization skills (J16, see also Ambrose). Sequencing multi-step directions and inferential skills continued to be a challenge for her (J16, J17). Danielle's report card grades generally stayed the same with slight improvement (B+ from B) in science and computer and social studies (B- from C), slight decreases in Math Ext. due to missing homework (C from C-) and slight decreases in Writing due in part to proofreading issues (B-.from B); Id. Her social studies teacher noted that she was generally meeting curriculum expectations and that her research projects were well planned and presented (J94). She was having difficulty meeting curriculum expectations in reading; however her writing in that class showed improved effort and she was using graphic organizers to help her with her assignments (J94, J16).

39.    On February 10, 2003 Parents applied to the Carroll School for admission for the 2003-2004 school year (J107). Carroll rejected Danielle's application on March 18, 2003 (J108). In its rejection, Carroll indicated that Danielle's primary difficulty lies within the Central Auditory Processing diagnosis and receptive language. It concluded that despite its ability to address the decoding and fluency issues and the small classes, it could not provide Danielle the support and structure she required (J108). Carroll did however suggest its summer program as an alternative for increasing Danielle's decoding and reading skills; Id.

40.    Danielle's 6th grade special education teacher (Nancy Pearlstein) reassessed Danielle for her three-year reevaluation during late February to mid March 2003 (J15). The SLP (Kathleen Davis) also did a speech/language observation during that time (J13). Ms. Davis observed that the reading, writing and science classes used multisensory teaching approaches, broke down multi-step directions and used graphic organizers (J13). Danielle was able to use the graphic organizer, however, the information she gathered was sparse. Ms. Davis also noted that Danielle did not ask questions or want to elaborate on her ideas even though she was confused, but that once an assignment was explained she was eager to work independently (J13). The SLP also noted that during her reading

---

20 Sharon did not ask to conduct a speech/language evaluation; see (J53).

class discussions Danielle had difficulty maintaining her attention and would become engaged with friends by passing notes and talking; however during science, where Danielle was sitting up front and the therapist was sitting near her, attention was focused; Id. She also noted that Danielle tended to avoid class participation because she had difficulty putting her ideas into words. Danielle was however able to display comprehension of the assignment when the therapist checked in, and would ask the SLP questions if unsure of the information; Id. Ms. Davis recommended that teachers encourage Danielle to ask questions to ensure that she remains focused, encourage her to ask questions and verbally repeat assignments to ensure comprehension and to work with Danielle to seek adult help during class and at home to complete her homework assignments (J13). Speech therapy services were recommended for both in and out of the classroom (J13).

41.    Ms. Pearlstein noted that Danielle had made a smooth transition to middle school with respect to changing classes, manipulating the rotating schedule and getting to all her classes in a timely fashion (J15). She also noted that Danielle participated well when called on, and appeared to be happy and socially accepted by her peers and seemed to enjoy her new school; (J15, Pearstein, see also Ambrose).

Danielle's estimated academic ability as measured by the Woodcock-Johnson III (WJR-III) spanned mostly within the average to low average range with average math skills and low average scores in reading comprehension, vocabulary and word identification subtests. Ms. Pearlstein noted that the variation of scores in the related subtests of Letter-Word Identification and Word Attack suggested inconsistency in Danielle's ability to decode words (J15). Ms. Pearlstein, like Dr. Kemper, found that Danielle could apply phonics and structural word analysis but struggled with their automatic application, requiring additional time to read text succinctly with correct phrasing and pronunciation (J15, compare J15, J24). She also noted that Danielle's low scores in the Reading Comprehension subtest suggested some difficulty with inferential comprehension. Danielle's spelling, punctuation and writing fluency skills were in the average range with above average scores in the writing fluency subtest. Oral Language skills (Story Recall, Understanding Directions, Picture Vocabulary, Oral Comprehension and Sound Awareness) were all in the low average range (J15, see also Pearlstein). When this November 2003 testing is compared with previous testing done in May 2002 Danielle showed growth in her word attack skills going from the 5th (SS 75) to the 18th percentile. She also showed growth in her basic skills increasing from the 14th percentile (SS 84) to the 30th percentile (SS 92) and increasing from the 11th percentile (SS 82) to the 19th percentile (SS 87). [21]

Ms. Pearlstein also administered the WIAT written expression subtest. Danielle received a standard score of 99 with a percentile rank of 47, scores practically identical to the scores obtained in the written expression cluster of the writing portion of the WJR-III. Although Sharon noted that Danielle's writing displayed better punctuation and more interesting vocabulary, these test scores when compared with WIAT-Written Expression

---

[21] These scores are all still lower than her Woodcock Reading Mastery scores of November 2000; compare (J15, J30).

subtest scores conducted by Sharon in November 1999 show a decrease from the 61st to the 47th percentile; compare (J38, J15, see also J1, Pearlstein).

Ms. Pearlstein also assessed Danielle's ability to read orally using the Gray Oral Reading test (J15). Scores are calculated on the rate and the accuracy of reading increasingly difficult passages (J15, Pearlstein). Danielle took excessive time to read the passages and had many substitutions, deletions, repetitions and hesitations earning her an oral reading quotient of 79 compared with a score of 70 when Dr. Kemper tested her in February 2002; compare (J15, J24). Ms. Pearlstein concluded that Danielle may experience difficulty when asked to respond in any situations that involve time constraints and that, along with weaknesses in all aspects of reading, required that she continue to have support in order to comprehend grade-level text (J15).

42.    The TEAM reconvened on April 1, 2003 to discuss Danielle's progress and develop an amended program (J1). The TEAM discussed having Danielle participate in a small group self-contained reading class; however Sharon felt that as long as Danielle was achieving success in her regular education reading class, she should remain in that environment.  The TEAM also discussed the possibility of having Danielle participate in Sharon's language-based program.  Parents and Advocate rejected this proposal because they felt, after reading the description of the program, that the student's in that program had emotional problems that Danielle did not have (Father, Lord, J1).[22] Parents also asked for services to be provided after school so that Danielle could participate in more special subjects such as art.  Sharon felt that as developed the IEP could be fully implemented during the school day (J1). The proposed IEP added an extra eighty minute session of pull-out academic support per week as well as one forty minute session of speech/language services in the classroom; compare (J1, J2).  There were no math goals and objectives added to the IEP although it would be appropriate to add some math support and consultation with the math teacher to help Danielle with word problems (J1, see also Pearlstein).

43.    In mid April 2003, Danielle received her special education progress reports and her 3rd term report card (J12, J94).  Danielle received A's in Art and P.E. and in those classes and in guidance (a pass/fail subject) Danielle's teachers noted that her conduct was excellent, that Danielle was cooperative and that she was a pleasure to have in class (J94).

In science Danielle's grades went from a B+ to a C+ due to inconsistent class participation and inability to stay consistently focused in class (J94, J94A). In social studies Danielle's grades went down from a B- to a C due to too much socializing and lack of focus in class as well as a 60 on a chapter test; Id.

---

22 The description of the language-based program reads in part: "The program is designed for students who have either learning issues, emotional issues, or a combination of the two. Many of the students in the program have language based disabilities and receive supports that cater to this specific need. Others who have emotional issues benefit from small group instruction and a supportive academic environment. The goals for the program are to provide academic success for students and reintegrate them into the regular education environment with as little support as possible as necessary to succeed" (J54).

18

Danielle's grades in Reading remained a C- (J94). The reading teacher (Ms. Ambrose) noted that Danielle had good conduct and effort but did not use her class time constructively (J94). Special education progress reports show that Danielle was able to keep up with the class in reading but continued to struggle with inferential comprehension and was inconsistent in asking for help (J12). Her regular education teacher however, noted that in reading, Danielle needed improvement; see Ambrose, (J94A, compare J12, J94A, J94B, J94C, J105). This however did not mean that Danielle was failing to access the curriculum (Ambrose).

Ms. Pearlstein (the special education teacher) also noted that in writing, Danielle continued to need support to expand her ideas and proofread and edit her work (J12, see also J94, J94A, J96, Pearlstein). However, Ms. Pearlstein found that Danielle showed steady progress in writing, effectively using webs, using topic sentences, developing relevant conclusions and showing understanding of adverbs and adjectives and correct punctuation; (J12, J94, J94A B, C). This was reflected in her schoolwork; see (J96-J99, J101). Her regular education writing teacher however found that Danielle needed improvement and gave her an incomplete, noting that her effort was inconsistent and that Danielle tended to socialize too much (J94, J94A).

Danielle maintained a C average in Math Extension[23] due to missing homework assignments. Her grade in Math (not Math Extention) dropped from a B to a C+ due to her inability to focus completely on topics under discussion, inconsistent test and quiz grades, incomplete or late homework and not reading problems more carefully (J94, J94A, see also J104). MCAS scores in math during the spring of 2001 also showed that Danielle continued to need improvement and bordered on a warning score (scaled score 220), a drop in performance from the previous year (scaled score 234) (J109, J109A).

44.     Special education progress reports also show inconsistent progress in organizational skills; Id. Danielle was able to use study guides effectively and produce well planned and well presented research projects; see (J12, J100, J102). Her assignments however were sometimes turned in late or if not late, were incomplete reducing her grade (J12, see also (J94A, J98). Ms. Pearlstein also noted that Danielle continued to need improvement in asking for help to clarify instructions; Id. Danielle did not receive any special education support with math word problems even though this was an area of need; see (J12, J1, Pearlstein). Progress reports show that Danielle was meeting her speech/language goals (J12).

45.     On April 22, 2003, Parents accepted the services but rejected the placement (J1, Father). On or about that time Parents, at the suggestion of their advocate, sent an application for Danielle (to immediately attend, or attend for 7th grade, as a day student) to the Landmark School (Landmark) a language-based program in Prides Crossing, MA (stipulation, see also J113, J106). [24]. An applicant and parent statement was attached to

---

23 Sharon requires an additional math class in addition to the regular math class for 6th graders.
24 The Parties stipulated that Landmark is a language-based program. The Parties disagree about whether Landmark is appropriate for Danielle and/or whether it is practical for Danielle to attend Landmark because Prides Crossing (a section of Beverly) is approximately sixty miles away from Sharon.

the application (J10A). Danielle did not (and does not) want to go to Landmark but completed the statement at the request of Father (Father). She told Landmark in her application that she liked art and writing stories but did not like the pull-outs and the resource room because they make her feel stupid and she felt like she already knew the information. She also told Landmark that she liked to hang-out with her friends, play basketball, swim and do cheerleading and would like Landmark to make her feel smart (J10A). Father also told Landmark that Danielle was involved with basketball, competitive swimming and cheerleading as well as arts activities and chorus (J10A). He also told Landmark that Danielle's greatest area of need was receiving and processing language (J10A).

46.     Danielle completed sixth grade with 4th quarter grades of an A+ in art, a B- in math (up from a C+), a C- in reading, a B- in science (up from a C+), a C in social studies and a B in writing (up from an incomplete) (J94).   She received a C in P.E. because her projects were not completed and her effort needed improvement (J94). Ms. Ambrose (the social studies teacher/reading teacher) noted that Danielle tended to stray off task when doing group work and needed to apply literacy skills independently in all classes (J94) (Abrose)[25] These focusing issues affected her grade (Ambrose).  However, Danielle's writing teacher noted that she displayed good team work (J94). Danielle's final 6th grade marks were A+ in art, B's in P.E. and math, C- in reading, B- in science, C in social studies and a B- in writing (J94).

47.     On July 12, 2003 Danielle received a private psychological evaluation from Gina-Marie Bonanno in order to provide support for her admission to Landmark (Bonanno, Lord, J11). Ms. Bonanno conducted a clinical interview and a mental status exam and made behavioral observations of Danielle (J11). She also administered the Cole Animal test, the Three Wishes test and looked at an informal writing sample (J11). Ms. Bonanno also administered the WISC-III. The WISC-IV was available at that time but was not used because its availability was unknown to Ms.Bonanno and even if known she had not been trained to administer it; however, Ms. Bonanno has experience administering the WISC III and those results are valid indicators of Danielle's intellectual ability[26] (Bonanno). Ms. Bonanno also reviewed independent evaluations, interviewed the educational advocate and Parents and reviewed school records. She did not however talk to anyone from the school or observe programs (Bononno, see J11).[27]  Danielle was reserved and shy and did not participate in spontaneous conversation but did answer all the questions that Ms. Bonanno asked (J11, Bonanno).  She required extra time to process information and did not always ask to have the examiner repeat questions; Id. Some of the questions however were multistep instructions; see Transcript [28].  Danielle achieved a WISC verbal IQ score of 97 with a performance IQ score of 116 (Full Scale 106). Previous testing on the WISC done by Sharon in 1999 show a Full Scale score of 100

---

25 Ms. Ambrose's name  when teaching Danielle in 6th grade was Ms. Fulton (Ambrose).
26 Ms. Bonanno was not asked to administer achievement testing (Bonanno).
27 This evaluation was conducted in the summer.
28 For example when the Hearing Officer asked Ms. Bonanno to give an example of an instruction she replied " I asked her or instructed her to -- if she could have three wishes at this point in her life, what would her three wishes be, and I would like her to write them out for me and describe what they would be".

with a verbal IQ of 104 and a Performance IQ of 96 indicating growth; Bonanno, compare (J39, J11). The results of subtests (i.e., comprehension, vocabulary) indicate that all of Danielle's verbal scores were in the average range, except for those subtests that required auditory attention and reception (J11, Bonnano). Danielle's long term memory skills were in the average range however, she displayed weaknesses in receiving short-term memory information which directly impacted her ability to comprehend messages that were complex; Id. Ms. Bonanno concluded that Danielle would have difficulty in a general learning situation because the majority of educational instruction involves some form of verbal learning. As such, Ms. Bonanno recommended that Danielle participate in a highly structured multi-sensory language based program that incorporates specialized instruction and a specialized reading program. She also recommended that the program incorporate extra time, brainstorming strategies and graphic organizers for written tasks, allows for repetition, clarification and review, pairs written and verbal instruction, teaches sequencing strategies and uses techniques such as chunking, visual imagery and mnemonic devices to improve word retrieval skills (J11).

48.    On August 22, 2003 Landmark conducted an admission screening battery (J10). Landmark administered the Lindamood Auditory Conceptualization Test (LAC), the Woodcock Reading Mastery Test-Revised (WRMT-R) word identification and word attack subtests, the Gray Oral Reading Test-III (GORT), the Kaufman Test of Educational Achievement (KTEA), the Berea Visual-Motor Gestalt (BEREA) and the Detroit Test of Learning Aptitude-2 (DTLA-2) Word Sequences and Oral Directions subtests, and a Landmark informal writing sample (J10).

Danielle achieved a standard score (SS) of 6 (4th percentile) on the DTLA-2 Word Sequences subtest dropping from a SS of 9 (37th %) when Sharon administered the test in November 1999; compare (J10, J38). She achieved a SS of 9 (37th %) on the Oral Directions subtest of the DTLA (J10).[29] (J10). On the WRMT-R Danielle achieved a SS of 78 (7th percentile) on the word identification subtest (J10). On previous testing by Sharon in May 2002 Danielle achieved a SS of 75 (5th %); compare (J10, J22). She scored in the 25th percentile (SS 90) on the word attack subtest, where, when tested by Sharon in May 2000, had performed in the 50th percentile on this test; compare (J10, J22).

On the GORT passage reading subtest Danielle's rate scored at the 9th percentile (SS 6), with an accuracy rate at the 2nd percentile (SS 4) and a passage score in the 1st percentile (SS 3) (J10). Testing by Dr. Kemper done in February 2002 showed SS of 4 in rate and accuracy with a passage score of 3, scores higher than Landmark's more recent entrance testing; compare (J10, J24). She scored in the mid 2nd grade range in auditory perception of speech sounds and scored in the 10th percentile in spelling on the KTEA, a grade equivalent of 3.8.

49.    Landmark did not admit Danielle for the 2003-2004 school year because it did not have an opening due to lack of staff to teach the individual tutorial. However, Danielle was eligible for admission and fit the profile of many of the students there although none

---

29 This subtest does not appear to have been given in 1999; see (J37).

would be at a lower reading level (Pulkinnen). Landmark anticipates that it is highly likely, although not certain, that it would have an opening in mid to late January (Pulkkinen).[30] [31] Landmark has 128 students at the elementary/middle school campus in Hamilton, MA.[31] Approximately 1/3 (42 or 43) of those 128 students are female. Fifty-three of the 128 students are publicly funded (Pulkinnen). Of those students five or six have been diagnosed with CAP-D with one of those students in the 7th grade; Id. If Danielle went to Landmark she would have a 1:1 tutorial in reading addressing phonological issues using the LiPs methodology (Pulkinnen). Landmark's speech/language pathologist (SLP) would also use the LiPs methodology in her auditory expression class once every other week. On the alternate week students receive social pragmatic instruction from the psychologist. Danielle would also be grouped with three girls and two boys in her oral expression/literature class. She would be grouped with one other girl and six boys in social studies, with two other girls and four boys in language arts and with one other girl and six boys in math (J10B). Her science class would contain four girls and two boys. Her art class would contain two girls and two boys and P.E. would have two girls and seven boys (J10B). The students in her academic subjects would be of similar skill level with language skills integrated throughout the curriculum. Homework is monitored through an assignment book which students take to each class and to home. Parents monitor their child's homework completion and can contact the case manager regarding any problems (Pulkinnen).

Auditory processing issues are addressed through small or individualized instruction to reduce ambient noise issues. Classroom teachers would also reinforce attention by asking students to reverbalize, and insistence that students not interrupt each other and talk over another student along with insistence that students raise their hands and be recognized before they offer their verbal input. Teachers would also structure seating so that students can predict when their turn is coming so that they can take the time to process the information (Pulkinnen). Visual distractions are minimized by keeping a minimum of papers and extraneous visual materials on the board and through grouping students near the blackboard and where the visual information is being presented; Id. The classes in Landmark's new wing (language arts, social studies) are in sound proof rooms; however many of the science and math classes are in the old wing with tile floors and ceilings without acoustic tiles; Id.. Landmark has had students who have required physical alteration to the rooms and has in the past put tennis balls on the bottom of chairs to decrease reverberation. It has also serviced students who have used FM receivers. However if other accommodations are required, Landmark would look at the issue with the facilities personnel and make a programmatic decision about whether it would do that for one student (Pulkinnen).

50.    Landmark's school day begins at 7:45 a.m. Students begin arriving at 7:15 a.m. and have an opportunity to have breakfast and socialize before school. Sharon is

---

30 On or about December 17, 2003 Danielle was admitted to Landmark (stipulation, see J10B).
31 Landmark also has a 5 day residential program for the middle school containing six boys and two girls. There is also one girl who stays for three evenings a week so that she can sttend JV girls basketball practices and play in games. All the residents leave for at 3:00 p.m. on Friday and return Sunday evening at 6:00 p.m. for study hall (J10B). Parent's did not present the residential program as an option but did supply information about the program at the Hearing Officer's request (J10B).

approximately sixty miles south of Hamilton on Massachusetts Route 128; see (J106, Father).[32]  Landmark does not currently have any other students from the South Shore at its Hamilton campus. Mr. Pulkinnen anticipates that at a minimum the trip without delays would take at least one hour and fifteen minutes (Pulkinnen, see also Father).[33] The school day ends at 2:58 p.m.; Id.   In the fall, Landmark offers interscholastic soccer and cross country, in the winter there is basketball and wrestling and in the spring softball, baseball and track and field. Eighth graders may also try out for the Junior Varsity or freshman teams; Id. Landmark also has a JV girls and a middle school boys basketball team.  The JV girls basketball team is composed of 7th-10[th] grade girls (J10B). The middle school also has a cheerleading team that cheers at the Middle school boy's basketball home games (J10B).  Everyone who is interested in cheerleading is on the team; Id. Landmark also offers intramural soccer in the fall, intramural basketball and floor hockey in the winter, and a combination of volleyball, badminton and softball in the spring.  It also offers extracurricular activities (such as art) depending on student interest (see J106). All the sports and extracurricular activities take place after school and end between 4:30 –5:00 p.m.  Students that participate in sports are picked up by their parents. It does not offer swimming (Pulkinnen, see J106). Student wants to continue participating in Sharon's swimming program and would like to continue to play on the basketball team in Sharon.  Parents feel that this would be an option because the meets and games are on the weekends.

51.    Danielle liked the art on Landmark's walls and asked about the sports there. After going to Landmark for testing Danielle still did not want to attend but told her Father she would try it for a year (Father).  She would like to remain at Sharon Middle School (Father).

52.    Danielle began 7th grade at the Sharon Middle School in September 2003 (Father). She received an updated psycholinguist reevaluation from Dr. Kemper on September 5, 2003, less than one week later (Kemper, J9).  Dr. Kemper readministered the tests that he gave Danielle in February 2002 in order to compare scores and draw conclusions regarding whether Danielle had made gains since February 2002; compare (J9, J24, Kemper). Dr. Kemper found that Danielle made few, if any, gains in decoding, reading fluency, reading comprehension, writing and spelling (J9, Kemper). However, Dr. Kemper also acknowledged that some or all of Danielle's scores may be indicative of regression over the summer. However, he continued to believe that Danielle had greatly impaired ability to become a competent reader and achieve success in meeting a 7th grade curriculum due to deficits in phonological awareness, memory and rapid naming, skills only showing a comfortable reading level in the mid 2nd to mid 3rd grade level, oral reading fluency at the 2nd grade level and reading comprehension at a third grade level (Kemper). Dr. Kemper continued to recommend a substantially separate language based program that incorporates the Fast Forward[34] computer program (to address language

---

32 Interstate Route 95 and Route 128 merge for a great portion of the route.
33 It took Father approximately one hour to travel from Sharon to Landmark going 65-70 miles per hour at mid-day (2:30) in April 2003 (Father).
34 Fast Forward is a 6-8 week 100 minute per day computer program that slows down and pulls apart auditory information so that those with reading comprehension and auditory processing difficulties can process the information more efficiently. The information is then slowly and systematically (through a

processing), LiPs[35] and Project Read[36] (Kemper). Although Dr. Kemper feels that these are the best methodologies there are other methodologies that can accomplish the same goals (Kemper).

53.    Dr. Kemper visited Sharon's program on September 10, 2003 and observed all of Danielle's classes except for speech and language (Kemper, Turk). However he wrote his report before observing the program (Kemper). Dr. Kemper was only able to observe ten minutes of Ms. Lanzel's class because as usual there was an accident on Route 128 causing him to arrive 35 minutes late (see Kemper). Dr. Kemper did talk to the SLP about the work she did with Danielle. The SLP told Dr. Kemper that she was working on auditory processing and recall strategies in a small group and also supported her in this area in class. Dr. Kemper agreed that this work was appropriate. However he also felt that the SLP should be showing the teacher how to break down information into smaller segments to facilitate Danielle's processing capabilities and that the SLP should also work with the teachers on how to cue and ask questions appropriate for Danielle's level of understanding (Kemper). Dr. Kemper did notice that Danielle was participating in the special education academic labs. He also noticed that in Ms. Pearlstein's class students did move from the simple to complex in a systematic way. He did not however observe Ms. Pearlstein explain to the students spelling rules or what the parts of speech had to do with stringing rules together, as would be required in the Orton-Gillingham or Project Read methodologies (Kemper).

Dr. Kemper also observed English, science, social studies and math. Danielle did not actively participate in any of these classes (Kemper). The English lesson he observed was well done but was fast paced and contained material from a book with long complex sentences that Dr. Kemper analyzed at above a 12th grade level (Kemper). Danielle, although not verbally participating, was actively following the reading with a pen (Turk). Dr. Kemper also found that the social studies lesson was well presented but was also fast paced. Similarly, science, although a very structured, organized and well presented lesson, used, like the other academic subjects, difficult vocabulary and complex language that would be difficult for Danielle to decipher even with modifications (Kemper, but see J102, J103, 103A).[37] Danielle did attempt to answer one science question but did, like in

---

protocol) speeded up to a normal rate (Kemper).

35 LiPS (Linda Mood Bell Phoneme Sequencing Program) is an intensive continuous five-day a week (60-80 hour and mostly individualized) phonemic awareness program where children learn labels that are associated with the particular phonemes and vowels to hear and feel differences in sounds which helps with decoding.

36 Project Read is a reading comprehension program; Story Form (breaks down a story into its beginning, middle and end, character setting, action/reaction and analysis); Project Form (teaches expository reading in social studies, math and science) and Framing Your Thoughts (a structured syntactic writing program that teaches how to string words into a noun and verb phrases and expansions) (Kemper).

37 School work samples show that Danielle was able to correctly use vocabulary such as democracy, olgarchy, monarchy and hypothesis, variable and analysis. On a 7th grade science test with a grade of "80" , Danielle correctly answered questions dealing with "taxonomy," "animalia", "carnivora", "binomial nomenclature", "heterotroph", and "multicellular". She also answered the two written questions on the examination correctly and her answers, while not complex, show progress in the areas of sentence structure and spelling, as well as a grasp of the subject matter; see (J103A), (School Brief at 14).

social studies, spend a lot of time socializing with a neighboring classmate. Math was
also well presented and used strategies to recall difficult concepts. Dr. Kemper however
did not feel that Danielle could comprehend these concepts due to her limited decoding
abilities even with accommodations and pull out and in class special education support
(Kemper, but see (Terrell, Turk).

54.     On September 13, 2003 Danielle received an updated CAP evaluation from Ms.
Shubow (J8). Danielle did show improvement in her hearing acuity. She also showed
improvement in her auditory processing when compared to her previous audiological
testing done in February 2000 (Shubow, J8). Much of her improvement in auditory
processing is attributable to neurological maturation of the auditory system (Shubow, J8).
[38] However even with testing done under ideal listening conditions in a sound proof
room, Danielle continued to display mild difficulty processing complex auditory
information displaying more difficulty with longer tasks. She also continued to have
difficulty accurately comprehending speech presented with competing background noise;
Id. This difficulty would be exacerbated in a classroom setting where ambient noises
fluctuate through the day resulting in varied attention over the course of the day or from
day to day; Id. In addition, Danielle's language-based learning difficulties combined
with her auditory processing deficits put Danielle at continued risk for inaccurately
perceiving auditory information in a classroom setting. This was especially true in
situations where information is presented in a noisy background or is presented quickly
or contains multiple parts or unfamiliar language concepts (Shubow, J8). Ms. Shubow
recommended a setting that has a structured stable and supportive environment where
goals, expectations and time frames are clear and extra time is given to process the
information given; Id.. She also reiterated the educational modifications made in
February 2000; compare (J8, J36). However, she no longer recommended an auditory
trainer due to Danielle's neurological auditory maturation (Shubow, compare J8, J36).
Ms. Shubow noted that her recommendations could be implemented in a public school
setting; however, implementation would be more difficult due to larger class size
(Shubow). She has not observed the settings at either Landmark or the Sharon Middle
School (Shubow).

55.     Danielle's current 7th grade schedule is an inclusion program for all her academic
subjects and she receives modifications such as study guides, notes, pneumonic
sentences, graphic organizers, and multisensory pairing of information; see (Terrell,
Lanzel)[39] Danielle also participates in Chorus, P.E., Graphic Arts and Computer (J95,
J119). She also receives daily pull out special education instruction with Ms. Lanzel
either individually or with one or two other peers (Lanzel, J119, J120, J115G).[40] This
instruction includes reviewing class lessons and assignments, previewing new

38 Ms. Shubow noted that developmentally children have a right ear advantage, because auditory stimuli
goes into the left hemisphere of the brain where language is processed where as what goes into the left ear
goes into the right hemisphere and has to cross over the developing mid brain (corpus collosum). This gap
closes at age 12-14 when the corpus collusum mylinizes. (Shubow)
39 Ms. Terrell (the science teacher) also has a web page with the class notes and relevant links (Terrell).
40 Ms. Lanzel is a certified master's level special education teacher (J115G). Much of her teaching was in
Israel. Ms. Lanzel has an accent but has articulate speech and is understood by Danielle despite her CAP-D
(Lanzel).

information, helping Danielle with organization, working on elaboration in her writing and going over parts of speech or proofreading techniques (Lanzel). One of Ms. Lanzel's paraprofessionals also goes into Danielle's English class four times per week and her math class once weekly (Lanzel, J120). There is also a paraprofessional assigned to Danielle's math class (Lanzel). Ms. Lanzel also formally meets with all of Danielle's academic teachers on a weekly basis and is available to meet with individual teachers daily as the need arises (Lanzel, Terrell). In addition, Ms. Lanzel also provides the teachers with modified material (such as vocabulary). Danielle has told Ms. Lanzel that she likes to come to see her and that she is having a great year, much better than previous years at school (Lanzel). She is motivated and has, since the beginning of the school year, been able to complete her homework; Id. She has good self advocacy skills, is motivated and has been able to demonstrate that she is learning the material (Lanzel).

56.    In addition, Danielle continues to receive pull-out speech/language therapy from Ms. Reeves once a week in a small group with two other students (Reeves). In this group Danielle works on strategies for listening, recall and word retrieval. Ms. Reeves also addresses how these students can deal with difficult listening situations (Reeves). All of these students have expressive and receptive language issues. One other student has a CAP-D (Reeves). Ms. Reeves also provides support in Danielle's English class twice a week and has as of March 24, 2003, begun providing support in social studies as a result of an interim agreement between the parties (J119, compare J95, J119). In these classes Ms. Reeves provides services to Danielle (and two other students) individually to ensure that she understands the task. Ms. Reeves also helps Danielle with organizational skills (Reeves). In addition Ms. Reeves provides Danielle's teachers with approximately five scheduled minutes of consultation per week. Speech/language consultation is not on the IEP (Reeves, see J1).

57.    Danielle also has, since approximately May 2003, as a result of an accepted IEP for services, continued to receive small group phonics based instruction twice per week from Ms. Pearlstein (Pearlstein, J116, J119, Pearlstein). The program Ms. Pearlstein uses with Danielle is the "LANGUAGE!" program (LANGUAGE!). Sharon chose the LANGUAGE! program over the Wilson program because they believed that Danielle could benefit from more of an overall language program as opposed to a program that primarily deals with decoding [41] (Pearlstein). LANGUAGE! is a research-based, structured multisensory, [18] strand sequential language curriculum that incorporates ongoing criterion-based assessment and ongoing staff development and support (J116). [42] The program addresses deficits in reading, writing, spelling, vocabulary and grammar (J116, Pearlstein). Level 1 covers phonemic awareness, phonemic-grapheme correspondence, progressing to decoding, encoding, accuracy and fluency in passage reading to vocabulary, comprehension and broad supplementary reading to figurative language and idioms. The program also incorporates abundant writing and editing practice (Pearlstein, J116). Once students have mastered the contents of Level One they

---

41 Ms. Pearlstein has been trained in Wilson  (Pearlstein).
42 The eighteen strands are: speaking/listening, phonology, phonemic awareness, orthology, phonics, word recognition, spelling, syllabication, text reading, vocabulary, comprehension, morphology, semantics, figurative language, grammar/usage, mechanics, syntax and composition.

move to Level 2 and 3; <u>Id.</u> Level 2 covers developing fluency and automaticity of decoding and encoding polysyllabic words, morphology and syntax mastery in reading, writing and listening and expansion of grammar and composition through narrative and expository writing ; <u>Id.</u> Level 3 covers literacy concepts such as universal theme, narrative style, tone, point of view and character development (J116).

LANGUAGE! was originally created for children and adults who were learning English as a second language, but it is also designed to be used for students with learning disabilities that result in difficulty with reading, writing, spelling, vocabulary and grammar, or other students who function at or below the 30th percentile or who are two or more grades below their grade level (Pearlstein, J116). It is intended to replace language arts instruction (J116). LANGUAGE! provides additional practice materials for students with identified learning disabilities (J116). Students are given a placement test and are placed according to their encoding and decoding skills (these may differ) (J116, Pearlstein). Students who have successfully completed Level 2 by the end of the fifth grade are returned to the conventional reading/language arts classroom for 6th grade. The publisher recommends that all other students complete Level 3 before returning to the regular English classroom to ensure that older students are reasonably able to perform independently in the regular English classroom (J116). In 6th grade, Danielle pretested into Level 2 (Pearlstein) and was placed with a group that she continues with in 7th grade. She is hard working, motivated and has developed self advocacy skills to ask questions and self correcting skills in punctuation and grammar. When needed, Ms. Pearlstein may use elements of Wilson and work on basic decoding, encoding and phonemic awareness if it appears that a student needs such instruction (Pearlstein).

58.    Naami Turk spent approximately 7+ hours observing Danielle in her program on June 16, 2003 and again on September 9, 10 and 26, 2003 as part of her part time employment as a psychologist for the Sharon Public Schools (<u>see</u> J114A, Turk). (J115E, Turk).[43] Sharon did not seek consent for Dr. Turk to conduct this observation (Turk). Dr. Turk also spoke to Danielle on two separate occasions [44]. Danielle appeared comfortable in the middle school social setting, was socially well adjusted and was sought after by her peers (Turk, J114A, <u>see also</u> Pearlstein, Terrell). Danielle also appeared eager to please, diligent and motivated to succeed. Dr. Turk also observed that Danielle was comfortable with her routine and transitioned into her classroom and from subject to subject with ease, immediately settling into her desk and independently taking out appropriate books

---

43 Dr. Turk also consults to the Walpole Public Schools and a number of private school programs part time and has a small private practice in Sharon (Turk).

44 The Parties dispute whether Dr. Turk is an employee or an independent contractor. Parents maintain that as an independent contractor Dr. Turk's observation and discussions with Danielle was equivalent to an evaluation of Danielle that was done without consent; <u>see</u> Parent's motion to exclude. Dr. Turk however, maintains an office in the Sharon schools (Turk, <u>see also</u> (Father). She is supervised by the special education director and observing programs is part of her duties for Sharon (Turk). Sharon maintains that speaking to the student to determine if the program is appropriate is not equivalent to clinical interviews in an evaluation requiring consent. Dr. Turk's discussions with Danielle were stricken from Exhibit J114A but were allowed into testimony to determine if those discussions were evaluative in nature. Those discussions are stricken on other grounds because the information relevant to this decision is cumulative of other evidence presented elsewhere in the record. The general observations are admissible; <u>see</u> <u>In Re Steven A</u> (Sherwood), 2 LRP 9679.

and materials (Turk, J114A). Dr. Turk also observed Danielle using paired verbal instruction and visual cuing and completing her work in a reasonable amount of time, being neither the first nor the last to finish; Id. She was, in English, able to identify the primary characters, their traits and the process leading to the outcome of a story that had been read to them, given visual and written prompts and preferential seating; see (J114A). She was also able, with preferential seating and pairing of information, to follow the science lesson, ask relevant questions, comprehend the tenets of organization and successfully present information (Turk, J114A, see also Terrell).[45] Danielle was also able to actively engage in a math discussion and remain focused on the lesson. Id. She was able to use paired visual and verbal instruction successfully in her computer class, and was observed appropriately answering questions in all her inclusion settings, was open to support and feedback, and was able to usefully incorporate that feedback and ask for help to see if she had done a task correctly[46] (Turk, Terrell, Lanzel, Reeves).

Dr. Turk also observed Danielle in her academic lab with Ms. Lanzel and her small group instruction with Ms. Pearlstein (Turk). Danielle enjoys going to the academic lab and appeared motivated, diligent and receptive to feedback from Ms. Lanzel; see (Turk, Lanzel, J114A). She also fully participated in Ms. Pearlstein's class answering questions appropriately and asking appropriate questions. She was comfortable in the group, focused and able to comprehend and recall the information that was presented in a structured and predictable manner (Turk, Pearlstein, J114A). Dr. Turk has recommended that students be placed in substantially separate placements in situations where the opportunity to be educated alongside nondisabled peers is no longer possible, either because of safety reasons or because the ability to learn curriculum is just in no way accessible for that child; or in situations where the resources of a school or a program have been exhausted in terms of supporting the child in the least restrictive environment (Turk). In this situation however Dr. Turk recommended that Danielle was able to access the curriculum with supports and therefore should remain in her current placement (Turk). Father however asserts that Danielle can not read road signs when traveling, can not read directions on a brownie box and only receives good grades because he works extensively with Danielle before tests and makes her stay up and memorize everything; see (Father). Parents feel that Danielle requires a substantially separate program that will meet her needs (Father).

59.     Parents learned of Dr. Turk's observation as a result of reviewing discovery as part of this hearing and were upset because it presented information that Danielle was happy, doing well in Sharon Middle School and did not want to go to Landmark (Father). Danielle became upset with Parents but did not deny that Ms. Turk's conclusions were correct (Father).

60.     Progress notes from 7th grade show that Danielle is generally meeting curriculum expectations in her classes (J123). Her English teacher noted that Danielle's writing

---

45 Danielle has received A's and B's on all of her science quizzes (Terrell, see J103A).
46 For example, Ms. Turk observed that Danielle had missed part of a direction but was able to, with support from the SLP, to correct her mistake and ask for confirmation from the teacher to see if she did it right (Turk).

clarity had improved and she had good class participation in her English class. Her social studies teacher commented that Danielle needed to remember to review her notes each night but that she was doing a good job. Her mathematics instructor made a note of Excellent! (J123). She was however inattentive in chorus and tended to socialize too much (J123). Special education progress reports also show that Danielle is making effective progress in most areas; see (J121). She still continues however to have trouble mastering writing goals including eliminating extraneous information and proofreading (J121, Lanzel). She has demonstrated progress in her ability to focus on classroom instruction, has improved her auditory memory and responds appropriately to questions in small group discussions. In tasks involving word retrieval, Danielle continues to display periods of relative ease interspersed with periods of difficulty in her speaking and her writing (J121).

61.    Danielle received first quarter 7th grade marks of an A in Graphic Arts, an A- in P.E., B's in Chorus, English, Science and Math, a B- in Computer Applications and a C+ in Social Studies. Her teachers, with the exception of Social Studies, noted good to excellent conduct and effort. Her English and Social studies teachers however noted inconsistent class participation and her computer teacher noted that Danielle needed to take more responsibility for her learning (J122).

62.    Danielle has been admitted to Landmark and could start in late January 2004 (stipulation, see J10B). There are also openings at the South Shore Collaborative's Intermediate Learning Disabilities (LD) Program at the Randolph Middle School and the Charms Collaborative (LD) program at the Galvin Middle School in Canton.[47]  Sharon's alternative learning disabilities program is also an option. Parents like the South Shore Collaborative program but do not know if it would be appropriate. They would only like Landmark explored.

## FINDINGS AND CONCLUSIONS

At issue is whether the program and services that Sharon offered Danielle at the Sharon Middle School in its current IEP provide a free appropriate public education (FAPE) in the least restrictive environment (LRE). Also at issue is whether Sharon failed to implement accepted speech/language therapy services and if so, whether Parents' should be reimbursed for privately retaining those services.

A.    **THE FAPE STANDARD**

Under the federal FAPE standard, an educational program must be provided under an IEP that is tailored to the unique needs of the disabled child and meets all the child's identified special education and related service requirements. This includes academic, physical, emotional and social needs; 34 C.F.R. 300.300(3)(ii); Lenn v Portland School Committee, 910 F. 2d 983 (1st Cir. 1990), cert. Denied, 499 U.S. 912 (1991) and Burlington v Mass. Dept. of Education, 736 F. 2d 773, 788 (1st Cir. 1984). In addition,

---

47 Randolph and Canton are neighboring communities to Sharon. Sharon feels that its program is appropriate but is willing to explore other programs.

the IEP must be reasonably calculated to provide a student the opportunity to achieve meaningful educational progress. This means that the program must be reasonably calculated to provide effective results and demonstrable improvement in the various educational skills identified as special needs; Roland v Concord School Committee, 910 F. 2d 983 (1st Cir. 1990).

B.    **LEAST RESTRICTIVE ENVIRONMENT (LRE)**

      In addition to meeting the above standard, special education and related services must be provided in the least restrictive environment. This means that to the extent appropriate, students with disabilities must be educated with children who do not have disabilities. Programs and services can only be implemented in separate settings when the nature and severity of the child's special needs is such that the student can not make meaningful progress in a regular education setting even with the use of accommodations and specialized services; see 20 U.S.C. 1412 (5)(A). In Massachusetts, the IEP must also enable the student to progress effectively in the content areas of the general curriculum; 603 CMR 28.02 (18). Massachusetts has defined "progressing effectively in the general education program" as "mak[ing] documented growth in the acquisition of knowledge and skills, including social/emotional development, within the general education program, with or without accommodations, according to the chronological age and expectations, the individual educational potential of the child and the learning standards set forth in the Massachusetts curriculum frameworks and the curriculum of the district"; Id.

C.    **COMPENSATORY EDUCATION**

      Finally, FAPE also entails complying with the procedural requirements of the IDEA; a school district which violates a student's procedural rights under federal or state law may be liable where "procedural inadequacies [have] compromised the pupil's right to an appropriate education…or caused a deprivation of educational benefits." Roland M. v Concord Public Schools, 910 F. 2d at 994 (1st Cir. 1990); see also Murphy v Timberlane Regional Sch. Dist., 22 F. 3d 1196 (1st Cir. 1994) ("a procedural default which permits a disabled child's entitlement to a free and appropriate education to go unmet for two years constitutes sufficient grounds for liability under the IDEA."). Neither the IDEA nor Massachusetts statutes prescribe a limitations period for compensatory education claims. In Massachusetts both state and federal claims have been decided on a case-by-case basis; see e.g. Amann v Stow, 991 F. 2d 929 (1st Cir. 1993), Murphy v Timberlaine Regional School District, 22 F. 3d 1186 (1st Cir. 1994). When considering the appropriate limitations period, Courts examine the competing policies of encouraging rapid resolution of placement disputes with the incentive to take the necessary time to resolve the matter through good faith negotiation between the parties; compare Amann, *Timberlaine* supra. The BSEA has adopted a three year statute of limitations period; see Fall River Public Schools 5 MSER 183 (Crane). Such claims however may be defeated by equitable considerations; see Marshfield Public Schools BSEA 95-2757 (Sherwood 1997).

D.      **RULING**

      After review of the documents and testimony presented in this matter, I find that Sharon's IEP as configured does not provide a FAPE to Danielle. I find however that Sharon is not responsible for reimbursing Parents for speech/language therapy during the fall of 2000 because Parents did not accept the IEP that designated those services. My analysis follows:

I.      **Compensatory services**

      The Parties do not dispute that Sharon's June 12, 2000 IEP offered Danielle one forty minute pull-out and two forty minute in class speech/language therapy sessions; see (J6). The Parties however also do not dispute that on July 7, 2000 Parents postponed a decision on this IEP pending the completion of an independent evaluation and that services were provided once Parents in December 2000 accepted those services; see (J6, J5). Parents believed that they would still receive the services because they indicated at the TEAM meeting that Danielle should have speech therapy. However Parents did not accept those services on the IEP despite appropriate notice of their rights and access to their educational advocate. Nor did Parents at that time inform Sharon that they had obtained private speech therapy for Danielle and were seeking reimbursement. As such, Parents' request for reimbursement is denied.[48]

II.     **The Middle School Program**

      After extensive review of the record I find that the Sharon's current program for Danielle has many positive aspects. Danielle's writing has improved as a result of support from Ms. Lanzel. She is also benefiting from the pull out support that Ms. Reeves (the SLP) provides to address retrieval and recall deficits. Although shy, she has now made many friends, is comfortable at the Middle School and participates extensively in the Sharon community. She enjoys, and is doing relatively well, in her nonacademic classes. WISC III scores done by Parents' independent evaluator indicate growth and her ability to read orally, showed some improvement; compare J15, J24 Gray Oral scores. Although improvement is still needed, Danielle is also making some gains in asking for help when she needs it.

      Parents' claim that Dr. Kemper's, Ms. Shubow's and Ms. Bonanno's testing and both Dr. Kemper's and Ms. Lord's observations show that Sharon's program is inappropriate. Ms. Bonanno's testing showed gains. Ms. Shubow indicated that while it is more difficult to implement the modifications that Danielle requires in a larger setting it could be done. In addition, she did not view Danielle's program. Dr. Kemper's conclusions were problematic because they were based in part on testing that should have

---

48 The Parties do not dispute that Father requested an evaluation for Danielle on September 1, 1998 and that Sharon did not conduct an evaluation until it received Parents' private evaluation from Children's Hospital one year later. Sharon also did not conduct the speech/language evaluation it recommended in December 1999 until May 2000. Although that claim is time-barred this failure to receive services may have an impact on Danielle's current educational needs.

been correlated with teacher reports and work samples (TORC-3), testing that should not be used to make specific recommendations regarding individual programming (TOWL-3) and testing that may not be appropriate for a child with CAP-D. His conclusions were also based in part upon a misconception of the services Danielle was receiving in school. In addition, Dr. Kemper deemed Sharon's program inappropriate prior to viewing it and his comparison of testing was done using grade equivalents which he admitted were misleading and were also done at a time where regression may have occurred over the summer, indicating a need for a summer program but not a need for an out of district placement. Ms. Lord does not have the expertise to determine if a program is language-based. However, Dr. Kemper and Ms. Lord's observations did correlate with Danielle's former SLP's (Ms. Davis) written observation that Danielle tended to avoid class participation because she had difficulty putting her ideas into words and her 7th grade English and Social Studies teachers observation of inconsistent class participation.

However, despite these shortcomings IN Parents' case, the IEP on its face is inappropriate because it does not address Danielle's difficulty comprehending mathematical word problems that Sharon agrees would be beneficial for Danielle. Danielle is now beginning to use the computer and Inspiration software (recommended by Sharon in June 2000) to assist in writing but is not encouraged to consistently use the technology that Sharon and Ms. Shubow (the audiologist) recommends for her to use at school and at home. The IEP also does not include the Fast Forward and LindaMood Bell programs Ms. Shubow recommends to address auditory processing deficits and consultation is not included on the IEP.

Also, Sharon's own testing shows that Danielle decodes inefficiently on materials at or above a 5th grade level and continues to have deficits in reading comprehension (J15). Woodcock Reading Mastery testing done in May 2002 (5th grade) show significant percentile drops in all subtests done a year and a half earlier (November 2001), dropping from the 41st to the 14th percentile in basic skills, from the 28th to the 11th percentile in reading comprehension and from the 34th to the 12th percentile in total reading skills (see Finding 26). Although Sharon's testing done in March 2003 show that her basic skills increased from the 14th to the 30th percentile, this percentage is still significantly below her 41st percentile rank in November 2001. In addition, Sharon's testing of Danielle's written expression, using identical tests (WIAT written expression subtest), show a drop from the 61st percentile in November 1999 to the 47th percentile in March 2003. Danielle's school work show that she is able, with teacher assistance, to focus in class, and has been able to make use of Ms. Lanzel's assistance in previewing and reviewing class material. However, Landmark's admission testing shows percentile drops when compared to Sharon's testing indicating a failure to generalize the information she learned or substantial regression requiring an extended year program; compare J10, J24.

In addition, the current program is also inappropriate because Ms. Reeves (the SLP) only attends one social studies and two of Danielle's English classes despite testimony that Danielle needs frequent checking to ensure that she remains on task. Ms. Reeves works on recall and retrieval but does not address breaking down language to make it accessible for Danielle because Ms. Lanzel covers those issues. Ms. Lanzel

32

works with the teachers to modify class material. However, Ms. Lanzel is not in her classes, instead sending a paraprofessional to cover English. No evidence was offered regarding Ms. Lanzel's work with the paraprofessional to break down the language to ensure Danielle's comprehension or monitoring of the paraprofessional to ensure compliance with the IEP. Further the science website, although excellent, has content that has not been made language-based and as such is not fully accessible for Danielle. In addition, although the LANGUAGE! program provides the small group phonics based instruction recommended by Ms. Shubow and Dr. Kemper, it is only provided twice a week instead of the daily instruction recommended by the program.

Landmark is a language-based program with a good reputation and like Sharon has charming and personable staff. That alone however is not enough to make a program appropriate. Landmark is sixty miles away from Sharon and requires at least an hour and fifteen minute drive north on Route 128 on a good day. Most days are not good days. Landmark's school day begins at 7:45 a.m. This would require Danielle to be ready for the bus at a very early hour. Danielle has trouble going to bed and trouble getting ready in the morning. In addition Danielle does not want to go to Landmark and although she could perhaps sleep on the bus, lacks the motivation to be ready when the bus comes.

Danielle also does not want to go to Landmark because that would require her to leave cheerleading, swimming and basketball in Sharon and her friends there, friends that have taken a long time to make due to her shyness. Parents maintain that Danielle could still participate in all her activities if she went to Landmark. This Hearing Officer disagrees. Landmark's residential program could be an option. However the residential middle school program is very small and although if living there, Danielle could participate in Landmark's cheerleading and basketball the evidence does not show that Danielle would be motivated to attend. In addition, less restrictive and closer collaborative and day programs have not been explored.

Testing by both Landmark and Dr. Kemper show substantial regression over the summer. As such, Sharon will locate or create a language-based summer program that will include Fast Forward and/or LiPs instruction. Sharon will also locate or create a language based program that provides the agreed upon special education support with math word problems during the school year, consultation from Danielle's special education providers and daily phonics based instruction in reading and writing.

In addition, Sharon will immediately send a referral packet to the South Shore Collaborative's Intermediate LD program in Randolph, MA, and any other language-based day programs in the Southeastern Massachusetts, Rhode Island or the MetroWest area that service cognitively average to above average middle school students with dyslexia and CAP-D. It will also pursuant to Special Education Hearing Rule 9 B12 fund an independent evaluator approved by the Hearing Officer, will contact that independent evaluator by January 16, 2004, and send the evaluator any records requested.[49] It will also arrange on observation of its program and the South Shore Collaborative program in January 2004. The evaluator will speak to Danielle about all options, including

---

49 A list of potential evaluators will be provided under separate cover.

33

Landmark.[50] The evaluator will also view Sharon's current program and the South Shore Collaborative program and provide a report to the Hearing Officer and the Parties.[51]  The Hearing will be reconvened after receipt of the report to consider the independent evaluator's recommendations.

## **ORDER**

Parents' request for compensatory speech/language services for the period of September-December 2000 is DENIED.  Sharon will locate or create an appropriate language-based program for Danielle pursuant to the decision within.

By the Hearing Officer,


_____

Joan D. Beron
Date:  January 12, 2004

---

50 The Parties will contact Landmark to determine if the opening can remain for a brief period of time (i.e. one week).
51 Information regarding the independent evaluator will be provided under separate cover.  The independent evaluator's report may be oral.  Both Parties may contact the evaluator.

April 20, 2004

# COMMONWEALTH OF MASSACHUSETTS
## BUREAU OF SPECIAL EDUCATION APPEALS

---

## SHARON PUBLIC SCHOOLS

### BSEA # 03-4311

---

BEFORE

JOAN BERON
HEARING OFFICER

RUTH BORTZFIELD, ATTORNEY FOR THE PARENTS
BARRY MINTZER, ATTORNEY FOR THE SCHOOL

## COMMONWEALTH OF MASSACHUSETTS
## SPECIAL EDUCATION APPEALS

**BSEA #03-4311**

RE:   **DANIELLE[1]  v**
      **SHARON PUBLIC SCHOOLS**

### DECISION

This decision is issued pursuant to M.G.L. c.71B and 30A, 20 U.S.C.§1401 et seq., 29 U.S.C. §794, and the corresponding regulations. A decision was rendered on January 12, 2004 finding both Sharon's and Parents' program inappropriate and requiring Sharon to fund an independent evaluator to determine if Sharon's program could be modified to meet Danielle's needs. If not, Sharon would be required to locate an appropriate program in Southeastern Massachusetts or Rhode Island or the Metro West area.

Joan Axelrod was chosen as the independent evaluator and observed Sharon's program and a program at the South Shore Collaborative on January 27, 2004 supplying oral reports to the Parties on January 28, 2004 and February 3, 2004. Ms. Axelrod issued a written report to the Parties on February 10, 2004.

On February 17, 2004 Parents, through their attorney, moved to set the matter for further hearing to rebut the independent evaluator's findings and offer rebuttal testimony from Dr. Robert Kemper. The motion was allowed over Sharon's objection. On March 10, 2004, a hearing was held at the Bureau of Special Education Appeals to receive rebuttal testimony. The Parties agreed to extend Danielle's IEP until May 28, 2004 and that pending the final decision the current IEP would be amended to include individual Wilson and reading comprehension instruction (as recommended by Ms. Axelrod) and speech and language consultation to Danielle's academic inclusion teachers pending this final decision. The Parties also agreed that Sharon would apply to Landmark's summer program. The official rebuttal record consists of the independent evaluator's report and resume marked HO-1 and HO-2 respectively and Parents' Rebuttal 1 (Bell Schedule for Sharon Middle School) and approximately four hours of testimony. The record closed on April 20, 2004 after written closing arguments were received from the Parties[2].

Those present for all or part of the hearing were:

|  |  |
|---|---|
|  | Mother |
|  | Father |
| Robert Kemper | Pyscholinguist |
| Joan Axelrod | Independent Evaluator |
| Judy Levin-Charns | Director Student Services; Sharon |
| Ruth Bortzfield | Attorney for Parents |
| Barry Mintzer | Attorney for Sharon |

---

1 Danielle is a pseudonym used for confidentiality and classification purposes.
2 The original date for filing closing arguments was April 16, 2004. Parent was given an extension due to problems transmitting the closing argument by email.

Joan Beron                      Hearing Officer, BSEA
Christine Silva-Aderman        Court Reporter-Catougno Court Reporting

## ISSUES

I.     Can Danielle's program at the Sharon Middle School be modified to provide her
with a free appropriate public education (FAPE) in the least restrictive environment
(LRE)?

II.     If not, does Student require an out of district day program to achieve a FAPE in
the LRE?

## SUPPLEMENTAL FINDINGS OF FACT

1.     A decision on this matter was issued on January 12, 2004. This Hearing Officer
found that Danielle was benefiting from the special education support and the recall and
retrieval strategies provided by the speech/language pathologist (SLP). However, the IEP
as then configured, did not provide a FAPE to Danielle because it did not adequately
address her decoding and reading comprehension deficits, did not provide SLP and/or
special education consultation to the inclusion teachers to address breaking down
language to make it accessible for Danielle and did not consistently provide the
technology recommended to address her language and auditory processing deficits. This
Hearing Officer also found that the program at Landmark did not fit Danielle's
individualized needs and ordered Sharon to fund an independent evaluator to determine if
Danielle's program in Sharon could be modified.[3] If not, Sharon would be required to
locate a program in the Southeastern Massachusetts, Rhode Island or Metro West area.
see Danielle v Sharon Public Schools 104 LRP 2454[4].

2.     Joan Axelrod was chosen to evaluate Danielle's program at the Sharon Middle
School.[5]  Ms.Axelrod is a psychoeducational diagnostician who has been in private
practice for approximately fifteen years.[6]  She has also been a psychological consultant
for the Gifford School[7] in Weston, and a parents' independent evaluator and clinical
director at the North Shore Children's Hospital in Salem, MA. Ms. Axelrod has also
taught special education at Wheelock College and Clark University and has published in
the area of hyperactivity and learning disabilities. Ms. Axelrod currently consults to the
Lynnfield Public Schools, the Lincoln Public Schools, the Lincoln-Sudbury High School

---

3 The Parties were given a choice of evaluators who could view and/or evaluate the program in a timely
manner.
4 Compensatory issues were also addressed in that decision and will not be covered here.
5 Ms. Axelrod also viewed a South Shore Collaborative program at the Randolph Middle School. The
Parties agree that the program provides the language-based programming Danielle requires but that the
peers are inappropriate and as such does not meet her individualized needs.
6 Ms. Axelrod is in private practice with her husband Dr. Jed Lerich. Dr. Lerich is a clinical psychologist
with former experience at the Carroll and Willow Hill Schools (both 766 schools that service children with
language-based learning disabilities).
7 The Gifford School is a 766 approved special education day school that services children with learning
and/or emotional disabilities or PDD.

2

and the Belmont and Needham Public Schools (Axelrod, see HO-2). She has also provided consultation to other public and private special education schools including Landmark; Id. Public school and collaborative consultations account for approximately 10-15% of Ms. Axelrod's income. The majority of the rest of her work is evaluating children at the request of parents. She has on occasion testified at the Bureau of Special Education Appeals for parents and for schools and has made recommendations for both in-district and out-of-district programs depending on the needs of the child (Axelrod).

3.      Ms. Axelrod reviewed the Hearing Officer's decision on January 20, 2004. She also contacted the Parents and spoke to Mother about Parents' concerns (HO-1, Axelrod). On January 27, 2004 Ms. Axelrod observed Danielle's Academic Lab with Ms. Lanzel, her LANGUAGE! decoding program group and her inclusion English, science and social studies classes.[8] She also met with Ms. Lanzel, Ms. Pearlstein (the LANGUAGE! teacher), Ms. Reeves (the SLP)[9] and with Danielle. In addition, Ms. Axelrod assessed Danielle's decoding and reading comprehension abilities through the Qualitative Reading Inventory (QRI).

4.      Ms. Axelrod was impressed with Danielle's accomplishments in her academic lab with Ms. Lanzel. Ms. Lanzel and Danielle worked well together and Danielle appeared motivated during the session, initiating questions and requests. During the session Danielle effectively used the graphic organizers, outlining, preview, review and spiraling and mapping techniques presented that Ms. Lanzel presented to her. Ms. Lanzel appeared to speak quickly and occasionally Ms. Axelrod heard conversation from two other students on the other side of the room; however Ms. Lanzel frequently checked in with Danielle to ensure that she understood the material. Danielle did not appear distracted by the other students (Axelrod).

5.      However, Ms. Axelrod found that the small group LANGUAGE! session did not meet Danielle's needs since it took a week to get through a daily lesson because the session was only delivered twice weekly and the lesson she observed did not cover decoding as intended nor was Danielle able to follow parts of the grammar lesson she observed (Axelrod).

6.      Ms. Axelrod also observed all of Danielle's academic inclusion classes except math. She was impressed with the inclusion English class. Danielle sat in front of the room in front of the teacher. The teacher used many of the recommended techniques such as rubrics, highlighting, pnemonic associations and modeling. Danielle's notebook had many entries with pictures and extensive associated notes. Ms. Axelrod did not observe Danielle raising her hand; however, she was engaged and readily responded to each direction (Axelrod). Danielle's teacher confirmed that all her English work had

8 Ms. Axelrod observed a shortened version of Danielle's classes because January 27, 2004 was a ½ day in Sharon.
9 Ms. Axelrod did not observe Danielle's weekly speech/language session with Ms. Reeves or Ms. Reeves working with Danielle but did learn from her that Ms. Reeves worked on recall strategies with Danielle once a week and was in Danielle's English class twice a week and social studies once per week (HO-1, Axelrod).

3

been turned in and that her writing had shown improvement. Ms. Axelrod further noted that in her science class Danielle was able to explain the concepts of osmosis, diffusion and active transport using the pictures that she and Ms. Lanzel had worked on in their academic lab (Axelrod).

7.      Ms. Axelord also noted that Danielle was able to correctly complete some of the written questions on her science worksheet. She also noted however, that the science teacher's answers to student's questions were linguistically difficult to understand (Axelrod).

8.      In social studies Danielle was able to participate in her group project and accepted correction from a friend on the two occasions where she misread a word. However, the teacher told Ms. Axelrod that although Danielle completed all her homework, her performance in class was variable, fluctuating between a failing grade on a pop quiz and a 100 on a following test. He also noted that Danielle was generally quiet in class but would talk to other students during group work (HO-1).

9.      Ms. Axelrod also met[10] with Danielle privately and conducted testing. On the way to the testing destination several different girls approached Danielle in the halls. Once they were alone, Ms. Axelrod asked Danielle questions about her current program. Danielle was reserved but quite forthcoming. When asked about which classes she liked most/least, Danielle reported that she really likes English because Ms. Moore (the teacher) is *"fun"* and the activities are interesting. She also reported that she did not like science as much because it is *"hard"*. Danielle noted, however, that it helps when she previews/reviews science with Ms. Lanzel. She also told Ms. Axelrod that she likes working with Ms. Lanzel. Danielle also spontaneously showed Ms. Axelrod her binder which was well organized (HO-1, Axelrod). Ms. Axelrod also asked Danielle about her feelings about Landmark.[11] Danielle responded: *"I guess maybe they could help me learn better"*. I asked her if she had visited any classes when she visited Landmark. She said, *"No"*. I asked her if she had any other reactions to the school and she said, *"It was big...I might get lost"*. Ms. Axelrod felt that this represented Danielle's anxiety about the unknown rather than a realistic assessment of the school's size.

10.     Ms. Axelrod informally assessed Danielle's ability to read to from her science text and estimated that on difficult material that she had already read for homework and reviewed with Ms. Lanzel, she was able to read the text with about 95% accuracy (HO-1, Axelrod). Ms. Axelod also reviewed a five-paragraph essay that Danielle was drafting, including her notes and her draft. The language was quite simple and somewhat redundant (*"With all the money Jennifer Lopez has, she buys a ton of things like a ton of really really nice cars)*. However, the essay was cohesive, with a topic sentence and support for each paragraph and it followed the basic template she had been taught by Ms. Lanzel (HO-1, Axelod).

---

10 Ms. Axelrod contacted both Parties prior to the Hearing Officer ordered observation and told them of her desire to talk with Danielle and to do some assessment.
11 Ms. Axelrod did not directly ask if she would like to go to Landmark because she thought this could potentially require her to defy her parents' wishes (Axelrod).

11.    Ms. Axelrod also assessed Danielle's skill levels using 5th and 6th grade reading passages from the Qualitative Reading Inventory, a criterion referenced[12] reading assessment.  Results were as follows:

**Qualitative Reading Inventory (QRI)**

| Word Lists | Accuracy | Percent Correct | |
|---|---|---|---|
| Grade 3 | 17/20 | 85% | Instructional |
| Grade 4 | 16/20 | 80% | Instructional |
| Grade 5 | 10/20 | 50% | Frustration |
| Grade 6 | discontinued | | |

| Passages | Rate | Accuracy | Comprehension |
|---|---|---|---|
| (from recall) | | | |
| 5th grade narrative | 84 wpm | 94% | 6/8=75% |
| Instructional | | | |
| 6th grade expository | 85 wpm | 94% | 5/8=62.5% |
| Frustration  (HO-1, Axelrod). | | | |

"When presented with single words, [Danielle] recognized high frequency words automatically, recognizing most—but not all—of the sample of words selected from 3rd and 4th grade level texts. Even at this level, she occasionally confused familiar words with other words of similar phono-graphic configuration (e.g. She misread BELIEVE as *"behavior"*). She also tended to misread words that were less likely to be in her known (or immediate) lexicon (e.g. GLOWED as *"grown...growed"*; PRECIOUS as *"purious"*). As she reached words from 5th grade texts, her accuracy faltered. She knew some relatively challenging ones (e.g. THREATENED) but had considerable difficulty decoding many of the multiple-syllable, lower-frequency words." (HO-1, see also Axelrod).[13]

Danielle was more accurate when reading continuous text despite inaccurate recognition of words in isolation, due to her use of contextual cues to aid her in identifying words (HO-1, Axelrod).  She read with about 94% accuracy on 5th and 6th grade level passages, an acceptable range for texts that a student is reading with instructional support (i.e. where the topic/text is discussed and reviewed in class, etc) but not accurate enough to insure that a student could read the text independently and understand it thoroughly.  Ms. Axelrod found that some of Danielle's errors were minor, small word substitutions that are typical of students with word-retrieval deficits (e.g. THAT as *"and"*) (errors that would have significantly lowered her accuracy on the Gray Oral Reading Test) (HO-1, see also Axelrod).  Ms. Axelrod found however that other

---

12 Criterion based testing is an objective based test assessment of the ability of the child (or anyone taking the test) to master the material presented at a certain level of instruction whereas norm referenced testing is an objective testing administered to a large group and performanced scored on how children of different ages performed on the test (Axelrod).

13 Ms. Lanzel confirmed that Danielle did have difficulty understanding abstract terminology, particularly in science (HO-1).

errors seemed to be due to deficient decoding beyond the first syllable of the word and often changed the meaning of the text (e.g. PREDICTED as *pretended*); Id.

12.    Ms. Axelrod found that Danielle's reading fluency (rate) of 85 words per minute was exceptionally slow for her age/grade with a rate more equivalent to a third grade level (most students her age would read at closer to 120 or 150 words per minute) (HO-1, Axelrod). Thus, Danielle would need a longer amount of time to complete reading assignments (HO-1, Axelrod).[14] However, even though Danielle's reading was quite labored, Ms. Axelrod was impressed with Danielle's ability to retell the passage she had read. Danielle was able to summarize the main idea as well as many of the facts that had been presented in the passage. She did however miss or misinterpret some information that was implicit or that was delivered in syntactically complex sentences.

Ms. Axelrod also found that, during testing, Danielle was able to answer open-ended comprehension questions about what she had read. She recalled many facts, but forgot or confused some information. For example, she had read that, before an earthquake, chickens refused to go into their coops. However, when asked how they behaved before the earthquake, she said, *"They didn't cope"*. Sometimes, her answers were marginally correct but reflected her paucity of vocabulary so that her explanations were not clear. Ms. Axelrod concluded that when reading text at the 5th to 6th grade readability level, Danielle was somewhat hampered by both her decoding and language processing issues. She also found however that Danielle was able to acquire a reasonable amount of the information presented. She would not however be able to understand material beyond a 4th to 5th grade level without extensive support (HO-1, Axelrod).

13.    Ms. Axelrod concluded that Danielle requires a systematic, sequenced reading decoding program delivered with enough intensity and longevity to address use of more complex words, which provides practice with single phonetic elements so that Danielle can achieve automaticity and more fluency in her reading. She also concluded that the Language! program delivered twice a week to a group does not provide enough practice with these decoding skills. Ms. Axelrod also found that Danielle's program should include some support in reading comprehension and that Danielle's inclusion teachers would benefit from consultation to help make language more accessible to Danielle. She also recommended that Danielle receive an intensive language immersion program in the summer. She found however that while some students with language-based and reading disabilities like Danielle's are clearly uncomfortable and unhappy in school, Danielle seemed socially connected and very motivated to complete assigned work (with support). She also noted that while there may be some benefits to placement in a more specialized, language immersion program, she would be concerned about the costs to Danielle socially and academically if she were to be moved at the current time. In Ms. Axelrod's professional opinion, modifications to Danielle's current program at Sharon would provide Danielle a FAPE in the LRE.

---

14 Ms. Axelrod found this slow rate consistent with recent research suggesting that rate deficits are often persistent residual symptoms of students with dyslexia (Axelrod).

6

14.    Ms. Axelrod orally presented her findings and recommendations to the Parties and the Hearing Officer during a phone conference the following day (January 28, 2004).[15] The Parties were given extensive[16] opportunity to ask Ms. Axelrod questions and/or challenge her findings and recommendations and discuss specifics for implementation of the recommendations. All Parties were able to freely participate in the discussion. Ms. Axelrod agreed to communicate separately with either or both Parties if either so chose to do so (Axelrod).

The main components of the program recommended were:

°    a daily, systematic decoding program delivered one-to-one in a quiet room free from distractions that emphasizes practice decoding multi-syllable words and includes a fluency component that incorporates applying the skills being taught with practice reading continuous text; [17.]

°    regular opportunity for guided comprehension development by providing reading comprehension development as part of her reading tutorial, specifically by:

   •   co-reading a trade book with her tutor with emphasis on identifying and analyzing words and phrases that are difficult to understand;
   •   visualizing/drawing the *exact* information described in a given reading passage;
   •   learning to identify key words/phrases that are signals to text structure (i.e., Reasoning and Reading workbooks by Joanne Carlisle),
   •   analyzing the syntax of math word problems and then completing the problems

°    periodic SLP observations in each of Danielle's classes and consultation with teachers regarding regulating the pace and complexity of the language; see (Axelrod, HO-1).

°    a "language immersion" summer program that focuses more intensively on developing her receptive and expressive language strategies rather than course content;

15.    On January 30, 2004, Sharon's Counsel spoke to Ms. Axelrod about the specifics of implementing the proposed program (HO-1, Axelrod). Sharon proposed removing Danielle from the two Language! program sessions and substituting a 1:1 tutorial in Wilson with Ms. Lanzel that would occur five times in a six day cycle over a four day period (one day being a double block) for a total of 294 minutes (or 4 hours and 56

---

15 At a conference call conducted on January 14, 2004 the Parties requested that Ms. Axelrod present her findings orally by teleconference. The Parties were given the opportunity to speak to Ms. Axelrod without the Hearing Officer. Both Parties asked that the Hearing Officer be included in the call. The Hearing Officer contacted Ms. Axelrod who agreed to the request.
16 This teleconference was between 60-90 minutes in duration.
17 Ms. Axelrod specifically recommended the Wilson program for decoding supplemented with the "Great Leaps" program to improve fluency. Other methodologies for discussion purposes included LiPs, FastForward and LindaMood Bell Visualization and Verbalization. Sharon chose to provide Wilson supplemented by Great Leaps.

minutes) per week; see (Parents' Rebuttal 1, Axelrod). During this time period Danielle would also work with Ms. Lanzel on reading comprehension.[18]. Ms. Axelrod learned that Ms. Lanzel was not Wilson certified but had been receiving training since September 2003 and regular supervision and group training (Axelrod). Ms. Axelrod would have preferred that Ms. Lanzel was Wilson certified. However, she believed that Danielle working with Ms. Lanzel would be preferable to having Sharon provide a certified Wilson tutor that Danielle was unfamiliar with because Ms. Lanzel was familiar with Danielle's current curriculum, was in tune with Danielle's learning style and needs, and could individually tailor the 1:1 tutorial.

16.    On February 3, 2004 an additional teleconference was held between Ms. Axelrod, the Parties and the Hearing Officer to discuss if Sharon could implement Ms. Axelrod's suggested modifications. Sharon presented its proposal. Again, the Parties were given extensive[19] opportunity to ask Ms. Axelrod questions and/or challenge her findings and recommendations as well as the specifics for implementation of the recommendations. All Parties were able to freely participate in the discussion. The Parties discussed specifics regarding Ms. Axelrod's recommendation for a 1:1 decoding and comprehension tutorial as well as other recommendations for additions to the IEP. These recommendations included the following:

- adding extended school year services through a language immersion summer program;
- adding objectives to the IEP to address comprehension of math word problems,
- adding consultation from the SLP to Danielle's teachers regarding down breaking down language to make it accessible, and
- including more technology in the program (such as greater use of the computer or an Alphasmart for extended writing and the CAST E-Reader or the Kurzweil Reading System) to assist Danielle in more independently reading text not currently accessible to her given her reading level; (Axelrod).

17.    Ms. Axelod indicated that with these modifications she would anticipate that after a year of intervention Danielle would acquire sufficient gains in accuracy such that she should be able to read middle school level (7th or 8th grade) text with over 95% accuracy. She also anticipated gains in reading rate of a middle school text at least 100 words per minute. She further recommended that these gains be monitored by assessment at the end of the summer language program with a comprehensive thorough assessment in the second quarter of the 2004-2005 school year. This assessment would include assessment of single word reading and decoding skills; reading fluency (rate and accuracy); reading comprehension[20], written expression (including generation of a multi-paragraph composition without pictorial supports); applied math skills (word problems) and receptive and expressive oral language skills (HO-1, Axelrod).

---

18 The extra sessions of reading tutorial could be accomplished by dropping one session of gym, one club activity per week and two periods of shop and switching Danielle's art class to another time.
19 This teleconference also lasted over an hour.
20 Ms. Axelrod recommended a silent reading assessment that has multiple passages at a middle to high school level, such as the Gates MacGinitie or Stanford Diagnostic Reading test;

18.    Ms. Axelrod submitted a written report to the Parties by email on February 10, 2004.[21]  The Parties were given the option of informing the Hearing Officer within one week of their position regarding reconvening the hearing to receive testimony from Ms. Axelrod. On February 17, 2004 Parents filed an intention to cross examine Ms. Axelrod and offer testimony from Dr. Robert Kemper. The hearing was convened on March 10, 2004[22] to receive rebuttal testimony to Ms. Axelrod's evaluation report. [23]

19.    Ms. Axelrod's testimony at hearing was consistent with her report; compare (HO-1, Axelrod). At the hearing Ms. Axelrod reiterated that she was impressed with the academic lab between Danielle and Ms. Lanzel. She also stated that she is generally skeptical about schools presenting programs for observation that do not occur all of the time; however, in this session, both Danielle and Ms. Lanzel knew the sequence of activities and worked well together. She was also impressed with the writing sample that Ms. Lanzel had indicated Danielle had independently produced (Axelrod).

20.    Ms. Axelrod also reiterated that Sharon's proposed implementation of an individualized Wilson tutorial would be appropriate. She felt however that Danielle also required a reading comprehension tutorial because her current program did not provide sufficient reading comprehension instruction. However, Ms. Axelrod recommended that more time be spent in decoding instruction because Danielle's reading comprehension deficits were secondary to her decoding deficits and Danielle's language skills would enable her to comprehend more if she could decode what she was reading (Axelrod).

21.    As such, Ms. Axelrod recommended that Danielle receive an individualized decoding program such as Wilson together with individualized reading comprehension instruction. Ms. Axelrod also explained that Wilson lessons are generally delivered in a 45-minute block. Most of Sharon's classes are 49 minutes long. Some may be as short as 44 minutes long, see Parents' Rebuttal 1, (Axelrod). Ms. Axelrod felt that the 44-49 minute block schedule that Sharon proposed would be sufficient to review previously learned skills, introduce a new phonetic element, read sentences containing new and old elements and write words and sentences from dictation. Ms. Axelrod recommended however, that the Wilson (or other decoding) instruction not be delivered every day because the program, in order to make it effective, is tedious and repetitive making it boring and leading kids to turn off to the program (Axelrod, see also Kemper). Therefore Wilson instruction should be delivered approximately three times a week with comprehension instruction the other two days, or conversely, that Wilson be done every day for 30 minutes with the rest of the time spent on reading comprehension. Ms. Axelrod has found that this model has been successful in both public schools and in language-based private schools (i.e., Carroll and Landmark).

---

21 The report expanded on the oral recommendations and included vocabulary expansion and visualization techniques, gradual exposure to a greater variety of graphic organizers and consideration of supplementing a decoding program with a fluency development program (i.e. Great Leaps).
22 A March 10, 2004 hearing date was scheduled due to Dr. Kemper's full day availability.
23 On February 10, 2004 Sharon informed the Hearing Officer and Parents' Counsel that it did not intend to seek a reconvening of the hearing. On February 19, 2004 it filed its objection to testimony from Dr. Kemper. The motion was denied in part on that day; see Record.

9

22.     Ms. Axelrod, during the phone conference following the observation, indicated that this tutorial should be given by a good, well-trained teacher, certified in Wilson, who can tailor a daily tutorial reading program including decoding and comprehension skills (Axelrod).  Sharon proposed that Ms. Lanzel deliver this tutorial; Id. Ms. Lanzel is not Wilson certified but has been receiving Wilson training since September with ongoing individual supervision and monthly group training classes. Ms. Axelrod assumed that Ms. Lanzel was Wilson certified during the follow up phone conference on February 3, 2004. Ms. Axelrod was not thrilled to learn that Ms. Lanzel was not Wilson certified. Ms. Axelrod did not feel obliged to follow Sharon's recommendation and could have recommended that Sharon locate an in or out of district provider and has made such a recommendation when she does not feel that there would be a qualified staff member to deliver the service.  However, in this case, Ms. Axelrod chose to recommend that Ms. Lanzel deliver this service.  Her opinion was based on Ms. Lanzel's knowledge and training in teaching the developmental sequence of phonetic elements and the principles of starting at sounds to syllables to words as well as her understanding of syllabication principles (and different syllable types).  Ms. Axelrod also noted that Ms. Lanzel would be able to talk to Danielle about why a word is decoded a certain way.  Ms. Lanzel would also have knowledge of Danielle's curriculum so that she could make quick judgments about what to work on with Danielle, could reinforce the skills they were working on in her current tutorial.  In addition, Ms. Axelrod observed that Ms. Lanzel appeared to be attuned to how kids with language disabilities think (Axelrod).

23.     At hearing, Ms. Axelrod was also asked about whether Landmark would be an appropriate program for Danielle.  Ms. Axelrod has conducted training at Landmark and is very familiar with the program (Axelrod), see (HO-2).  She is currently in the process of recommending that a child with a similar profile to Danielle attend Landmark (Axelrod).  She has also recommended that a child be removed from a mainstream situation when the psychological climate was damaging because the child could not keep up.  She has seen kids, even those who are apprehensive about going to a new school, eager to try anything different.  She has also recommended out-of-district programs for students even if they did not want to go (Axelrod).  However, Danielle was quite comfortable and happy in the school environment, did participate in some (though not all) of her classes by raising her hand, spoke about liking some of her classes, talked to students in the hall and appeared incredibly well organized and motivated (Axelrod).  In addition, a three-hour round trip commute to and from Landmark (or boarding at the Landmark residential middle school program as currently configured) would not be emotionally advantageous for Danielle (Axelrod).  In addition, Danielle did not require an out of district program in order to have an effective educational program because her current program could be modified to meet her needs (Axelrod).  Further, Danielle's progress could be monitored through consultation and through the ongoing assessment recommended in her report (Axelrod). However, if Landmark were available as a residential program in the summer, that program would meet her recommendations for extended school year programming.  Other language immersion summer programs, if available, may also be appropriate for Danielle (Axelrod).

24.     Dr. Kemper offered rebuttal testimony.  Dr. Kemper is a colleague of Ms. Axelrod's and they worked together for four or five years at the North Shore Children's

Hospital during the late 1980's. Dr. Kemper has a good relationship with Ms. Axelrod and respects her immensely (Kemper). He agrees with Ms. Axelrod's recommendations that fluency and reading comprehension instruction is needed and approves of her recommendations regarding specific materials. Dr. Kemper also agrees that the speech/language pathologist should consult with teachers regarding breaking down language.

25.    However, Dr. Kemper does not agree that Danielle's needs can be met with a tutor that is not Wilson certified, indicating that any Wilson tutor would need at least two years of experience after training in the Wilson program (Kemper). Dr. Kemper also does not feel that the school system could deliver the intensity of services that Danielle needs in decoding and encoding, fluency, reading comprehension and writing and have Danielle still be responsible for major content acquisition in English, science, math and social studies (Kemper). Dr. Kemper also does not believe that the skills that Danielle would acquire in the tutorial could be sufficiently reinforced and generalized to the inclusion setting; Id. Sharon feels however, that Dr. Kemper has not considered its proposal for having Ms. Lanzel and the classroom aids address these needs (Kemper, Levin-Charns).

26.    In addition, Dr. Kemper feels that Danielle would require a daily tutorial instead of a double session tutorial once weekly because the Wilson program can be tedious if done in a long session. Dr. Kemper also feels that not having Wilson every day would require spiraling back and reviewing before moving forward thus slowing down the learning process.

27.    Dr. Kemper also disagrees with Ms. Axelrod's recommendation for exploring assistive technology (such as the Kurweil or Cast-E reader) to help Danielle access text. In Dr. Kemper's professional opinion, Danielle would not benefit from them and that such programs should not be tried until methodologies such as Wilson have been exhausted or until Danielle has reached a plateau with Wilson instruction (Kemper).

28.    Dr. Kemper also disagrees with Ms. Axelrod's opinion regarding use of FastForward. Dr. Kemper is trained in FastForward (Kemper). Although he agrees with the research cited by Ms. Axelrod that shows that the use of FastForward does not provide conclusive evidence for reading improvement, the purpose of FastForward is to help students process what they hear more efficiently by increasing auditory pathways and making existing pathways more efficient. Danielle also is diagnosed with Central Auditory Processing disorder and thus requires this service. Dr. Kemper recommends that FastForward be done in the summer.

29.    Finally, Dr. Kemper continues to recommend a Landmark placement for Danielle. He does not believe that there would be any possible social costs associated with Danielle attending Landmark even if she does not want to go. Dr. Kemper has seen many kids apprehensive about trying a new school but believes that it is probable that Danielle would be happy at Landmark once she attended, would make friends and could see why she should be there (see Kemper).

## FINDINGS AND CONCLUSIONS

On January 12, 2004 this Hearing Officer found that Sharon's IEP as configured did not provide a FAPE to Danielle. Specifically this Hearing Officer found that the IEP did not provide enough small group phonics based instruction, did not address Danielle's reading comprehension issues in math and did not adequately address reading comprehension issues in other areas, did not provide consultation from the speech/language pathologist (SLP) to make language more accessible and did not include the recommended assistive technology to address Danielle's auditory processing and language issues. The IEP also was inappropriate because it did not include a language-based extended school year program. The Hearing Officer also found however that the Landmark School, although a language-based program, did not meet Danielle's individual needs nor did it provide the least restrictive environment for Danielle; see *Danielle v Sharon Public Schools*, 104 LRP 2454. The Hearing Officer ordered Sharon to fund an independent evaluator to observe Sharon's program to determine if it could be made appropriate with modifications. If not, Sharon would be required to locate a language-based program that would meet Danielle's needs; Id. After consideration of the report, qualifications and testimony of Ms. Axelrod, as well as the rebuttal testimony from Dr. Kemper, I find that Sharon's program can be modified to meet Danielle's needs.[24]

In so finding, this Hearing Officer places considerable weight on Ms. Axelrod's recommendations. Ms. Axelrod has extensive experience working with students with language-based learning disabilities. She has been, and is currently, a consultant for a number of public and private schools servicing students with language-based learning disabilities, including Landmark. Ms. Axelrod has also been, and is currently, an evaluator for parents and receives the majority of her income conducting evaluations. Ms. Axelrod has recommended both in and out of district programs for children and has testified on behalf of both parents and school districts. She based her recommendations in this matter not only on the findings from the record, but also on her own observation and testing and gathered information from the school, parents and the child. This Hearing Officer found Ms. Axelrod refreshingly independent and child centered. Ms. Axelod was open to all possibilities and listened to and considered views from both sides but did not feel obliged to agree with the School District, Parents or the Hearing Officer.[25]

Ms. Axelrod found that Danielle required an individual tutorial in decoding and regular guided reading comprehension, a language immersion summer program, consultation to teachers to make the inclusion classes more language-based and technology and programs to address her language deficits. Sharon proposed a program that did not provide the Wilson certified teacher. It also proposed a schedule that

---

24 The Hearing Officer issued an interim order pending this decision that amended the IEP to include SLP consultation and a decoding and language comprehension tutorial. The Parties also understood that the final IEP would include an extended school year component. Sharon agreed to send applications to language-based summer programs. Parents' requested that the application be sent only to Landmark's summer program.
25 Ms. Axelrod disagreed with the Hearing Officer's finding that Danielle required Fast Forward.

provided the number of hours recommended. However, Sharon scheduled the tutorial on a double block on one day with no instruction on another instead of the daily tutorial originally recommended. Ms. Axelrod was not thrilled that Ms. Lanzel did not have Wilson certification and extensive experience teaching Wilson; however this did not serve as an automatic bar to disqualify Sharon's choice. Ms. Axelrod based her recommendation on conversations with Ms. Lanzel as well as her observation of Ms. Lanzel and Danielle working together and felt that Ms. Lanzel could implement her recommendations.

Appropriate certification and licensure is an important criteria and should not be disregarded lightly. However, just as a teacher from Landmark (or other private school who is not certified) would not automatically be disqualified as a service provider nor should a public school employee if (s)he is able to appropriately implement the IEP. This Hearing Officer had the opportunity to examine Ms. Lanzel's resume, examine testimony and documentary evidence from and regarding Ms. Lanzel's implementation of services and observed Ms. Lanzel at hearing. This Hearing Officer concurs with Ms. Axelrod that Ms. Lanzel can implement the decoding, comprehension and fluency instruction Sharon proposed, will seek additional supervision when needed and will gear the instruction towards Danielle's needs.

The Hearing Officer has also considered Dr. Kemper's testimony that the decoding tutorial is not delivered daily. However, Danielle will receive the same number of instructional hours, will only not receive the tutorial one day per week and would not as such require extensive review to move on. Nor would the double block have to consist of only decoding instruction and would be geared toward Danielle's individual needs. Danielle will also be continuing her academic support with Ms. Lanzel on that day. Ms. Axelrod has indicated that the services can be implemented as proposed. She has seen a model combining decoding and comprehension and fluency instruction work in other school systems with children with similar profiles to Danielle. Her testimony is credited.

The Hearing Officer also considered Dr. Kemper's opinion that Sharon could not deliver the intensity of services that Danielle needs in decoding and encoding, fluency, reading comprehension and writing and have Danielle still be responsible for major content acquisition in English, science, math and social studies. Also considered was Dr. Kemper's opinion that the skills that Danielle would acquire in the tutorial could not be sufficiently reinforced and generalized to the inclusion setting; Id. However, Danielle has the support of paraprofessionals in eight of the twenty classes. The SLP comes in to provide support for three classes. Ms. Lanzel also comes into Danielle's inclusion classes. All of the teachers and paraprofessionals would receive consultation from (or by) Ms. Lanzel and the SLP as well as Ms. Axelrod. In addition, Ms. Lanzel would continue to provide academic support to Danielle. Ms. Reeves would continue to provide speech/language therapy to address recall and retrieval issues. Danielle's progress would also be monitored through testing in early fall and spring. Danielle's work samples show that she is accessing some of the curriculum. With these modifications she could achieve a FAPE in the LRE.

13

This Hearing Officer however does agree with Dr. Kemper's recommendation for implementation of FastForward during the summer. Dr. Kemper is trained in Fast Forward. His recommendation correlates with the audiologist's recommendation for its use to address Danielle's central auditory processing deficits. The Hearing Officer however does adopt Ms. Axelrod's recommendation to explore whether assistive technology can help Danielle access text. This exploration can be done as part of the consultation Sharon has suggested that Ms. Axelrod conduct.

Parents still would like Danielle to attend Landmark. This Hearing Officer previously found that Landmark was not the least restrictive environment for Danielle.[26] Parents feel that if Sharon's program is not appropriate, a decision not allowing Danielle to attend Landmark would be rewarding Sharon for its inappropriate actions.[27] A decision may have many collateral outcomes and Parties may have a number of reactions to a decision. A decision however must be based upon a factual determination concerning the issues that are in dispute. In this case the issue is what program provides Danielle a FAPE in the LRE. An IEP can only be implemented in separate settings when the nature and severity of the child's special needs is such that the student can not make meaningful progress in a regular education setting even with the use of accommodations and specialized services; see 20 U.S.C. 1412 (5)(A). In this matter accommodations and specialized services can make Sharon's current program appropriate for Danielle.

As such, Sharon will amend Danielle's current IEP to include the 1:1 tutorial in decoding, reading comprehension and fluency proposed by Sharon (pursuant to Ms. Axelrod's recommendations), consultation by the SLP, special education teacher and Ms. Axelrod, an extended school year language immersion program[28], a FastForward tutorial in the summer and monitoring through assessment by an outside evaluator.

## ORDER

Parents' request for a private day or residential program at Landmark is denied. Sharon will amend Danielle's IEP consistent with the decision within.

By the Hearing Officer,

Joan D. Beron
Date: April 20, 2004

---

26 This Hearing Officer (like Ms. Axelrod) is not shy about finding a Landmark program appropriate for a student if so warranted by the evidence. Nor is a placement more than one-hour commute automatically eliminated if it is the least restrictive option to provide a FAPE to a child. If the public school program could not have been modified and Sharon was not able to locate an appropriate program Landmark would have been an option for further exploration. Such is not the case here.

27 A decision requiring Sharon to fund an independent evaluator not originally of their choosing coupled with an order to modify their program may not constitute a rewarding experience. That is however for Sharon to determine if so inclined.

28 This Hearing Officer previously ordered an extended school year program. Ms. Axelrod also recommended this service. Parents' are requesting Landmark. Landmark's residential program would be appropriate for Danielle as well as other summer language-based language immersion programs.

14