*UNITED STATES DISTRICT COURT*
*DISTRICT OF MASSACHUSETTS*

FILED
IN CLERKS OFFICE

*CIVIL ACTION* 2006 JAN 26  P 1: 14
*NO.04-10994NMG*
U.S. DISTRICT COURT
DISTRICT OF MASS.

*PARENTS OF DANIELLE*
*Plaintiffs,*

*v.*

*MASSACHUSETTS DEPARTMENT OF*
*EDUCATION, DAVID P. DRISCOLL, COMMISSIONER;*

*And*

*SCHOOL COMMITTEE FOR*
*THE TOWN OF SHARON:*
*SAM LIAO, ANDREW NEGENAZHL,*
*DONALD GILLIGAN, JANE FURR, MITCH*
*BLAUSTEIN AND SUAZANNE PEYTON*

*Defendants.*

---

*PARENTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR*
*MOTION FOR SUMMARY JUDGMENT AS TO COUNT I*

---

*I. Overview of Issues Presented for De Novo Review and Relief*

Plaintiffs moved for summary judgment on Count I of their Complaint. In so doing, they

ask this court for a *de novo* review, relying on the findings and rulings of the state's *"BSEA"*

They argue that based upon the Agency's subsidiary findings, the ultimate findings and rulings

constitute errors of law. *Ross v. Framingham Sch. Comm., 44 F. Supp.2d 104, 111 (D. Mass.*

*1999).* The two decisions are attached and incorporated by reference.

The *BSEA* considered three issues: (1) Whether IEPs (Independent Education Plans) for

March, 2003-March, 2004, provided Danielle with a free appropriate public education (FAPE) in

the least restrictive environment (LRE); (2) If not, whether accommodations or modifications to the program would provide a FAPE "in the LRE;" and (3) If not, whether Danielle required an out of district day program at Landmark to achieve a FAPE "in the LRE."

## II. Summary of Parent's Position

*Parents* urge that issue formulation, itself, manifests errors of law. They also argue that the *BSEA* erred when it failed to order the implementation of the special education prescription found to be necessary: the *IEP* elements it determined to be required in order to provide a *FAPE;* and instead, permitted a lesser program in order to achieve a lesser restrictive environment.

*Parents* further complain that based upon the fact findings and rulings, the Agency also committed error by ordering the creation of a new, untried program for Danielle, rather than requiring placement in an established, proven, and experienced program. Instead of ordering her placement at the Landmark School (upon availability of an opening), the Agency ordered an as-yet non-existing program. In that fashion, the Agency exposed her to an experimental program, including delivery by at least one professional uncertified to deliver that service -- and exposed her to all of the risks attendant to that, including the loss of educational time, progress, and access to curriculum content. In short, Danielle lost another year of learning.

Below, Plaintiff *Parents* argue that under current legal standards, Danielle was entitled to a *Free Appropriate Public Education.* By that, they mean that under then-new, current legal standards, she was entitled to a certain quality of program. She was entitled to that particular program which would provide all of the elements she needed, using the best instructional practices necessary to a full educational opportunity. In other words, under those new standards, *Parents* say that Danielle was and remains entitled to the best instructional practices applicable to

those educational elements, and all implemented in the fashion necessary to achieve the best education possible. They argue that Sharon was obliged to provide that, irrespective of the learning environment in which it was available; and that the Hearing Officer was obliged to order that. However, Sharon offered no such program, and the Hearing Officer ordered no such program. *Parents* therefore urge that neither Sharon, nor the Hearing Officer, were entitled to place Danielle in any program where those elements and methodologies did not exist; or where they were not likely to be provided to the same standards, or where they could not be provided to the same standards; or where they did not already exist in a proven, programmatic fashion for similarly afflicted students. They argue that both Sharon, and the Hearing Officer, were obliged to protect Danielle from use of an unknown, unproven program delivered by one or more unqualified person; and to protect her from further loss of time through an educational experiment, where an identified program existed (and would be available to her either as a day student, or as a residential student.) *See cited authorities, below.*

*Parents* also argue that the Hearing Officer's placement order was based upon speculation about whether their daughter would be as happy in a particular environment. However, there were no emotional or psychiatric issues, nor any evidence from any qualified mental health professional. The evidence was limited to the child's fears and anxiety about a change.

The Hearing Officer determined that as yet, and for years, Danielle had not been provided a *FAPE*. She also determined that Landmark would provided a *FAPE*. The Hearing Officer found that the public school's own existing special program, LANGUAGE!, expressly included children with emotional issues, that would not provide a *FAPE*, and that would not provide the features required to constitute a *FAPE* for Danielle.

The Hearing Officer found that Sharon's *IEPs* did not provide Danielle with a free appropriate public education. She then considered whether the School's program might provide a *FAPE*, if accommodations or modifications were added. To that end, she permitted the school to try to create such a program, anew; but still required the school to forward applications to separate, specialized schools providing an out of district day program, with Landmark to be under continued consideration and discussion (including both its day and residential programs).

In addition to those issues identified above, *Parents* respectfully suggest that given the findings made, the Hearing Officer erred by entering a ruling consisting of disparate alternatives, giving Sharon the option of locating or creating an appropriate program. In so doing, the Hearing Officer allowed the *FAPE* to be reduced and mediated by the *LRE,* rather than give precedence to the *FAPE.* In that regard, Parents say the Hearing Officer erred. While the Hearing Officer relied upon *603 CMR 28.02, Parents* say that the regulation either does not conform to the required federal standard, as argued below; or must be construed and interpreted strictly according to the federal standard of "best" and according to its own, internal standard, requiring a program that will allow timely growth to "chronological age and developmental expectations, *[and]* the individual educational potential of the student, as argued below. *Id., (18).*

*II. Argument under Applicable Law*

*A. Relationship between FAPE and LRE:  Pursuent to IDEA and NCLB the FAPE determines the LRE - not Vice Versa*

Danielle is protected both under the *IDEA, 20 USC 1400 et seq.* and under the *NCLB, PL 107 110 (2002) amending 20 USC 2701 et seq. and IDEA, etc.* At issue is the relationship between a *FAPE* and an *LRE.* Their relationship has been expressly determined under these

statutes, as set forth in applicable updated regulations.  In particular, where the *FAPE* appears to be in conflict with "the *LRE*," the regulations set out how competing interests are prioritized, and how they are to be resolved. *34 CFR 300.121* at 300.123 expressly sets out the goal incumbent upon each state and school system for each disabled child between birth and age 21. That goal is "full educational opportunity." "Full educational opportunity" is given neither limitation nor exception. As a goal, it is expressly the responsibility of *both* the state and the individual school system. *34CFR300.550 (b)* then provides the standard under which a child may be removed from regular classes.  It provides that where

> the nature or severity of the disability is such that education in regular classes, even with the use of supplementary aids and service, cannot be achieved satisfactorily

a student will be educated in special classes, or separate schooling which is removed from the regular educational environment. Taken together, these provisions demonstrate the functional relationship between a *FAPE* and an *LRE.*  They are not equal, competing legal standards. They are not equal, competing requirements or considerations. The *FAPE* is the first priority. It must be served first. It must be fully satisfied first. Only once the educational prescription has been determined, and its elements defined, can it be satisfied. Only once the educational prescription has been fully identified and structured, *i.e.* by way of an *IEP,* does the next issue arise.

*B. Where a Preferred LRE would Compromise the FAPE, the LRE is not Permitted*

Only once the *IEP* elements are determined does *LRE*  arises as a question: what is the least restrictive environment in which the education prescription can be successfully delivered? It is the educational prescription, the *IEP,* which drives the *LRE,* not vice versa. It is the *IEP* which drives the *LRE.* The *LRE* must be subservient to the *FAPE.* Choices between *LREs* do

Page 5 of  20

not exist, as a matter of law, unless the particular *FAPE* can be provided without compromise of quality in more than one learning environment. Only then may the learning environments be compared, with the requirement that the *FAPE* be provided in the least restrictive placement -- but only as between those environments which provide the same programmatic elements, to the same quality. The *FAPE* may not be sacrificed for the *LRE,* but the *LRE* must be sacrificed for the *FAPE (*assuming parental consent) *34 CFR 300.552 (d)*.

     *34 CFR 300.552 (d)* expressly provides the standard by which an *LRE* is to be determined. In regard to the content of the *FAPE,* determination of the *LRE* must be determined both with attention to the "... potential harmful effect on the child" or to the "... potential harmful effect... on the quality of services that he or she needs...," all as those services are identified to constitute the required elements of the the *FAPE.* This is expressly pursuant to *20 U.S.C. 1412(a)(5),* which authorizes greater restriction of the environment

> when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. *Id.*

The test is a two pronged test, to be applied in the alternative. First, attention must be given to whether there is evidence of a potential harmful effect on the child. If there is no evidence of such a risk, then the second tier of the test is applied: potential harmful effect on the quality of services needed.

     Ergo, under *34 CFR 300.552 (d)*, where there is no evidence of potential harm to a child by an *LRE ,* the issue turns to which *LRE* will deliver the *IEP* elements with the least compromise of quality and effectiveness. Given more than one learning environment, if a placement in a particular, less restrictive, learning environment would directly harm the quality

of services needed by the child, or their effectiveness, that particular learning environment is not a permitted option. The regulation requires and provides that where the required educational program cannot be achieved as effectively in a lesser-restricted environment, including regular classes, the child must be educated in special classes or separate schooling removed from the regular educational environment - and as between those, in that environment which will optimize the quality of the special educational elements. The only exception is where there is a potential for harm otherwise. *Id.* In the instant matter, the *Agency* did otherwise. While specifically finding that a program in the public school's learning environment lacked the required *IEP* elements, lacked efficacy, and lacked teacher certification, nonetheless, it allowed the proposed placement. (Landmark staffing did not allow for acceptance mid-year, but was anticipated to be sufficient for the school cycle next following the *BSEA's* final decision in April, beginning with the summer session, and indeed, following that, the Hearing Officer required Danielle to be enrolled in Landmark's summer session.)

*C. By Federal Regulation, Learning Environment May Not Be Reduced based on Child's Popularity, Recreation, or Shyness, and Must Provide Direct Curriculum Content Instruction in the Child's Communication Mode to assure Educational Progress*

The Hearing Officer finally ordered a public school learning environment, doing so based on "concern" about Danielle's social life, athletic activities, shyness, and recreational activities, and without attention to the regulatory requirements discussed above. Those do permit the Hearing Officer to consider potential harm beyond educational efficacy and elements. However, the regulations directly address the relationship between such "potential harm," and any non-academic and social considerations, and prescribe how those must be considered. By regulation,

only once a student's academic and educational needs are met may programming efforts then go on to consider and provide for a child's non-academic and extracurricular services and activities with non-disabled children. Only then may placement be in a less restrictive learning environment. Only then may the environmental restrictions be reduced (if restrictions they be). However, by regulation, the environment may be reduced only "to the maximum extent appropriate to the needs of that child." *34 CFR 300.553*. Again, proven, demonstrable, determined needs come first, and control such considerations. Anything less than a (proven) "need" may not be considered.

In this instance, the Hearing Officer found that in such a placement as the public school, in some instances, Danielle had already fallen further and further behind. The Hearing Officer found that even in areas of some recent improvement, Danielle still had not recovered earlier performance levels (based upon percentiles disclosed by regular testing). With these findings, such an *LRE* was proven to be inadequate, and therefore, inappropriate to the requisite *FAPE* and its elements. Therefore, the regulations preclude such a placement. Given demonstrated impairment of the *FAPE* and its elements, the demonstrated failure of the educational program to restore Danielle to recovery of earlier performance levels, and its demonstrated failure to advance her beyond those, such an *LRE* was simply not a legally available option.

Under *34 CFR 300.123*, the "harm" test is limited in its application. It applies only to the educational elements prescribed to address the nature and severity of the disability. The regulation expressly provides that the *FAPE* must be determined based upon the child's identified disabilities, and their nature and severity. No other elements may be considered by the *FAPE,* nor included in it. Therefore, where other considerations may be tempting, they are

simply not permitted unless they reflect the specifically identified disabilities, and the consequent education and service needs, *infra*; or unless their consideration will not compromise the program elements necessary to maximize education in the context of those disabilities. The only exception would require findings that there are other needs which must be met in order to avert other, overriding, potential harm. Clearly, to compromise the requisite educational prescription, there must be more potential for non-academic harm than mere speculation, mere concern, mere preference, or mere shyness.

The regulations also require that the *FAPE* address more than a student's disability, *per se*. To comply, the educational program and services provided to children such as Danielle must "address all of the child's identified special education and related services needs *34 CFR 300.300 (3(i)*. Again, the *FAPE* must come first. It must address *all* of the student's identified special education needs. None of those needs may be sacrificed to an *LRE*. The *FAPE* must be driven by the student's unique needs - his or her individual *special* education needs. Such issues as popularity are not among "identified special education and related services needs." Therefore, such a consideration is impermissible. Under *34 CFR 300.300(3)(ii)*, the *FAPE*, and therefore, the *IEP*, must first serve the student's unique special education needs (which result from the disability) so that there is "full educational opportunity." It may not serve the disability alone. In order to achieve such "full educational opportunity," placement in a residential program is expressly permitted, if necessary to achieve that full educational opportunity. *S. 300.302, s. 300.304.* In short, "full educational opportunity" may not be compromised by social, recreational, or avocational interests, unless those are a function themselves of recognized disabilities which bespeak special education needs warranting response.

Page 9 of 20

The regulations expressly recognize the issue of communication. They provide that an *IEP,* and therefore, a *FAPE,* must take into account a child's communication needs.

S. *300.346 (2) (iv)* requires that communication be fully addressed, without exception, to achieve the required full educational opportunity. In turn that must include "... opportunity for direct instruction in the child''s communication mode" to avert "the effect of that communication mode and the effect of the disability on progress." The *FAPE*, through the *IEP,* must not only identify how the student's disability effects her involvement and progress in the general curriculum *s. 300.347 (a) (1) (i).* It must also provide direct instruction in academic content areas that will provide a full educational opportunity to the content area, and provide a full opportunity to learn the material being taught, as it is being taught. Recognition of the communication needs, alone, is not sufficient. Therapy for the communication disabilities, alone, is not sufficient The *FAPE* and *IEP* must provide for them, and must "address all of the child's identified special education and related services needs *34 CFR 300.300 (3(i).* Therefore, where a student's communication modes are compromised by placement in a learning environment, and where the student's disability effects her progress acquiring the knowledge and skills taught in the general curriculum, placement in a more restrictive environment is not only permissible, but is warranted *S. 300.347 (a) (1) (i) (*unless parents do not consent.) in order to allow the child full opportunity to gain the education that is delivered by the curriculum. Only that, in turn, may be to "satisfactory" levels.

In the instant matter, based on the Concise Facts in their entirety, both the Hearing Officer and the school, expressly compromised the *FAPE.* They compromised both its elements, and the environment necessary to enable and enhance Danielle's expressive and receptive

communication - her most essential tools. Indeed, those were the areas of her greatest need, given her Central Auditory Processing disorder. Yet, School and Hearing Officer sacrificed such issues to social concerns. They did so specifically based upon Danielle's happiness and popularity in her then-current school placement. However, nowhere do the Agency Findings disclose any professional evidence concerning any specific risk of psychological, psychiatric, emotional, or behavioral harm to Danielle in the event of an educational relocation, nor was there any evidence adduced that there were any related special education diagnoses or needs. Similarly, there are no Findings that there was any significant likelihood of any such harm. References to such issues were limited to "concern" and the like - to mere speculation, and no more. *Fact No, 17.* Significantly, no such concern arose from any identified or diagnosed disability, impairment, or condition; nor did any such concern arise from any professionally identified specific need. In short, the *FAPE* was compromised on nothing more than a teenagers' understandable enjoyment of her popularity. Indeed, the Hearing Officer's order specifically provided that there would be on-going discussion with Danielle about attending the Landmark School, presumably for the purposes of engaging her greater interest or increased willingness. *Fact No. 16, 17.* However, that too, was unnecessary: the Hearing Officer found that Danielle *was* willing to try Landmark, *Fact No. 1.*

Further, as between the identified, available *LREs* with *existing* programs, Landmark was identified as the only *LRE* which would provide an established, proven, non-experimental placement and program. It was the only one where curriculum material would be directly communicated in the fashion necessary to assure that Danielle could and would access the content of the curriculum information being taught, and that she would and could manipulate it

through the learning process. Among the identified programs, it, alone, offered the special elements and program in an effective fashion, and it was the only *LRE* that would not expose Danielle to direct involvement with a population of children who were receiving services due to primary emotional or behavioral diagnoses. Certainly, it would better serve Danielle's education and special needs to place her in a program where she would not be exposed to emotionally disturbed or behaviorally disordered children, and where her educational efforts would not be distracted or diluted by the psychiatric, psychological, or behavioral needs of other students.

While the hearing officer gave consideration to "concerns" about social life, shyness, and avocational interests, she gave no consideration to the risks of exposing Danielle to an emotionally disturbed or behaviorally disordered population. *Fact No. 16.* Those risks - learning bad behavior or sick thinking, are the very risks associated with the more classical forms of institutionalization, such as mental health facilities and prisons. The legal history of *LRE* arises from the issues of institutionalization in a mental health institution (*Olmstead, below).* However, the issue and risks becomes slightly different in the context of placement in a learning disability environment. Isn't the environment more restrictive when it is populated by students who suffer mental health diagnosis, where the environment is a program designed to directly treat those diagnoses (as described in LANGUAGE!, *Fact No. 5*)? Isn't that more restrictive than a program designed exclusively for mentally healthy learning disabled students who are grouped together for more effective teaching and learning, free of exposure to mental illness and its therapeutic interventions? Doesn't the presence of such mental illness and programmatic interventions compromise the education of a child who has no such needs?

In the matter at bar, there is a conflict. Should social life be the deciding factor, or

should efficacy of education be the deciding factor? Should freedom from a mentally ill or mentally disturbed population control placement, or should (minor) distance, travel, or dormitory-style campus living be averted? The above-cited regulations do not provide clear answers to all of those competing issues. However, where there is a conflict between which should be accorded priority as between social life and efficacy of the learning environment, the above-cited regulations do provide a clear answer: efficacy of the learning environment must and should come first, absent some other potential for harm. Social life is the most easily replicated and exchanged circumstance, compared to efficacy of learning environment, and freedom from bad behavior and sick thinking.

Similarly, where, as here, there is a communication issue, the regulations clearly answer whether *LRE* is an equal consideration, or whether communication of curriculum content comes first. A "full educational opportunity" requires that curriculum content be taught by direct instruction in the child's communication mode, S. *300.346 (2) (iv)*. That instruction, and the program, must be sufficiently pervasive to by-pass the effect of the communication mode and the effect of the disability on a child's progress. Therefore, where an available program provides such features, it must be chosen over the *LRE* which does not. In short, the design of Sharon's program would not and could not provide the necessary communication mode in a consistent fashion throughout content area classes. The Landmark program would do so. Therefore, *LRE* could not be reached as an issue.

*D. State Regulation, Interpreted Consistently with Federal Regulations, Require the Same Outcome*

Under *603 CMR 28.02,* Danielle's *IEP* was required to provide for any and all sensory

impairment, and its sequelae, including but not limited to:

> ...(d) 1. Hearing. The capacity to hear, with amplification, is limited, impaired, or absent and results in one or more of the following: reduced performance in hearing acuity tasks; difficulty with oral communication; and/or difficulty in understanding auditorally-presented information in the education environment. The term includes students who are deaf and students who are hard-of -hearing.

> (e) Neurological Impairment. The capacity of the nervous system is limited or impaired with difficulties exhibited in one or more of the following areas: the use of memory, the control and use of cognitive functioning, sensory and motor skills, speech, language, organizational skills, information processing, affect, social skills, or basic life functions. The term includes students who have received a traumatic brain injury.

and resulting or independent communication limitations and issues:

> (g) Communication Impairment. The capacity to use expressive and/or receptive language is significantly limited, impaired, or delayed and is exhibited by difficulties in one or more of the following areas: speech, such as articulation and/or voice; conveying, understanding, or using spoken, written, or symbolic language. The term may include a student with impaired articulation, stuttering, language impairment, or voice impairment if such impairment adversely affects the student's educational performance. *Id at (g).*

including where identified as a specific learning disability:

> (j) Specific Learning Disability. The term means a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, that may manifest itself in an imperfect ability to listen, think speak, read, write, spell, or to do mathematical calculations. Use of the term shall meet all federal requirements given in federal law at *34 C.F.R. §§ 300.7(c)(10)* and *300.541.*

In those instances, a child's program and placement requires a structure that will provide for

"documented growth in the acquisition of knowledge and skills...according to the chronological

age and expectations, the individual educational potential of the child and the learning standards

set forth in the ...curriculum... *603 CMR 28.02 (18).* The Hearing Officer's findings documented

the effects and results of Sharon's program and placement to be just to the contrary, *Facts No. 6-*

*8.* Therefore, whether viewed from the perspective of state regulations or from the perspective of

federal regulations, the result is the same.

    *E. Controlling Federal Case Law and Statute Warrant the Same Outcome*

    The current issue of *LRE* arises from *Olmstead et als v. L.C., 527 U.S. 581 (1999).* That

concerned involuntary mental health institutionalization, where the patient's diagnosed clinical

needs did not require institutionalization. *Olmstead* construed language of the *Americans with*

*Disabilities Act,* the *ADA, Title 1, s. 12132,* which provided:

> Subject to the provisions of this subchapter, no qualified individual with a
> disability shall, by reason of such disability, be excluded from participation in or
> be denied the benefits of the services, programs, or activities of a public entity, or
> be subjected to discrimination by any such entity.

Therefore, the issue is limited to involuntary institutionalization, *i.e.* for mental health treatment.

Where the clinical placement is unnecessary to achieve treatment, it is not permitted on an

involuntary basis. *Olmstead* considered that to be discriminatory. It concerned imposition of

such discrimination (such involuntary institutionalization) by an arm of government. However,

in the case at bar, the residential placement is a voluntary choice proposed by parents, and

agreed-upon by the student *who was found to be willing to try it.* In the case at bar, the issue is

not *LRE, per se.* It is more akin to parental choice between treatment alternatives than to

involuntary institutionalization. That is especially so since the Landmark experience cannot be

said to mimic involuntary hospitalization, but rather to mimic a college campus. In that context,

there is no issue of an involuntary placement, and there is no dispute that the placement would

provide the more efficacious educational "treatment." In the instant matter, there is no issue of

mental health diagnosis or treatment, except in the program and placement advanced by Sharon. There is no issue concerning an arm of government imposing institutionalization, or any restrictive environment beyond that sought by Parents, and agreed upon by the child, herself, *Fact No. 1.*

*F. Same Continued: The Hearing Officer's Decision and Rulings Violate "No Child Left Behind Act"*

Long after *Olmstead,* Congress enacted the *No Child Left Behind Act, PL 107-110 of 2002 (115 Stat. 1425).* That generally effected multiple titles of the *ESEA.* By its terms, it sets out to ensure that every school provides the best possible education to each student, expressly including both academic content and academic achievement. Contrary to that new standard, in the instant matter, both the Sharon and the Hearing Officer expressly compromised Danielle's access to academic content, achievement, and progress. Those were sacrificed to issues which had no relationship to any diagnosed impairment or disability, or to any identified special education need. *Fed Reg 68698 (FR December 9, 2003 (Volume 68, Number 236).) Id., 68704.*

The State, School, and Hearing Officer, were all obliged to ensure objective achievement testing standards. The purpose of those standards is, in turn, to reflect the instructional standard: best instructional practices known for students with the most significant cognitive disabilities. *Id. 68707* such as Danielle (see *603 CMR 28.02 (e)).* The terms of *S. 200.13 (c) (2) (iii) and S. 200.13 (c) (4) (i)-(iii)* require accountability for these through the executive branches of government, requiring that School demonstrate annual yearly progress of students using the same standards as applied to non-disabled students. If the testing standard is "the best," then *ipso facto,* the instructional standard must be considered to be the same: the best. The court should

require no less of any *FAPE* and *IEP*.

Apparently taking into account the regulations cited above, in *Shawsheen,* this Court

properly ruled that

> Under the federal *FAPE* standard, an educational program must be provided
> under an *IEP* that is tailored to the unique needs of the disabled child and meets
> all the child's identified special education and related service requirements. This
> includes academic, physical, emotional and social needs; *34 C.F.R.*
> *300.300(3)(ii); Lenn v Portland School Committee,910 F. 2d 983 (1ˢᵗ Cir. 1990),*
> *cert. Denied, 499 U.S. 912 (1991) and Burlington v Mass. Dept. of Education,736*
> *F. 2d 773, 788 (1ˢᵗ Cir. 1984).*

In the instant case, Danielle has no diagnosed physical or social needs: she suffers no physical,

emotional, mental health, or social impairment or disability. Therefore, the *FAPE* must be

provided according to an *IEP* which is determined by her neurological, hearing, communication,

cognitive, and learning disability needs, as they affect her learning - as they effect her receipt of

information and skills, from her academic courses. Only her diagnosed needs may structure her

program and placement, and those prove to be limited to academic needs.

Danielle's academic needs are, in turn, driven by her disabilities. Those specifically

include communication needs determined by a Central Auditory Processing disorder which, by

its nature, disables full and accurate receipt of communication. Without enhancing service to her

communication needs to the fullest extent, she cannot engage to the fullest extent in receptive

communication. Her expressive communication then must become a function of that receptive

communication, and suffer resulting impairment. *Ergo,* she cannot engage in the cross-

communication activities which allow her either the learning experience to either the "best "

standard or to a "full opportunity" standard, as now expressly required by Federal regulations

pursuant to the *NLRB*. Without that, she cannot access curriculum subject matter information to

those required standards.

In *Roland v Concord School Committee,910 F. 2d 983 (1<sup>st</sup>Cir. 1990),* the holding was

that an

> ... *IEP* must be reasonably calculated to provide a student the opportunity to
> achieve meaningful educational progress. This means that the program must be
> reasonably calculated to provide effective results and demonstrable improvement
> in the various educational skills identified as special needs, *Id.*

However, *Roland* was decided years prior to the *NCLB.* The issue should now be considered in

light of the new standards set out in NCLB. Similarly, the court's attention is called to the

regulatory requirements cited above. Those regulations do not permit the *IEP* to be limited to the

child's disabilities, *i.e.* educational skills in need of special help, nor the improvement of those

skills, alone. Now, the *IEP* must also address simultaneous acquisition of educational content.

The *IEP* must address all of the education needs which flow from those disabled and deficient

skills.

In regard to whether the *FAPE* drives the *LRE,* or *vice versa,* this court has properly ruled

in the past that

> In addition to meeting the above standard, special education and related
> services must be provided in the least restrictive environment. This means that to
> the extent appropriate, students with disabilities must be educated with children
> who do not have disabilities. *Shawsheen, supra.*

However and again, the *LRE* is not the first consideration, nor even an equal consideration. The

extent to which a learning environment is appropriate is now controlled, and must now be

determined, under the new standards set out in the *NLRB* and the Federal Regulations set out

above. The *LRE* follows the *IEP* and *FAPE,* and does not drive them Further, and perhaps

above all else, it must be driven by particular attention to the communication issues, as referred

Page 18 of 20

to above: without effective exchange of communication between teacher and student, there can be no effective teaching, let alone effective learning. Without effective exchange between students, there can be little secondary learning.

> Programs and services can only be implemented in separate settings when the nature and severity of the child's special needs is such that the student can not make meaningful progress in a regular education setting even with the use of accommodations and specialized services; see *20 U.S.C. 1412 (5)(A)*. *Shawsheen. supra.*

Such programs and services must be so implemented where the nature and severity of the student's special needs are such that they cannot be implemented under the "best" standard. In the instant matter, they cannot be implemented to the best standard, or to the former "satisfactory" standard or "meangingful progress" standard, where the student's ability to receive and express communication is compromised. The Findings were clear. Danielle's communication would be best enhanced and most efficacious at Landmark. All other identified programs were found to have characteristics and participants that would limit and compromise communication. To place her in such a program would be no different than submerging a child who speaks only Russian in an English literature class taught only in English. Danielle, and other such students, require much more.

### G. Massachusetts Lex Loci is the "Best Standard"

Massachusetts requires that under an *IEP*, the student must be enabled to progress effectively in the content areas of the general curriculum. *603 CMR 28.02 (18). 603 CMR 28.02* *expressly incorporates by reference both M.G.L. c. 71B* and *20 U.S.C. 1400 et seq.*, thereby recognizing federal primacy in such regards. Under the definition of *LRE,* the state regulation also incorporates, by express reference, all "federal special education law." That is included

without limitation. Therefore, it incorporates all standards set out by federal regulation and the Federal Register.

*V. Conclusion*

     *Lex Loci* brings Parents full circle: their daughter was, and remains, entitled to the "best" standard once the *NCLB* was enacted. Both under federal statute and regulation, and under state statute and regulation, the Hearing Officer erred. Both federal and state law mandated that Danielle be relieved of participating with a population of students afflicted with bad behavior, sick thinking, and mental health and behavioral treatment in her immediate presence. Where there is no diagnosis involving social considerations or extra-curricular activities, and where there are no more than mere speculative concerns about social life and extra-curricular athletic activities, Danielle was, and remains, entitled to the most efficacious *LRE* to achieve the "best" results from her education prescription, the *IEP* required by the Hearing Officer. Otherwise, a child may be considered to be deprived of the very educational benefits necessitated by her disabilities and resulting special education needs. If those are not included in her *IEP,* or in her program as a whole, she loses the best instructional methods to which she is legally entitled, and their benefits. *See and compare Roland M. v Concord Public Schools,910 F. 2d at 994 (1ˢᵗCir. 1990); see also Murphy v Timberlane Regional Sch. Dist.,22 F. 3d 1196 (1ˢᵗCir. 1994)*

     For these reasons, Plaintiff Parents ask for summary judgment in their favor.

Respectfully submitted,

Alanna G. Cline, Atty.
300 Market St.
Brighton, MA 02135
617 783 5997
BBO 086860

January 26, 2006