UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO. 04-10994NMG

PARENTS OF DANIELLE, Plaintiffs,

v.

MASSACHUSETTS DEPARTMENT OF
EDUCATION, DAVID P. DRISCOLL, COMMISSIONER
SCHOOL COMMITTEE FOR THE TOWN OF SHARON:
SAM LIAO, ANDREW NEGENAZHL,
DONALD GILLIGAN, JANE FURR, MITCH
BLAUSTEIN AND SUAZANNE PEYTON, Defendants.

---

PLAINTIFF PARENTS' CONCISE STATEMENT OF MATERIAL FACTS IN SUPPORT OF
THEIR MOTION FOR SUMMARY JUDGMENT AS TO COUNT II

---

Parents filed a motion for summary judgment, based upon the fact findings and rulings of the Massachusetts Bureau of Special Education Appeal. The material facts they rely upon are relevant findings and rulings, presented as a summary here. They present this concise fact statement as summary of the BSEA's relevant findings. Findings and Rulings of January 12, 2004 are referred to as *Decision I*, and those of April 20, 2004 are referred to as *Decision II*.

*III. Relevant Findings Including Objective Data (Testing): Decision I*

1. Danielle, is 13 year-old 7th grader in Sharon, MA. *Decision I, p. 2, Finding No. 1,* who is willing to try Landmark for a year, *Decision I,. P. 23 Finding No. 51.*

2. Danielle has dyslexia and a central auditory processing disorder. She struggles with phonics and structural analysis in reading. She displays many reversals in spelling; moderate delays in receptive and expressive language, sequencing and word retrieval; deficits in

understanding inferential concepts; and weaknesses in her writing skills. She needs more time to process auditory information, suffering weaknesses in both auditory memory and reception of complex auditory information. *Id., p. 3  Finding No. 2.*

    3. Danielle showed reading difficulty in 1st grade. In early 2nd grade, Father asked for both a reading evaluation and core evaluation. While *School* gave Danielle informal support in class, there was no evaluation, TEAM meeting, or *IEP* that year. *Id., p. 3, Finding No. 3.*

    4.    During the next two years, Danielle was evaluated and received special needs services, *Id., pp. 3-12, Findings 4-27.* In November of 4th grade (2001), *School* gave her a Woodcock Reading Master Test. *School* gave that test again in May of the 5th grade (2002). The results between the two tests showed that in about 18 months, her percentile ranks had dropped in every subtest: from 32% to 5% in word identification, from 53% to 50% in word attack, from 38% percentile to 14% percentile in word comprehension, and from 27$^{%}$ to 9$^{%}$ in passage comprehension. Her basic skills cluster dropped from 41% to 14%, reading comprehension cluster scores dropped from 28% to 11%, and the total reading cluster dropped from 34% to 12%, *Id., p. 13, Finding No. 28,* all notwithstanding teacher reports of significant progress, understanding, motivation, confidence, some grade-level work, and increasing abilities, and smooth transition to middle school, . *Id., Finding No. 29 p. 13, ; No. 41, p. 17.*

    5.    The [current] TEAM did not compare those scores. It proposed "The Alternative Learning Program" which, by its description, was

> inappropriate for any child who needs a self-contained academic model in order to achieve academic success. The program is designed for students who have ...learning issues, emotional issues, or a combination of the two. Many of the students have language based learning disabilities... *Findings Nos. 29, 30,* p. 13-14.

    6.    Testing showed low average ability in reading comprehension, vocabulary, and

word identification; inconsistent ability to decode words, lack of automaticity, need for additional time to read with correct phrasing and pronunciation, difficulty with inferential comprehension, and problems with the skills of story recall, understanding directions, picture ocabulary identification, oral comprehension, and sound awareness. In spite of growth between 2002 and 2003, after 18 months of services recommended by *School,* tests scores were still lower than the scores of November, 2000. *Id., p. 13-14, p. 17-18.* MCAS math scores also dropped, bordering on a warning score. In spite of math word problems being an area of need for Danielle, *School* provided no special education support for that. *Id., 19, Finding 43, 44.*

    7. A private psychological evaluation showed need of extra time to process information, and displayed weaknesses in receiving short-term memory information which directly impacted her ability to comprehend messages that were complex, explaining her problem in a general learning situation where most educational instruction involves some form of verbal learning. A highly structured multi-sensory language based program that incorporates specialized instruction and a specialized reading program was recommended *Id.* P. 20, *Finding No. 47.*

    8. Further private testing at Landmark in August 22, 2003, compared to 1999, showed Danielle dropped to 4% on Word Sequences from 37%, had made little progress on word identification, and dropped from 50% to 25% in word attack. On passage reading, she scored 9%, with accuracy at 2% and a passage score at 1%. In auditory perception of speech sounds, her score dropped to mid-2nd grade range. In spelling, her grade equivalent was 3.8. *Id., Finding No. 48.* Private testing in September, 2003, showed that since February 2002, Danielle had made few, if any, gains in decoding, reading fluency, reading comprehension, writing, and spelling. While that may have also been influenced by regression over the summer, the evaluator believed

that Danielle had a greatly impaired ability to become a competent reader and achieve success in meeting a 7th grade curriculum due to deficits in phonological awareness, memory, and rapid naming skills, only showing a comfortable reading level in the mid-2nd to mid- 3rd grade level, oral reading fluency at the 2nd grade level, and reading comprehension at a third grade level. A substantially separate language based program was recommended, to include Fast Forward computer program (to address language processing), LiPs, and Project Read, or other programs appropriate for such needs. *Id., p. 23-24, Finding No. 52.*

9. On September 13, 2003 an updated Central Auditory Processing evaluation showed improvement and maturation of the auditory system but still showed difficulty processing complex auditory information, displaying more difficulty with longer tasks. She continued to have difficulty accurately comprehending speech which was presented with competing background noise, a difficulty exacerbated in a classroom setting where ambient noises fluctuate resulting in varied attention. Her language-based learning difficulties, combined with her auditory processing deficits, put her at continued risk for inaccurately perceiving auditory information in a usual classroom, particularly when information is presented in a noisy background or is presented quickly or contains multiple parts or unfamiliar language concepts. Recommendations could be implemented in a public school setting, but would be more difficult due to larger class size. *Id. P. 25   Finding No. 54.*

   *B. Hearing Officer's Ultimate Findings- Decision I*

10. The IEP on its face was ruled to be inappropriate. It did not address Danielle's difficulty comprehending mathematical word problems that Sharon agrees would be beneficial for Danielle. It does not include Fast Forward and LindaMood Bell programs for auditory

processing deficits, does not include consultation, and Danielle is not encouraged to consistently use computer technology. *Id., p. 18 Findings Nos. 32, 44 p. 32.*

11. *School* testing shows that Danielle decodes inefficiently on materials at or above a 5th grade level, continues to have deficits in reading comprehension, shows significant percentile drops in all subtests done 18 months earlier, dropping from 41% to 14% percentile in basic skills, from 28% to 11% in reading comprehension, and from 34% to 12% in total reading skills. While by March, 2003 basic skills increased from 14% to 30%, this was significantly below her 41% rank in November 2001; and written expression, using identical tests, show a drop from 61% percentile in November, 1999 to 47% in March 2003, indicating failure to generalize information and/or regression during the summer, requiring an extended year program.. *Id., p. 32-3 4.*

12. The Wilson Reading program was delivered by a teacher who was not certified in that program, *Finding No. 22, p. 10.* The current program is inappropriate because the Speech/Language Pathologist) only attends one social studies and two of Danielle's English classes despite her needs for much more; and while as certified master's level special education teacher works with teachers to modify class material to break down language to make it accessible for Danielle, only a paraprofessional covered English, without evidence that any language break down, Danielle's comprehension, or paraprofessional monitoring, complied with the IEP. *Id., 25 fn.39; p. 32-33.*

13. The science content was not made language-based for Danielle. As such, it is not fully accessible for her.

14. A small group phonics program recommended for Danielle is provided only twice a week instead, contrary to the program's own instructions for daily instruction, and as Danielle

requires. *Id. P. 33.*

15. A day placement at Landmark is inappropriate based upon commuting issues, and a residential placement at Landmark is inappropriate based on questions about Danielle's motivation to attend, and because Sharon did not explore local day programs.. *Id., p. 33.*

C. *Initial Rulings after Hearing*

16. The Hearing Officer ruled in the alternative, ordering *School* either to locate an appropriate language-based program and to submit applications to particular schools; *or to create* an appropriate language-based program subject to an independent evaluator's oversight and reporting to hearing officer and parties. If a program were created, it was to agreed-upon special education support with math word problems during the school year, to provide consultation from Danielle's special education providers, and to provide daily phonics-based instruction in reading and writing. The Hearing Officer also ordered discussion with Danielle about the Landmark program, expressly deferring decision about placement at Landmark due to its distance as a day school and Danielle's lack of motivation to wake up early enough to attend as a day student, Danielle's preference not to leave her activities and friends and her alleged shyness, and, Sharon's failure to explore closer, less restrictive, day programs; but finding that Landmark "could be an option." She also ordered Sharon to locate or create a language-based summer program which included use of particular software programs such as Fast Forward and/or LiPs instruction. *Id., p. 33-34.* Landmark's profile and services are designed for language-based learning disabled students such as Danielle, (not for students whose primary problems include emotional problems.) *Findings Nos. 50, 51, p. 22-23.*

D. *Final Decision April, 2004: Relevant Findings -Decision II*

17. After taking further evidence from the independent evaluator, on April 20, 2004 the evaluator found that there may be benefits to placing Danielle in a more specialized, language immersion program. However, there was concern about the costs to Danielle socially and academically if she were to be moved from the current setting based upon her current comfort and happiness in school. She ruled that the round trip commute to and from Landmark, for day or boarding, "would not be emotionally advantageous for Danielle." *Decision II, p.* 6,11 (*Finding No. 23*). Apparently on that basis, the Hearing Officer (now) found that a Landmark placement would not meet Danielle's "individual" needs. *Id., p. 13* as it would not provide the LRE. *Id., p. 13*. She found that Danielle did not require an out of district program in order to have an effective educational program because her current program could be modified to meet her needs, through monitoring, consultation, and ongoing assessment of the program, finding "With these modifications, she could achieve a FAPE in the LRE." noting however "If the public school program could not have been modified and Sharon was not able to locate an appropriate program Landmark would have been an option..." and using it for an extended summer program was required. *Id. p. 13-15.*

Respectfully submitted,

Alanna G. Cline
Parents' Attorney
300 Market St.
Brighton, MA 02135
617 783 5997
BBO 086860

January 26, 2006