# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

CIVIL ACTION
NO.  04-10994-NMG

PARENTS OF DANIELLE,

                          Plaintiffs,

v.

MASSACHUSETTS DEPARTMENT OF
EDUCATION, et al.,

                          Defendants.

## STATE DEFENDANTS' OPPOSITION TO
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1, defendants Massachusetts

Department of Education and Commissioner David Driscoll (collectively referred to as "the

Department") respectfully submit this memorandum in opposition to the motion of plaintiffs

Parents of Danielle ("Parents") for summary judgment on their claim seeking judicial review of a

decision of the Department's Bureau of Special Education Appeals ("BSEA"), concerning

special education services provided by defendant Sharon Public Schools ("Sharon") to Danielle.

For the reasons set forth below, the Court should affirm the BSEA's decision and enter judgment

in favor of defendants on the judicial review claim.[1]  In support of this Opposition, the

---

[1]  Parents move for summary judgment on "Count I" of the Complaint, a reference to
their claim for judicial review of the BSEA's decision.  The Complaint does not expressly
identify different "Counts" but contains a claim for judicial review of the BSEA's decision
(captioned "Parent's Case for Appeal," Complaint ¶¶ 6-21), a claim for compensatory damages
seeking to recover the cost of placement at the Landmark School for the 2003-2004 school year
(captioned "Parent's Case for Compensatory Damages," Complaint ¶¶ 22-28), and a claim for

Department submits the accompanying Statement of Defendant Department of Education

Pursuant to Local Rule 56.1 ("Department's Statement"), constituting the Department's response

to the Parents' Concise Statement of Material Facts.

## **STATUTORY FRAMEWORK**

The Individuals With Disabilities Education Act ("IDEA"), 20 U.S.C.A. §§ 1400 et seq.,

provides that, as a condition of receiving federal funding, States must provide a "free appropriate

public education" to all children with disabilities.  20 U.S.C.A. § 1412(a)(1)(A) (2005 Supp.)[2];

Pihl v. Massachusetts Dept. of Ed., 9 F.3d 184, 187 (1st Cir. 1993).  In Massachusetts, the

provision of special education is governed by Mass. G.L.. c. 71B 3 (2004 ed.).  See also Roland

M. v. Concord School Comm., 910 F.2d 983, 987 (1st Cir. 1990), cert. denied, 499 U.S. 912

(1991); Lenn v. Portland School Comm., 998 F.2d 1083, 1086 (1st Cir. 1993).  The standard of

an "appropriate" education requires that a state provide services in a way "'reasonably calculated

to enable the child to receive educational benefits.'"  Lenn v. Portland School Comm., 998 F.2d

at 1086 (quoting Board of Educ. v. Rowley, 458 U.S. 176, 207 (1982)).

IDEA "imposes extensive procedural requirements on participating state and local

agencies to safeguard a disabled student's right to a free appropriate public education."  Pihl v.

Massachusetts Department of Education, 9 F.3d at 187.  The "primary safeguard" is the

---

attorneys' fees (captioned "Parent's Case for Attorney Fees and Costs," Complaint ¶¶ 29-33).
Sharon filed a motion for summary judgment on the fee claim in April 2005 but subsequently
withdrew that motion in light of its filing of a motion to dismiss the Complaint in its entirety.
Although Parents' summary judgment memorandum is confined to a discussion of the claim for
judicial review, the Department addresses as well the claim for compensatory damages, which is
in essence an aspect of the judicial review claim.

[2]  All citations to the U.S.C.A. are to the 2005 Pocket Part.

mandatory development of an individualized education program ("IEP") by the local school district responsible for educating a disabled student.  Pihl v. Massachusetts Dept. of Ed., 9 F.3d at 187; 20 U.S.C.A. §§ 1414(d), 1415; G.L. c. 71B, § 3.  The IEP, which is developed by the local school district with the parents' participation, is a written document detailing the student's current educational performance, the short-term and long-term goals of the plan, the specific educational services to be provided, and objective criteria to evaluate the student's progress.  See 20 U.S.C.A. §§ 1401(14), 1414(d); Lenn v. Portland School Comm., 998 F.2d at 1086; G.L. c. 71B, § 3; 603 C.M.R. §§ 28.02, 28.05.

Parents or students may challenge an IEP by seeking a due process hearing before the state special education agency.  20 U.S.C.A. § 1415(f); G.L. c. 71B, § 3; Lenn v. Portland School Comm., 998 F.2d at 1086.  In Massachusetts, BSEA conducts the due process hearing.  G.L. c. 71B, § 3; 603 C.M.R. § 28.08(3), (5).[3]  Proceedings before BSEA are conducted pursuant to the procedures set forth in federal regulations, 34 C.F.R. § 300.506-.513, and in the state Administrative Procedure Act, G.L. c. 30A, and state regulations.  See 603 C.M.R. § 28.08(5).  The decision of a BSEA hearing officer cannot be subject to review by the Department of Education, see 34 C.F.R. § 300.510(a), 603 C.M.R. § 28.08(6), but parents or students may seek judicial review of a decision by BSEA by filing an action in state or federal court, asserting a claim for review under IDEA.  See  20 U.S.C.A. § 1415(i)(2); 603 C.M.R., § 28.08(6).

## PROCEDURAL AND FACTUAL BACKGROUND

The procedural and factual background of this case are as follows.  The facts set forth

---

[3]  Parents or school districts also may seek to resolve disputes regarding the provision of special education services by requesting mediation, provided by mediators employed by the BSEA.  See 603 C.M.R. § 28.08(2)-(4); 34 C.F.R. §§ 300.506, 300.660.

below, which are not in dispute, are also set forth in the Department's Statement.

During the 2003-2004 school year, Danielle, then aged 13, was a seventh grade student at Sharon Public Schools. Administrative Record ("A.R.") I:182 (BSEA Decision in <u>Sharon Public Schools</u>, BSEA # 03-4311, dated January 12, 2004 ("Decision I"), Finding ¶ 1.[4]  In December 1999, in the middle of third grade, Danielle was found to be eligible for special education services, and an IEP was developed to address her language disabilities. A.R. I:184-185 (Decision I, Findings ¶¶ 6,7). Danielle, who was subsequently diagnosed with dyslexia and a central auditory processing disorder, began receiving services in January 2001. A.R. I:183, 185-188, 190, 194, 197-199, 204-205 (Decision I, Findings ¶¶ 2, 7-10, 13, 18, 21, 32, 34, 42, 45, 55).

In April 2003, when Danielle was in sixth grade, Danielle's TEAM convened to discuss Danielle's progress and to develop an amended program covering the period from March 2003 to March 2004. A.R. I:182, 197 (Decision I, Finding ¶ 42). The TEAM proposed an IEP that provided special education services to Danielle at the Sharon Public Schools. A.R. I:197 (Decision I, Finding ¶ 42). Parents accepted the services in the proposed IEP but rejected the placement at Sharon Public Schools. A.R. I:198-199 (Decision I, Finding ¶ 45). At about the

---

[4]  The Administrative Record is comprised of three volumes of pleadings and exhibits (cited here by Volume number and page, <u>e.g.</u>, A.R. I:25 refers to Volume I, page 25), as well as four transcript volumes (cited here by Transcript Volume number and page, <u>e.g.</u>, Tr. I:100 refers to Transcript Volume I, page 100). The record includes the two BSEA decisions related to Danielle. The first decision, dated January 12, 2004, is referred to by Parents and herein as "Decision I," and it appears at A.R. I:180-215. The second decision, dated April 20, 2004, is referred to by Parents and herein as "Decision II," and it appears at A.R. I:244-260. The Department cites the decisions by reference to the appropriate page number in the Administrative Record as well as, where applicable, the paragraph number in the decisions' factual findings. In the case of Decision I, the Hearing Officer's factual findings are referred to as "Findings" and, in the case of Decision II, the factual findings are referred to as "Supp. Findings," consistent with the terms used in the two decisions.

same time, Parents sent an application for Danielle to immediately attend, or to attend for the

seventh grade, the Landmark School (a language based program in Prides Crossing,

Massachusetts) as a day student.  A.R. I:198-199 (Decision I, Finding ¶ 45).  Landmark initially

did not admit Danielle for the 2003-2004 school year (when Danielle would be in seventh

grade), because it did not then have an opening, but Landmark subsequently admitted Danielle to

begin in late January 2004.  A.R. I:200-201, 208 (Decision I, Finding ¶¶ 49, 62).  Danielle began

seventh grade at the Sharon Middle School in September 2003, where she was in an inclusion

program for all of her academic subjects and also received a number of special education

services.  A.R. I:202-205 (Decision I, Finding ¶¶ 52, 55).[5]

Parents rejected the placement at Sharon proposed by Danielle's TEAM in the April

2003 IEP, covering the period March 2003 to March 2004, and the BSEA conducted an

adjudicatory hearing on three days in October 2003.  A.R. I:181, 198-199 (Decision I, Finding

¶ 45).[6]  The BSEA Hearing Officer who conducted the hearing framed the issues as follows:

(1)    Whether the IEP developed in April 2003, designating a program for Danielle at
       Sharon Middle School for the period March 2003 to March 2004, provide
       Danielle with a free appropriate public education ("FAPE") in the least restrictive
       environment ("LRE")?

(2)    If not, would modifications to the current program provide a FAPE in the LRE?

(3)    If not, does Danielle require an out of district day program at Landmark in order
       to achieve a FAPE in the LRE?

---

[5]  In particular, Danielle received a number of special education services, including
modifications to the inclusion classes such as study guides, daily "pull out" special education
instruction, classroom support from paraprofessionals in her english and math classes, and
speech and language therapy outside the classroom.  A.R I:204-205 (Decision I, ¶¶ 55-56).

[6]  At the BSEA hearing, Parents also challenged the June 2000 IEP and sought
compensatory services for Danielle for 2000, which the BSEA rejected.  A.R. I:210.

A.R. I:182.[7]  At the hearing, Parents took the position that Sharon's inclusion program could not provide the language-based program that Danielle required in order to receive a FAPE.  A.R. I:192.  Sharon's position was that its inclusion program, together with pull out support and related services, addressed Danielle's deficits and provided her with a FAPE.  A.R. I:192.

The Hearing Officer issued a decision on January 12, 2004, concluding that Sharon's program as then configured did not provide a FAPE to Danielle.  A.R. I:210.  In particular, the Hearing Officer concluded that the IEP did not adequately address Danielle's decoding and reading comprehension deficits; it did not provide for a speech/language pathologist and/or special education consultation to the inclusion teachers; and it did not consistently provide the technology recommended to address Danielle's language and auditory processing deficits.  A.R. I:246 (Decision II, Supp. Finding ¶ 1).  The Hearing Officer concluded, however, that the Landmark School, although a language-based program, did not meet Danielle's individual needs nor did it provide the LRE for Danielle.  A.R. I:212-213, 256.  The Hearing Officer directed Sharon to fund an independent evaluator to report back to the Hearing Officer after considering the various options, including whether Sharon's program could be modified to meet Danielle's needs, and including the Landmark as an option.  A.R. I:212-213.  The Hearing Officer also directed Sharon to obtain information concerning other nearby language-based programs that provided the type of services that Danielle required.  A.R. I:212.

The independent evaluator chosen by Sharon observed Danielle in her classes at Sharon

---

[7]  The hearing officer also identified a fourth issue, concerning Parents' claim that Sharon should provide compensatory speech and language services for the period September-December 2000.  A.R. I:182.  The Hearing Officer's ruling on that issue (rejecting Parents' claim) is not in question in this action for judicial review.  See Complaint, Prayer for Relief.

Middle School on January 27, 2004, and the evaluator (Joan Axelrod) issued a written report concluding that the Sharon program, if modified, would provide Danielle with a FAPE in the LRE.  A.R. I:235, 250, 253 (Decision II, Supp. Finding ¶¶ 13, 18).  The BSEA convened an additional hearing on March 10, 2004, at which the independent evaluator testified and was examined by the Parents, who also offered testimony of Dr. Robert Kemper to respond to the independent evaluator's conclusions.  A.R. I:253-255 (Decision II, Supp. Finding ¶¶ 18-19, 24); Tr. IV:5.

On April 20, 2004, the BSEA issued a second decision ("Decision II"), denying Parents' request for placement in a day program at Landmark on the basis that Landmark did not provide the LRE for Danielle.  A.R. I:244, 258.  The Hearing Officer also found that Sharon's program could be further modified to meet Danielle's needs and to provide a FAPE in the LRE.  A.R. I:256-257.  The Hearing Officer ordered Sharon to amend its IEP to provide Danielle with the following additional services:  an individual tutorial in decoding, reading comprehension and fluency;[8] consultation among the speech/language pathologist, special education teacher, and independent evaluator; an extended school year [typically meaning summer] language immersion program (which could be Landmark's residential summer program or another summer language-based immersion program); a tutorial ("FastForward") in the summer; and monitoring by an outside evaluator.  A.R. I:258.  The Parents and Sharon subsequently agreed

---

[8]  The Hearing Officer concluded that Ms. Lanzel, Danielle's special education teacher at Sharon,  although not certified in the Wilson method of instruction (a method of instruction that breaks down language to enable students to decode sounds, then syllables, and then words to phrases), nevertheless could provide the decoding, comprehension, and fluency instruction that Sharon had proposed.  A.R. I:250, 253-254, 256-257 (Decision II, Supp. Findings ¶¶ 13, 21, 22). In reaching that conclusion, the Hearing Officer relied on testimony and documentary evidence concerning Ms. Lanzel's implementation of services.  A.R. I:257.

that Danielle would attend Landmark's summer program to implement that portion of Decision II requiring Sharon to provide a summer language immersion program.  A.R. I:263.  Danielle attended Sharon Public School during the 2004-2005 school year, receiving services as provided in her IEP (as amended pursuant to the Hearing Officer's order in Decision II).

Parents filed this action in May 2004, seeking judicial review of the BSEA's decision.  In their first claim ("Parent's Case for Appeal"), Parents challenged, in particular, BSEA's holding that Sharon's program as modified would provide a FAPE to Danielle and BSEA's holding that placement at Landmark was not warranted, and Parents requested that the Court set aside those aspects of BSEA's decision.  Complaint ¶¶ 20-21 and Prayer for Relief ¶¶ 1, 3.  In their second claim ("Parent's Case for Compensatory Damages"), Parents alleged that Danielle had not received a FAPE during 2003-2004 school year, and Parents sought an order directing Sharon to pay "compensatory damages to the plaintiff in an amount equal to the cost of placement at Landmark Schools for the 2003-2004 school year."  Complaint ¶¶ 23-28 and Prayer for Relief ¶ 5.  In a third claim ("Parent's Case for Attorney Fees and Costs"), Parents sought attorneys' fees and costs in the amount of roughly $58,000 for the BSEA proceedings as well as an unspecified amount of attorneys' fees and costs incurred in this judicial proceeding.  Complaint ¶¶ 30-33 and Prayer for Relief ¶ 6.  In November 2004, the Department filed, as part of its Answer, a certified copy of the record of administrative proceedings before the BSEA.

As noted above in footnote 1,  Parents now seek summary judgment on the claim for judicial review.  For the reasons set forth below, the Court should deny Parents' motion for summary judgment on that claim (as well as the related claim for compensatory damages) and enter judgment for the Department on both claims.

**ARGUMENT**

I.   **PARENTS' CLAIM FOR JUDICIAL REVIEW, CHALLENGING THE BSEA DECISION, IS WITHOUT MERIT, AND THE COURT ACCORDINGLY SHOULD AFFIRM THE DECISION.**

    A.   **THE STANDARD OF REVIEW IN CASES UNDER IDEA IS LIMITED TO "INVOLVED OVERSIGHT" OF THE BSEA'S DETERMINATIONS.**

In an action under IDEA seeking review of a BSEA decision, the Court "shall receive the records of the administrative proceedings; shall hear additional evidence at the request of a party; and basing its decision on a preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C).  The federal statute "contemplates an intermediate standard of review on the trial court level -- a standard which, because it is characterized by independence of judgment, requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete *de novo* review."  Lenn v. Portland School Comm., 998 F.2d 1083, 1086 (1st Cir. 1993); Shawsheen Valley Regional Vocational Technical School District School Committee v. Massachusetts Dept. of Ed., 367 F. Supp. 2d 44, 49 (D. Mass. 2005).  A court's role in reviewing a decision by a state educational agency is limited to one of "involved oversight."  Roland M. v. Concord School Comm., 910 F.2d 983, 989 (1st Cir. 1990), cert. denied, 499 U.S. 912 (1991).  "In the course of this independent review, the administrative proceedings must be accorded 'due weight.'"  Lenn v. Portland School Comm., 998 F.2d at 1087 (quoting Board of Educ. v. Rowley, 458 U.S. 176, 206 (1982)).  A reviewing court "is not at liberty either to turn a blind eye to administrative findings or to discard them without sound reason."  Lenn v. Portland School Comm., 998 F.2d at 1087.

Applying the foregoing standard of review, the Court should affirm the BSEA's decision, as Parents have not presented any persuasive basis for reversing the BSEA's decision.

**B.    PARENTS' CLAIM THAT THE BSEA GAVE TOO MUCH WEIGHT TO THE CONCEPT OF "LEAST RESTRICTIVE ENVIRONMENT" REFLECTS A MISUNDERSTANDING OF THE BSEA'S DECISION.**

Parents devote a considerable portion of their memorandum of law to a somewhat rambling discussion of the relationship between the concepts of "free appropriate public education" ("FAPE") and "least restrictive environment" ("LRE"). The thrust of Parents' argument on this topic is their claim that FAPE and LRE "are not equal, competing requirements or considerations" but rather that FAPE "is the first priority" and must be "served first." Parents' Memorandum of Law in Support of Their Motion for Summary Judgment as to Count I ("Parents' Memorandum"), at 5. Parents thus argue that "[t]he LRE must be subservient to the FAPE" and that learning environments – that is, the extent to which one environment is more restrictive than another – may be considered only after the BSEA first determines that a FAPE can be provided "without compromise of quality in more than one learning environment." Parents' Memorandum, at 5-6. Parents go on to claim that the BSEA erred in applying the foregoing standards insofar as its decision provided for placement for Danielle at the Sharon Public Schools notwithstanding the Hearing Officer's "finding that a program in the public school's learning environment lacked the required *IEP* elements, lacked efficacy, and lacked teacher certification." Parents' Memorandum, at 7.

Parents' arguments reflect a basic misunderstanding of the Hearing Officer's decision. The Hearing Officer unambiguously determined that Sharon's program, once modified to provide specified additional services to Danielle, <u>would</u> provide a FAPE to Danielle.  <u>See</u>

Decision II, at 12 ("I find that Sharon's program can be modified to meet Danielle's needs.");

Decision II, at 13 ("With these modifications [detailed in the decision] she could achieve a FAPE

in the LRE.").[9]  The Hearing Officer thus did not "compromise" Danielle's FAPE or "sacrifice"

her educational needs in order to serve the purpose of placement in the least restrictive

environment (namely, placement in an inclusion setting in the Sharon Public Schools, which is

less restrictive than placement at Landmark School, a specialized school for students with

language impairments, see 20 U.S.C. § 1412(a)(5)(A)).  Instead, the Hearing Officer, having

determined that Sharon's program, as modified, would provide a FAPE to Danielle, then

determined that Sharon's program as modified would be the appropriate placement for Danielle

under IDEA because it provided the least restrictive environment, as compared to the Landmark

program also being considered:

> This Hearing Officer previously found that Landmark was not the
> least restrictive environment for Danielle. . . . In this case the
> issue is what program provides Danielle a FAPE in the LRE.  An
> IEP can only be implemented in separate settings when the nature
> and severity of the child's special needs is such that the student can
> not make meaningful progress in a regular education setting even
> with the use of accommodations and specialized services; see 20
> U.S.C. 1412(5)(A).  In this matter accommodations and
> specialized services can make Sharon's current program
> appropriate for Danielle.

A.R. I:258.[10]

_____

[9]  The additional services specified by the Hearing Officer, as discussed in the text above,
see supra pages 7-8, were as follows:  an individual tutorial in decoding, reading comprehension
and fluency; consultation among the speech/language pathologist, special education teacher, and
independent evaluator; an extended school year language immersion program; a tutorial
("FastForward") in the summer; and monitoring by an outside evaluator.  A.R. I:258.

[10]  Further underscoring her conclusion that Sharon's program, as modified, would
provide Danielle with FAPE, the Hearing Officer further noted that "[i]f the public school

The Hearing Officer's determination was entirely consistent with, and indeed required by, IDEA, which provides that, in order to be eligible for federal funding, a State must adopt a plan including the following condition:

> To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). See also Hampton School District v. Dobrowolski, 976 F.2d 48, 50 (1st Cir. 1992) (IDEA requires state to assure that, to maximum extent appropriate, education will be provided in the least restrictive environment with children who are not disabled); Norton School Committee v. Massachusetts Dept. of Ed., 768 F. Supp. 900, 903 (D. Mass. 1991) (section 1412(5) [currently section 1412(a)(5)(A)] imposes a "mainstreaming" requirement; "[p]ut another way, the handicapped child must be educated in the least restrictive environment"); Lang v. Braintree School Committee, 545 F. Supp. 1221, 1228 (D. Mass. 1982) (referring to "the mainstreaming approach preferred by the Act").[11]

In short, the Court should reject Parents' claim that the BSEA improperly gave too much

---

program could not have been modified and Sharon was not able to locate an appropriate program Landmark would have been an option for further exploration. Such is not the case here." A.R. I:258 n.26.

[11] See also Monticello School Dist. No. 25 v. George L., 102 F.3d 895, 906 (7th Cir. 1996) ("the IDEA and the case law interpreting the IDEA give strong preference to mainstreaming students with disabilities . . . . This directive is also referred to as the LRE requirement.").

weight to the LRE standard, as that claim rests on a misunderstanding of the BSEA's decision.[12]

### C.   PARENTS' RELATED CLAIM THAT THE BSEA PLACED UNDUE EMPHASIS ON "SOCIAL ISSUES" ALSO IS WITHOUT MERIT.

Parents also claim that, in ruling that Sharon's program (as modified) was the proper

placement for Danielle, the Hearing Officer "compromised" the FAPE standard and "sacrificed"

Danielle's educational needs (in particular her needs resulting from her central auditory

processing disorder) to "social concerns" about placement at Landmark.  Parents' Memorandum,

at 10-11.  More specifically, Parents argue that the FAPE "must be driven by the student's . . . .

*special* education needs," not "[s]uch issues as popularity," Parents' Memorandum, at 9

---

[12]  As an aspect of their argument concerning the relationship between FAPE and LRE, Parents argue that Sharon's program "could not provide the necessary communication mode in a consistent fashion throughout content area classes" and that the Landmark program, in contrast, "would do so."  Parents' Memorandum, at 13; see also Parents' Memorandum, at 19 ("Danielle's communication would be best enhanced and most efficacious at Landmark.").  Although the meaning of Parents' argument on this point is not entirely clear, it appears that they thereby intend to argue that the Landmark program, but not the program at Sharon, could adequately address Danielle's language-based disabilities, and that the Hearing Officer accordingly should not have chosen placement at Sharon.  See Parents' Memorandum, at 13 (a program that is able to "by-pass . . . the effect of the disability on a child's progress" must be chosen over the *LRE* which does not).  But the record contains substantial evidence supporting the Hearing Officer's conclusion that Sharon's program, with modifications ordered in the Decision, would provide Danielle with a FAPE, including in particular the written report and testimony of Ms. Axelrod, who opined that the modifications, together with the special education services already in place, would adequately meet Danielle's needs.  A.R. I:256-258.  The Hearing Officer expressly considered, and rejected, the notion (advanced here in Parents' memorandum) that Ms. Lanzel's lack of certification in the Wilson method precluded her from providing appropriate services.  A.R. I:254 (Decision II, Supp. Finding ¶ 22), A.R. I:257, and that conclusion is supported by the opinion of the independent evaluator that Ms. Lanzel could provide the decoding, comprehension, and fluency instruction set forth in the IEP.  A.R. I:257.  The hypothesis advanced by Parents – that Landmark could provide a better instructional program – even if true, would not provide a basis for reversal of the BSEA's decision, insofar as the evidence supported the BSEA's conclusion that Sharon's program would provide Danielle a FAPE, and the IDEA "does not require school districts to reimburse parents who choose a superior placement for their child."  Hampton School Dist. v. Dobrowolski, 976 F.2d at 52.

(emphasis in original), and Parents further argue that the BSEA's determination that placement at Sharon was appropriate was based on improper consideration of such "social" issues as "Danielle's happiness and popularity" in her current placement at Sharon.  Parents' Memorandum, at 11.[13]

The "social issues" to which Parents refer apparently are the Hearing Officer's finding that the independent evaluator, Joan Axelrod, expressed concern "about the costs to Danielle socially and academically if she were to be moved at the current time," in light of Ms. Axelrod's view that Danielle "seemed socially connected and very motivated to complete assigned work (with support)" at her current program at Sharon Public Schools.  A.R. I:250 (Decision II, Supp. Finding ¶ 13).  The Hearing Officer also noted Ms. Axelrod's opinion that a 3-hour round trip

---

[13]  Parents repeat a version of this argument elsewhere in their memorandum as well.  <u>See</u> Parents' Memorandum, at 9 (stating that full educational opportunity "may not be compromised by social, recreational, or avocational interests, unless those are a function themselves of recognized disabilities which bespeak special education needs warranting response."); Parents' Memorandum, at 7 ("The Hearing Officer finally ordered a public school learning environment, doing so based on 'concern' about Danielle's social life, athletic activities, shyness, and recreational activities, and without attention to the regulatory requirements discussed above.").

The "regulatory requirements" to which Parents refer is 34 C.F.R. § 300.552(d), discussed in the portion of their memorandum immediately preceding the above-quoted sentence regarding the Hearing Officer's "concern" about social issues.  The cited regulation provides that, in selecting the least restrictive environment, a local educational agency give consideration to "any potential harmful effect on the child or on the quality of services that he or she needs." 34 C.F.R. § 300.552(d).  Parents go on to argue that the foregoing regulation and related regulations permit the Hearing Officer, in assessing any potential harm from a placement, to consider certain "non-academic and social considerations," but Parents argue that such non-academic considerations may be taken into account "only once a student's academic and educational needs are met."  Parents' Memorandum, at 7-8.

As discussed in Argument Section IIB, above, however, the Hearing Officer here found that placement at Sharon, with the further modifications ordered in the Decision, would provide Danielle with a FAPE, and in so doing, the Hearing Officer did not give undue weight to "social" considerations.

commute to Landmark "would not be emotionally advantageous to Danielle."  A.R. I:254

(Decision II, Supp. Finding ¶ 23).

Parents' argument on this issue, too, reflects a misunderstanding of the BSEA's decision.

There is simply nothing in the Decision that even remotely suggests that the Hearing Officer, in

making her placement determination, gave significant, let alone determinative, weight to social

issues as distinct from academic issues.  To the contrary, the Hearing Officer made extensive and

detailed findings concerning Danielle's educational deficits, and the manner in which her current

program at Sharon, and additional services, could and would meet those needs.  A.R. I:256-258.

Her passing reference to the independent evaluator's expressed concern about the social impact

of placement at Landmark can hardly be considered to constitute giving undue weight to social

issues at the expense of more purely educational needs.[14]

### D.    THE PARENTS' REMAINING CLAIMS ALSO ARE WITHOUT MERIT.

Parents also argue that the Hearing Officer erred in determining that placement at Sharon

was appropriate, because, "as between the identified, available *LREs* with *existing* programs,

Landmark was identified as the only *LRE* which would provide an established, proven, non-

experimental placement and program."  Parents' Memorandum, at 11 (emphasis in original).

This argument, which appears to challenge the Hearing Officer's determination to direct Sharon

---

[14]  Moreover, a student's social needs appropriately may be considered in determining
what type of educational program will provide a FAPE under IDEA.  Lenn v. Portland School
Comm., 998 F.2d at 1089 ("an IEP must target '*all* of a child's special needs,' [citing Burlington
v. Department of Ed., et al., 736 F.2d 773, 788 (1st Cir. 1984)] whether they be academic,
physical, emotional, or social.") (emphasis added by Court in Lenn).  In any event, even a
cursory reading of the BSEA's Decision here makes abundantly clear that the Hearing Officer,
far from placing great weight on social issues, focused in large part on the educational
components of placement at Sharon, in reaching her determination.

to provide additional services through modification of Danielle's IEP, is completely without merit.

It is in the very nature of IDEA that special education services be tailored to the particular needs of each individual student. In this regard, the statute requires that schools provide an <u>individualized</u> education plan for any student eligible for special education services. 20 U.S.C. § 1400(d)(1)(A) (purpose of Act is to ensure that disabled children receive special education services "designed to meet their unique needs"). Where the needs of a particular student may be met through additional services to be provided by a school through modifications to its current program, rather than through an <u>existing</u> program elsewhere, a Hearing Officer is well within her discretion in directing the provision of such additional services, and the fact that such services are not part of an "established" program is of no consequence. <u>See</u>, <u>e.g.</u>, <u>Monticello School Dist. No. 25 v. George L.</u>, 102 F.3d 895, 900-901, 906 (7th Cir. 1996) (affirming district court decision, which in turn affirmed hearing officer's decision rejecting parents' proposed placement of student in private school and ordering that modifications be made to student's current IEP to correct its deficiencies).

Parents also argue that the Hearing Officer erred in ordering that Danielle be placed at Sharon because both federal and state law require that "Danielle be relieved of participating with a population of students afflicted with bad behavior, sick thinking, and mental health and behavioral treatment." Parents' Memorandum, at 20. In similar vein, Parents elsewhere in their memorandum argue that the Hearing Officer failed to consider "the risks of exposing Danielle to an emotionally disturbed or behaviorally disordered population" at Sharon. Parents' Memorandum, at 12.

16

This offensive argument should be rejected out of hand.  Parents present no support (in the record or elsewhere) for their contention that the student population at Sharon is "emotionally disturbed or behaviorally disordered."[15]  Moreover, Parents' suggestion that placement at Sharon is more "restrictive" than placement at Landmark School due to the Sharon student population's "mental health diagnosis, <u>see</u> Parents' Memorandum at 12, is directly contrary to the express language of IDEA, which, as noted above,  requires that to the maximum extent appropriate, students with disabilities be educated in "the regular educational environment" rather than being placed in a separate program for disabled students.  20 U.S.C. § 1412(a)(5)(A).[16]

Parents also advance the curious claim that the BSEA's Decision violates the "No Child Left Behind Act," Pub. L. 107-110 of 2002, 115 Stat. 1425, arguing that that legislation requires that every school provides the "best possible education to each student," a standard that Parents contend sets a higher threshold than the "free appropriate public education" standard set forth in

---

[15]  In their memorandum, at page 12, Parents cite "Fact No. 16" following their statement, quoted in the text above, concerning "the risks of exposing Danielle to an emotionally disturbed or behaviorally disordered population."  But paragraph 16 in the factual findings sections of both of the Hearing Officer's Decisions have nothing to do with the student population at Sharon, and Parents present no other citation to support their strange claim.  A.R. I:187, 252.

[16]  Parents assert the related point that placement at Landmark would not be restrictive; and, apparently to illustrate that point, Parents distinguish between a voluntary residential placement at Landmark" and involuntary institutionalization in a mental health facility.  Parents' Memorandum, at 15 ("the Landmark experience cannot be said to mimic involuntary hospitalization, but rather to mimic a college campus.").  This argument misses the mark completely.  Nowhere in its decision did the BSEA suggest that placement at Landmark was the more restrictive placement because it was akin to involuntary institutionalization.  Rather, in finding that Sharon was the least restrictive placement for Danielle, the BSEA was merely adhering to the statutorily expressed notion that placement in a regular school program – here, the inclusion program at Sharon supplemented with certain special education services – constitutes a less restrictive environment and is the preferred placement.

17

IDEA. Parents' Memorandum, at 16. The Act, which is a general funding statute for public elementary and secondary schools (conditioning federal funding on schools attaining certain academic standards), does not purport to establish a standard governing the level of special education services that must be provided to particular eligible students; the statute governing the provision of special education services is IDEA. Moreover, the No Child Left Behind Act does not create a private right of action for individuals. See Association of Community Organizations for Reform Now v. New York City Department of Education, 269 F. Supp. 2d 338 (S.D.N.Y. 2003).

## II.    PARENTS' CLAIM FOR "COMPENSATORY DAMAGES" SHOULD BE REJECTED.

In their second claim, Parents alleged that Danielle had not received a FAPE during the period March 2003 to March 2004, citing the Hearing Officer's determination that Sharon's IEP for that period did not provide Danielle with a FAPE. Complaint, ¶ 23, 28. Parents further alleged that Danielle could have entered Landmark in January 2004, but that the Hearing Officer did not render her decision until March 2004. Complaint, ¶ 27.[17] Parents sought an order directing Sharon to pay "compensatory damages to the plaintiff in an amount equal to the cost of placement at Landmark Schools for the 2003-2004 school year." Complaint ¶¶ 23-28 and Prayer for Relief ¶ 5.

The Court should reject Parents' claim for "compensatory damages," as Parents, although couching their request for monetary relief as a request for "compensatory damages" (in an amount equal to the cost of placement at Landmark during the 2003-2004 school year), are not

---

[17] In fact, the Hearing Officer issued the first decision on January 12, 2004, and she issued the second decision on April 20, 2004.

thereby seeking reimbursement for actual expenses incurred, insofar as Danielle attended Sharon – not Landmark – during that period of time; nor are Parents seeking compensatory educational services.  It is well established that, under IDEA, compensatory educational services are available to remedy past deprivations under the Act, such as, for example, where the services provided by a school under an IEP are later determined to be inadequate.  Pihl v. Massachusetts Department of Education, 9 F.3d at 187-189.  Thus, "[i]f an IEP from a past year is found to be deficient, the Act may require services at a future time to compensate for what was lost."  Pihl v. Massachusetts Dept. of Ed., 9 F.3d at 189.  In addition, a student (or his parents) may seek reimbursement for costs actually incurred for special education services that should have been (but were not) provided.  See Burlington School Committee v. Massachusetts Dept. of Ed., 471 U.S. 359 (1985) (court's authority to grant relief under IDEA included power to order school to reimburse parents for their expenditures on private school education for child if court ultimately determined that such placement, rather than proposed IEP, is proper under the Act).

Such compensatory services (or reimbursement for actual costs incurred) are distinguishable from monetary "damages."  Frazier v. Fairhaven School Committee, 276 F.3d 52, 64 n.4 (1st Cir. 2002) (stating that courts typically treat reimbursement claims differently from claims for damages, and citing Hall v. Knott County Bd. of Educ., 941 F.2d 402, 407 (6th Cir. 1991), cert. denied, 502 U.S. 1077 (1992), where the Sixth Circuit, citing the Supreme Court's decision in Burlington, 471 U.S. 359, 371, stated that claims for reimbursement of out of pocket expenses for special education services should not be characterized as "damages").  In contrast, monetary "damages" are not available under IDEA except in "exceptional circumstances" such as where a school exhibits a "flagrant and egregious disregard of" the Act's

procedural requirements.  Gerasimou v. Ambach, 636 F.Supp. 1504, 1512 (E.D.N.Y. 1986).

Here, Parents are neither seeking reimbursement for actual expenses incurred in placing Danielle at Landmark, nor do they seek compensatory services.[18]  In addition, Parents do not set forth any facts suggesting the existence of "exceptional circumstances" that would warrant an award of monetary damages against Sharon.  The Court accordingly should reject Parents' claim for "compensatory damages."

### CONCLUSION

For the reasons set forth above, the Department respectfully requests that the Court deny Parents' motion for summary judgment and enter judgment for the Department on Parents' claim for judicial review and the claim for compensatory damages.

Respectfully submitted,

THOMAS F. REILLY
ATTORNEY GENERAL

 /s/ Amy Spector
Amy Spector, BBO # 557611
Assistant Attorney General
Government Bureau
One Ashburton Place
Boston, Massachusetts  02108
(617) 727-2200, ext. 2076

Dated:  February 9, 2006

### CERTIFICATE OF SERVICE

I hereby certify that the above document will be served on February 9, 2006, by electronic notice for registered counsel and a copy will be served by first-class mail, postage pre-paid, for non-registered counsel.

/s/ Amy Spector

---

[18]  Although Parents theoretically could have sought compensatory services for the period covered by the March 2003-March 2004 IEP, which was found not to provide a FAPE, they did not seek such relief at BSEA for that period.

Amy Spector
Assistant Attorney General